UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ARCH INSURANCE COMPANY, | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| CENTERPLAN CONSTRUCTION COMPANY, LLC, | : |
| ROBERT LANDINO, | : |
| KELLY LANDINO, | : |
| CENTERPLAN DEVELOPMENT CO., LLC, | : |
| RAL INVESTMENTS, LLC, | : |
| WALNUT HILL CHASE, LLC, | : |
| TINKER HOUSE, LLC, | : |
| GH DEVELOPMENT, INC., | : |
| CENTER EARTH, LLC, | : |
| and | : |
| CENTERPLAN COMMUNITIES, LLC, | : |
| Defendants. | : |

CIVIL ACTION

NO.: 3:16-CV-01891-VLB

January 19, 2018

**MEMORANDUM OF DEFENDANTS IN OPPOSITION TO PLAINTIFF ARCH INSURANCE COMPANY'S MOTION FOR A PRELIMINARY INJUNCTION AND FOR SUMMARY JUDGMENT AS TO COUNTS III THROUGH VI OF THE COMPLAINT AND TO ENFORCE ITS RIGHTS TO POSTING OF COLLATERAL SECURITY AND THE DISCLOSURE OF FINANCIAL INFORMATION**

THE DEFENDANTS
/s/    Jane I. Milas
Jane I. Milas (ct01271)
Raymond A. Garcia (ct05655)
Garcia & Milas, P.C.
44 Trumbull Street
New Haven, CT  06510
PH: (203) 773-3824
Fax: (203) 782-2312
jmilas@garciamilas.com

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

I.   INTRODUCTION......................................................................... 1

II.  DEFENDANTS' STATEMENT OF FACTS................................................ 2

III. ARGUMENT.......................................................................... 10

    A.  STANDARD OF REVIEW................................................... 10

        1.  Summary Judgment Standard...................................... 10

        2.  Injunctive Relief Standard......................................... 12

    B.  THE INDEMNITY AGREEMENTS MUST BE CONTRUED IN
        CONJUNCTION WITH THE TERMS OF THE BONDS TO WHICH
        THEY RELATE.......................................................... 13

    C.  THE PERFORMANCE BOND DOES NOT COVER ANY DAMAGES
        OF THE TYPE COVERED BY PROFESSIONAL LIABILITY
        INSURANCE REQUIRED UNDER THE CONTRACT....................... 19

    D.  THE ACTIONS OF ARCH CONSTITUTE BAD FAITH DEPRIVING IT
        OF THE RELIEF IT SEEKS WITH RESPECT TO COUNTS III
        THROUGH VI OF THE COMPLAINT...................................... 20

        1.  The Indemnity Agreements impose on Arch a duty of
            good faith and fair dealing, which Arch breached.............. 20

        2.  Arch acted in bad faith when it paid subcontractors on
            payment bond claims without regard to Centerplan's
            rights and defenses.............................................. 23

        3.  Arch's refusal to take any action until the City terminated
            Centerplan and Arch's entering into the Takeover
            Agreement deprived Centerplan and DoNo of critical
            contractual rights.............................................. 26

    E.  ARCH'S OBLIGATION UNDER THE PERFORMANCE BOND DID
        NOT MATURE AS THE CITY DID NOT MEET THE CONDITIONS
        PRECEDENT. ARCH HAD NO OBLIGATION TO PERFORM
        UNDER THE BOND.................................................... 29

F.  ARCH IS NOT ENTITLED TO SPECIFIC PERFORMANCE OR
    INJUNCTIVE RELIEF ON COUNT III (COLLATERAL SECURITY)
    BECAUSE ARCH HAS FAILED TO PROVE AN INADEQUATE
    REMEDY AT LAW AND IRREPARABLE HARM...............................30

G.  ARCH IS NOT ENTITLED TO SPECIFIC PERFORMANCE OR
    INJUNCTIVE RELIEF ON COUNT III BECAUSE THERE ARE
    GENUINE ISSUES OF MATERIAL FACT CONCERNING ARCH'S
    RIGHTS UNDER THE COLLATERAL SECURITY CLAUSE.................33

H.  A BALANCE OF THE EQUITIES FAVORS A DENIAL OF ARCH'S
    MOTION FOR SUMMARY JUDGMENT AND INJUNCTIVE RELIEF
    ON COUNT III (COLLATERAL SECURITY)....................................35

I.  ARCH IS NOT ENTITLED TO SUMMARY JUDGMENT OR
    INJUNCTIVE RELIEF ON COUNT IV (COMMON LAW EXONERATION)
    OR COUNT V (COMMON LAW *QUIA TIMET*)...................................36

IV. CONCLUSION...................................................................................38

## TABLE OF AUTHORITIES

**CASES**                                                      **PAGE(S)**

*Abish v. Nw. Nat. Ins. Co. of Milwaukee, Wis.,*
    924 F.2d 448, 453 (2d Cir. 1991)………………………………………... 38

*Auto-Owners Insurance Company v. Southeast Floating Docks, Inc.,*
    571 F.3d 1143 (11th Cir. 2009)………………………………………..… 29

*Baker's Aid, a Div. of M. Raubvogel Co. v. Hussmann Foodservice Co.,*
    830 F.2d 13, 15 (2d Cir. 1987)……………………………….......... 12, 13, 31, 32, 37

*Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania,*
    934 F.2d 30, 34 (2d Cir. 1991)……………………………………..…… 13, 32, 36, 37, 38

*Cacchillo v. Insmed, Inc.,*
    638 F.3d 401, 406 (2d Cir.2011)…………………………………….……… 12, 13

*Capstone Bldg. Corp. v. American Motorists Ins. Co.,*
    308 Conn. 760, 794 (2013)………………………………………..…… 20, 22, 29

*Enterprise Capital, Inc. v. The San-Gra Corp.,*
    284 F.Supp.2d 166 (D. Mass. 2003)……………………………..…….…. 29

*Flour City Bagels, LLC,* 557 B.R. 53, 74 (Bankr. W.D.N.Y. 2016),
    No. 16-CV-6667-FPG, 2017 WL 1433339 (W.D.N.Y. Apr. 24, 2017)…………..… 31

*Gager v. Gager & Peterson, LLP,*
    76 Conn. App. 552, 560, 820 A.2d 1063, 1069 (2003)……………………………. 31

*General Insurance Company of America v. K. Capolino Construction Corp.,*
    908 F.Supp. 197 (S.D.N.Y.1995)………………………………………..… 14, 20

*Ins. Co. of the State of Pennsylvania v. Lakeshore Toltest JV, LLC,*
    No. 15 CIV. 1436 (ALC), 2015 WL 8488579, at *2
    (S.D.N.Y. Nov. 30, 2015)………………………………………………. 32

*Jayaraj v. Scappini,*
    66 F.3d 36, 39 (2d Cir.1995)………………………………………….…… 13

*Klaxon Co. v. Stentor Electric Mfg. Co.*,
   313 U.S. 487, 496 (1941)……………………………………………..…….. 11

*Leninger v. Gibbs & Hill, Inc.*,
   730 F.2d 903, 905 (2d Cir. 1984)…………………………………………… 12

*Lindade Construction v. Continental Casualty Co.*
   No.X10UWYCV5008768S, 2009 WL 765501, at *2
   (Conn. Super. Ct. Feb. 25, 2009)…………………………………………….. 23, 24, 25

*Lumbermens Mut. Cas. Co. v. Dillon Co. Inc.* No. 3:98-CV-2013(EBB),
   2000 WL 1336498, at *2–3 (D. Conn. August 31, 2000)
   aff'd. 9F. App'x 81 92d Cir. 2001)………………………………………….. 11

*Lumbermans Mut. Cas. Co. v. Dinow*, No. 06-CV-3881 TCP,
   2012 WL 4498827 (E.D.N.Y. Sept. 28, 2012)……………………..……….. 14, 30, 35

*Marvel Characters, Inc. v. Simon*,
   310 F.3d 280, 286 (2d Cir. 2002)…………………………………………… 10

*Nw. Nat. Ins. Co. of Milwaukee, Wisconsin v. Alberts*,
   937 F.2d 77, 80 (2d Cir. 1991)……………………………………………… 13, 31, 37

*PSE Consulting, Inc. v. Frank Mercede and Sons, Inc.*,
   267 Conn. 279 (2004)…………………………………………..….... 11, 20, 21, 22, 29, 34

*Reichhold Chems., Inc. v. Hartford Accident and Indem. Co.*,
   252 Conn. 774, 781 n. 4, (2000)…………………………………………… 11

*Roel Partnership v. Amwest Sur. Ins. Co.*,
   258 A.D. 2d 780 (1999)……………………………………………………… 30

*R.T. Vanderbilt Co., Inc. v. Continental Cas. Co.*,
   23 Conn. 448 (2005)……………………………………………..…… 12, 30

*Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*,
   7 F.3d 1091, 1094 (2d Cir. 1993)………………………………………...….. 11

*SME Racks, Inc. v. Sistemas Mecanicos Para, Electronica, S.A.*,
   243 F. App'x 502, 504 (11th Cir. 2007)……………………………..…….. 32

*Stonington Water Street Assoc., LLC v. Hodess Bldg. Co., Inc.*,
   792 F.Supp.2d 253, 262 (2011),
   aff'd, 472 Fed.Appx. 71 (2d Circ. 2012)……………………………..…….. 29

*Suntech of Conn., Inc. v. Lawrence Brunoli, Inc.,*
   143 Conn. App. 581 (2013)................................................................. 25


*Tough Traveler, Ltd. v. Outbound Products,*
   60 F.3d 964, 968 (2d Cir.1995)........................................................... 33

*U.S. Fid. & Guar. Co. v. Neri Const. LLC,*
   109 F. App'x 457, 459 (2d Cir. 2004)..........................................…..…. 36

*Vivenzio v. City of Syracuse,*
   611 F.3d 98, 106 (2d Cir. 2010)..........................................…..….... 10

*Westchester Fire Ins. Co. v. DeNovo Constructors, Inc.,*
   177 F. Supp. 3d 810, 812 (S.D.N.Y. 2016)........................…...… 12, 13, 32

## OTHER AUTHORITIES

Restatement (Second) of Conflicts of Law § 188 (1971)...............................…..… 11

Restatement (Second) of Conflicts of Law § 193 (1971)...............................…..… 11

## I.   INTRODUCTION

The named Defendants (referred to collectively as the "defendants"), pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 7, hereby respectfully file the present Memorandum in Opposition to Plaintiff Arch Insurance Company's ("Arch") Motion for a Preliminary Injunction and for Summary Judgment as to Counts III through VI of the Complaint and to Enforce its Rights to Posting of Collateral Security and Disclosure of Financial Information, dated December 14, 2017 (referred to herein as Arch's Motion for Summary Judgment) (Doc. No. 81).

By Motion dated December 14, 2017, Arch seeks the issuance of a preliminary injunction and summary judgment as to Counts III through VI of the complaint which, if such relief were awarded, would require the defendants to post collateral security with Arch in the amount of $38,313,100.82 and to fully disclose to Arch all their financial records.   Arch's Motion ignores the fact that Robert Landino and Kelly Landino have each provided Arch with personal financial statements on forms provided by Arch to which Arch has offered no comment.   As set forth in this Memorandum in Opposition, the Local Rule 56(a)(2) Statement of Facts in Opposition to Summary Judgment, and the affidavit submitted herewith[1], there exists numerous issues of material fact which preclude the entry of summary judgment and the issuance of a preliminary

---

[1]Defendants have filed the affidavit of Robert Landino as Exhibit 2 to this Memorandum in Opposition.  References to the Affidavit are indicated as "Landino Aff ¶ ___."

1

injunction in this matter.  Arch's Motion for Summary Judgment should be denied in its entirety.

## II.   DEFENDANTS' STATEMENT OF FACTS

The issues in the present matter arise because of decisions Arch made without reasonable investigation and in its own self-interest.  The facts in support of and opposition to the pending motion show this is a complex matter, which should not be resolved on summary judgment.  There are many disputed issues of material fact and Arch is not entitled to judgment as a matter of law.

This matter arises largely out of the design development and construction of Dunkin Donuts Baseball Park in Hartford, Connecticut (the "Project").

In July of 2014, the City of Hartford (the "City") issued a Request for Proposals ("RFP") soliciting bids from developers to develop a minor league Baseball Park and 15 acres of surrounding real estate in the north end of Hartford.  Landino Aff. ¶ 10.  The City had lured Connecticut Double Play, LLC, which had been operating the New Britain Rock Cats, to come to Hartford (*id.*) with the promise of a state of the art baseball park.  The team is now known as the Hartford Yard Goats (the "Ball Club").  Landino Aff. ¶ 10.  After detailed analysis and interviews, the City selected a development team of Centerplan Construction Company LLC ("Centerplan") and others lead by Robert A. Landino, P.E., the CEO of Centerplan.  Landino Aff. ¶¶ 1, 9-10.

In the original response to the RFP, DoNo Hartford LLC ("DoNo") was to own and lease the Ballpark to the City.  Under this scenario, DoNo was responsible for all design, budgeting and scheduling, and committed to a budget

2

of $53,550,000 having complete control over this process.  Landino Aff. ¶ 12.
DoNo was formed to own and lease the Ballpark to the City.  Landino Aff. ¶ 10.

During the planning process, the budgeted cost for the Project, including construction of the Ballpark, was $56,000,000.  Landino Aff. ¶ 26.  The City hired Pendulum Studios, LLC as the architects under an agreement to design a facility that would cost less than $54,000,000 to construct.  Landino Aff. ¶ 18, Exhibit A. The Project cost ballooned past the planned budget before construction even commenced because of commitments the City made to the community and the Ball Club.  Landino Aff. ¶¶ 21, 27.  The City, however, refused to increase the budget to account for the additional requirements.  Landino Aff. ¶¶ 27, 28. Centerplan advised the City that the only way the additions to the budget could be accommodated was to change the design and thereby lower the construction cost of the Ballpark.  Landino Aff. ¶ 29.  The City never relinquished control of the design, even though the City knew the budget was limited and Centerplan was to control the design.  Landino Aff. ¶¶ 30-32.

On or about February 4, 2015, after an extended negotiation, the City, as "Owner," and DoNo, as "Developer" entered into a Development Services Agreement ("DSA") for the Project as outlined in that certain "Ballpark Development Agreement" dated January 26, 2015 entered into by and among the City, the HSA and the Ball Club.  Landino Aff. ¶ 14; Doc. No. 81-9 Arch Memorandum Ex. G.[2]

---

[2] References to "Arch Memorandum Ex. ___", are to exhibits to Arch's Memorandum in Support of its Motion for Summary Judgment.

On or about February 4, 2015, DoNo, as "Owner," and Centerplan, as "Design Builder" entered into a Design Build Contract ("DBC") for the Project. Landino Aff. ¶ 15.  The DBC was intended to give Centerplan control over the design of the Ballpark, which it was obligated to construct based on a Guaranteed Maximum Price ("GMP") of $53,550,000.  [*Id.*].  Centerplan expressly demanded control of the Ballpark design so that it could meet the budget. Landino Aff. ¶ 17.  To that end, the Architect hired by and under contract with the City was obligated to design the Ballpark so that the work could be completed for under $54,000,000.  Landino Aff. ¶ 18.

Centerplan was obligated to provide a payment and performance bond for the Project; it did so with Arch as surety and the City and DoNo as obligees. Landino Aff. ¶ 23; Doc. No. 81-12 Arch Memorandum Ex. J.

On or about February 4, 2015, the City, DoNo, and Centerplan entered into the "Direct Agreement."   (Doc. No. 81-11).  The purpose of the Direct Agreement was to provide the City with the ability to step into the position of DoNo, but only upon an event that would cause or provide Centerplan with cause to terminate the DBC or upon termination of the DSA by the City for a Developer Default thereunder. Landino Aff. ¶ 25; Doc. No. 81-11 at ¶ 8(a) Arch Memorandum Ex. I.

The DSA specifically stated that the City acknowledged that in order for the Developer and Design Builder to maintain budget, it was "imperative" that the Developer and Design Builder control the design and any further changes to the Project.  Doc. No. 81-9 Arch Memorandum, Ex. I ¶ 6. The DBC required that upon execution in February, 2015, the City was to assign control of all design

4

professionals that were previously under the direction of the City to Centerplan. Landino Aff. ¶ 31; Doc. No. 81-10 Arch Memorandum Ex. H.  The City never relinquished control of the design.  Landino Aff. ¶ 32.

The City, with the Ball Club, worked on design documents through the spring of 2015.  Landino Aff. ¶ 33.  The City and the Ball Club substantially changed and increased the amount of work required in virtually every area of the Project.  [*Id.*].    The City represented that the drawings were completed in March of 2015.  Landino Aff. ¶ 34.  The projected cost based on the design the City and Ball Club prepared was approximately $65,000,000.  [*Id.*].

The Ball Club with the City continued to direct the design process. Landino Aff. ¶ 37.  On June 10, 2015, through an Assignment of Contract for Architectural Services dated in May, 2015, the City, DoNo and Centerplan modified the DBC so that Centerplan only had responsibility for contract administration services during construction, which would be completed by the Architect as a consultant to Centerplan.  Landino Aff., Ex. A thereto; Landino Aff. ¶ 38.  At no time did Centerplan ever have control of the design in this process, making it impossible for Centerplan to control the budget.  Landino Aff. ¶ 37-41.

As Centerplan received bids from the various trade subcontractors, it became apparent that the actual cost of the Project, based on the design the City and the Ball Park developed with the Architect, would be in excess of $67,000,000.  Landino Aff. ¶ 39.  Centerplan, by July 2015, made over 170 value engineering recommendations to reduce the scope and cost of the work to bring it in line with the budget.  Landino Aff. ¶ 40.  The majority of the

recommendations were rejected, leaving the Project approximately $11,000,000 over budget in the summer of 2015.  Landino Aff. ¶ 44.

In late 2015, Centerplan advised the City that it could not complete the work for the amount of money the City had raised through the bond offering, left in the various accounts set aside to pay for the work, that adjustments had to be made and that completion for the beginning of the baseball season in April was in question.  Landino Aff. ¶ 45.  In December, 2015, Centerplan formally submitted a change order request ("COR") to increase the guaranteed maximum price of the Work by $10,300,000.  Landino Aff. ¶ 47.

On January 19, 2016, the City, Josh Solomon (the owner of the baseball team), DoNo, and Centerplan reached an agreement, the basic terms of which were set forth in a document described as a "Term Sheet." Landino Aff. ¶ 48.  The City was to prepare modifications to the various agreements incorporating the items of the Term Sheet.  [*Id.*].

In the Term Sheet (hereinafter the "Term Sheet" or "January Agreement") the City, DoNo and Centerplan agreed to extend the date for Substantial Completion of the Project from March 11, 2016 to May 17, 2016 and increase the Guaranteed Maximum Price ("GMP") by over $10,300,000 to accommodate the changes mandated by the City and the Ball Club.  Landino Aff., Ex. B attached thereto, (Term Sheet) at ¶ 11; Landino Aff. ¶ 49.

As part of the January Agreement, Centerplan and DoNo agreed to contribute approximately $2,800,000 million to the settlement.  Landino Aff. ¶ 50.  The City agreed to provide the remaining $7,500,000.  [*Id.*].   However, the City did

not raise the full $7,500,000 in the ensuing bond issue; it only raised $5,500,000. Landino Aff. ¶ 51.  The City relied on the Ball Club's agreement to pay up to $2,000,000.  Landino Aff. ¶¶ 50, 51, 52; Landino Aff., Ex. B at ¶¶ 6, 11.  The January Agreement was not conditioned on or in any way tied to the agreement between the City and the Ball Club.  Landino Aff. ¶ 53.  The City never appropriated enough money to meet its obligations.  Landino Aff. ¶ 54.

The January Agreement referenced the Design Build Documents, which the City had represented in March 2015 were complete.  Landino Aff. ¶ 34; Landino Aff. Ex. B at ¶ 1.  Following the execution of the January Agreement, the City almost immediately issued over 100 drawings which set forth hundreds of changes to the Project in a document named SI 15, subsequently renamed SI 14R ("SI" standing for "Supplemental Instructions") as a veiled attempt by the City to link these changes to drawings referenced in the January Agreement.  Landino Aff. ¶ 59.  At no time did Centerplan have the ability to reject these changes, or quantify their impact on cost and schedule.  Landino Aff. ¶¶ 60, 69.  In April and May of 2016, the City issued five (5) Construction Change Directives ("CCDs").  The City issued the CCDs with full knowledge that the CCDs would make it impossible for Centerplan to finish the work covered by the CCD's by May 17, 2016.  Landino Aff. ¶ 61.

The CCDs and change orders added substantial work to the Project which would take time to construct.  Landino Aff. ¶ 66.  The additional work made it impossible for the construction to be completed on time for the first home game

7

in late May, 2016. [*Id*.].   The CCDs also added millions of dollars of cost, for which the City was responsible.  Landino Aff. ¶ 66.

In addition, the City issued ten (10) Change Orders, of which only four (4) were signed before June 6, 2016.  Landino Aff. ¶ 65.  Ultimately, the City did not fund the Change Orders and did not follow the terms of the DSA.  Landino Aff. ¶ 65.

The renamed SI 14R, was issued by the City as CCD 1.  Landino Aff. ¶ 63. The City issued 4 more CCDs to Centerplan and DoNo in April and May of 2016. [*Id*.].  A sixth CCD was circulated in draft form on or about June 6, 2016. Landino Aff. ¶ 64.

As of June 5, 2016, Centerplan had an outstanding requisition in the amount of $5,989,818.96 and also had claims for additional compensation to cover the Change Order work and CCD work, which for the most part was underway or committed and not reflected on the requisition.  Landino Aff. ¶ 86; Landino Aff. Ex. D.

When Centerplan insisted the City address and resolve its payment obligations, the City first threatened to call and then made demand on Centerplan's Performance Bond.   Landino Aff. ¶ 88.  DoNo advised the City that without the assurance of the funds and clear direction about the potential additional work, the Ball Park Project could not be completed Landino Aff. ¶ 89. The City suggested that it was bankrupt and could not meet its then current obligations to Centerplan.  [*Id*.].

8

As of June 6, 2016, the City had advised Centerplan and Arch that it did not have enough funds on hand to pay for the changes it ordered and specifically did not have the money to pay the May requisition.  Landino Aff. ¶ 90.

Centerplan and DoNo repeatedly advised the City throughout April and May 2016 that as a result of the Change Orders and CCDs issued by the City in April and May of 2016 the Substantial Completion Deadline of May 17, 2016 could not be met.  Landino Aff. ¶ 75.

In late May, 2016 representatives of DoNo, Centerplan, and Arch met with the City regarding the Project. The City called for Arch to act.  Arch's position was that it would not perform under the bonds as long as Centerplan was the contractor of record on the Project.  Landino Aff. ¶ 83.

On or about June 6, 2016, despite being in material default, the City and the HSA ignored the provisions of the DBC which provided a cure period after an alleged default and wrongfully terminated the DSA and the DBC.  Landino Aff. ¶¶ 58-76, 86-91, 95-96.  The City also formally called the bond by sending Arch notice of the termination.   Landino Aff. ¶¶ 90, 91; See Doc. No. 81-10 at 91 of 119 Arch Memorandum Ex. H, Terms and Conditions § A.14.2.2.

On or about October 17, 2016 Arch entered into a Takeover Agreement with the City.  Beach Aff. ¶ 82.[3];Doc. No. 81-17 Arch Memorandum Ex. O.

Additional facts will be referred to in the Argument section of this Brief as necessary.

---

[3] References to Beach Aff. are to the affidavit of Joel Beach, Esq. attached to Arch's Brief as Ex. B.

III.   **ARGUMENT**

    A.    **STANDARD OF REVIEW**

    In its Motion for Summary Judgment, Arch fails to clearly identify the applicable standard of review with respect to the claims it is making, choosing instead to jump between its request for a preliminary injunction and its request for summary judgment.  The applicable standards are clearly set forth below.

    1.   **Summary Judgment Standard**

    Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party has the burden of proving that there are no genuine issues of material fact.  *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.*  (Internal citation omitted).   If there is any evidence in the record that could reasonably support a verdict for the nonmoving party, summary judgment must be denied.  *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citation omitted).

    In making the determination with respect to whether the defendants have offered sufficient evidence to raise disputed issues of fact, this Court, exercising diversity jurisdiction, must follow the precedent of the Connecticut Supreme Court.  When a federal court sits in diversity, it will determine which state's substantive law governs the dispute under the forum state's conflict of law rules.

*See, e.g., Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941).

Connecticut has adopted Restatement (Second) of Conflicts of Law

("Restatement") § 188 for issues of contract interpretation.

Section 188 states that the law of the state with the "most significant

relationship" to the transaction and parties ought to be applied absent a choice of

law provision in the insurance contract. *Reichhold Chems., Inc. v. Hartford*

*Accident and Indem. Co.,* 252 Conn. 774, 781 n. 4, (2000); Restatement (Second)

of Conflicts of Law § 188 (1971). Connecticut law recognizes a "rebuttable

presumption in favor of the state where the insured risk is located." *Reichhold*

*Chems., Inc.*, 252 Conn. at 782; Restatement (Second) of Conflicts of Law § 193

(1971). This Court has previously interpreted Restatement § 193 and the test it

sets forth to mean that, "in the absence of extraordinary circumstances, the law

of the state where the principal insured risk is located will apply." *Lumbermens*

*Mut. Cas. Co. v. Dillon Co. Inc.* No. 3:98-CV-2013(EBB), 2000 WL 1336498, at *2–3

(D. Conn. August 31, 2000) *aff'd.* 9 F. App'x 81 (2d Cir. 2001) (copy attached as Ex.

5).

The cases discussed in the following sections, including but not limited to

the case of *PSE Consulting, Inc. v. Frank Mercede and Sons, Inc.,* 267 Conn. 279

(2004), compel the conclusion that the defendants have offered the Court enough

evidence to raise disputed issues of fact defeating Arch's Motion for Summary

Judgment.

"In a contract dispute, summary judgment may be granted only where the

agreement's language is unambiguous and conveys a definite meaning." *Sayers*

*v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993) (Internal citation omitted). "If the language is susceptible to different reasonable interpretations, and 'where there is relevant extrinsic evidence of the parties' actual intent,' then the contract's meaning becomes an issue of fact precluding summary judgment." *Id.* Contractual ambiguities should be construed most strongly against the draftsman. *Leninger v. Gibbs & Hill, Inc.*, 730 F.2d 903, 905 (2d Cir. 1984). Any ambiguity in the bonds or indemnity agreements must be resolved in favor of the defendants. *See, R.T. Vanderbilt, Co. v. Cont'l Cas. Co.*, 273 Conn. 448 (2005).

### 2. Injunctive Relief Standard

A court may issue a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure. To obtain a preliminary injunction, the moving party must establish (1) irreparable harm and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor. *Baker's Aid, a Div. of M. Raubvogel Co. v. Hussmann Foodservice Co.*, 830 F.2d 13, 15 (2d Cir. 1987) (citations omitted).

In a case such as this, where the moving party seeks a mandatory preliminary injunction that alters the status quo by commanding some positive act, as opposed to a prohibitory injunction seeking only to maintain the status quo, the burden is even higher. *Westchester Fire Ins. Co. v. DeNovo Constructors, Inc.*, 177 F. Supp. 3d 810, 812 (S.D.N.Y. 2016), *citing, Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011). In such cases, the Court should

issue a preliminary injunction "only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Cacchillo,* 638 F.3d at 406.

A contract cannot define irreparable injury. *Baker's Aid,* 830 F.2d at 16; *Westchester Fire Ins. Co.,* 177 F. Supp. 3d at 813.   Rather, the moving party must prove irreparable harm to obtain the extraordinary remedy of injunctive relief. *Borey v. Nat'l Union Fire Ins. Of Pittsburgh, Pennsylvania,* 934 F.2d 30, 34 (2d Cir. 1991).   "Irreparable harm exists only where there is a threatened imminent loss that will be very difficult to quantify at trial." *Westchester Fire Ins. Co.* 177 F. Supp. 3d at 812 (citations omitted; internal quotation marks omitted).   Where monetary damages may provide adequate compensation, a preliminary injunction should not issue. *Westchester Fire Ins. Co.* 177 F.Supp. 3d at 812, 2d. 77, 82 (2d Cir. 1991), *citing*, *Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir.1995).   Likewise, a surety's permanent loss of the right to seek *quia timet* and exoneration does not establish irreparable harm.   *Nw. Nat. Ins. Co. of Milwaukee, Wisconsin v. Alberts*, 937 F2d 77, 80 (2d Cir. 1991).

### B.   THE INDEMNITY AGREEMENTS MUST BE CONSTRUED IN CONJUNCTION WITH THE TERMS OF THE BONDS TO WHICH THEY RELATE.

Arch's entire argument that it is entitled to summary judgment with respect to Counts III through VI of the Complaint and with respect to the posting of collateral security, and that it is entitled to disclosure of books and records is predicated on the false premise that the July 2010, October 2010, and January 2016 Indemnity Agreements (referred to collectively as the "Indemnity

Agreements") are to be reviewed in isolation from the other contracts relating to the Project and the status of the Project at the time the bond was called.   Courts have rejected such a simplistic approach.

In *General Insurance Company of America v. K. Capolino Construction Corp.,* 908 F.Supp. 197 (S.D.N.Y. 1995), the surety, which had issued a performance bond to the defendant K. Capolino in connection with construction contracts entered into between K. Capolino and the White Plains Housing Authority, argued that the court erred in looking beyond the express terms of the indemnity agreement between General Insurance and K. Capolino when it denied General Insurance's motion for summary judgment seeking its costs and expenses under the indemnity agreement.  The court on reargument set out its analysis and holdings.  908 F.Supp. 197 (S.D.N.Y.1995). Specifically, the court held that in the case before it allegations had been made by Capolino that the Housing Authority was in default.  As such, the court refused to consider the indemnity agreements in isolation without analyzing the terms of the performance bonds, stating that "our decision merely holds the surety to the terms of both of the agreements it negotiated." *Id.* at 200.

Other courts have in like manner refused to enter summary judgment in favor of a surety under indemnity agreements when disputed issues of fact exist as to whether the Owner satisfied the conditions of the Dual Obligee rider and was entitled to make a claim against the performance bond in the first instance. *See, e.g., Lumbermens Mut. Cas. Com v. Dinow,* No. 06-CV-3881TCP, 2012 WL 4498827 at *6 *(copy attached as Ex. 5).*

14

In the present matter, the Performance Bond and Payment Bond Arch issued for the Project specifically incorporate the DBC into the terms of the Bond. Landino Aff. ¶ 24; Doc. No. 81-12 at 2 of 9, 4 of 9, Arch Memorandum Ex. J. The Performance Bond also states that "[i]t is understood that this bond shall not cover any damages of the type specified to be covered by the professional liability insurance required under the contract." Landino Aff. ¶ 77; Doc. No. 81-12 at 2 of 9 last sentence of second to last paragraph, Arch Memorandum Ex. J.

The Multiple Obligee Rider attached to and forming a part of both the Performance Bond and Payment Bond lists DoNo, the City and the HSA as Obligees. It provides that:

> there shall be no liability on the part of the Principal or Surety under this Bond to the Obligees, or any of them, unless the Obligees, or any of them, shall make payments to the Principal, or to the Surety in case it arranges for completion of the Contract upon default of the Principal, strictly in accordance with the terms of said Contract as to payment, and shall perform all the other obligations required to be performed under said Contract at the time and in the manner therein set forth.

Landino Aff. ¶ 78; Doc. No. 81-12 at 8 of 9 first full paragraph, Arch Memorandum Ex. J.

The DBC, which was incorporated into the Performance Bond and Payment Bond, is the AIA A141-2004 Standard Form of Agreement Between Owner and Design-Builder. Landino Aff. ¶ 79; Doc. No. 81-10 at 2 of 119, Arch Memorandum, Ex. H. The DBC defines DoNo as the "Owner" and Centerplan as the "Design-Builder." [*Id.*]. However, the DBC specifically provides at § 8.1.10 that:

> Design Builder recognizes that Owner has entered into a Development Services Agreement with the City of Hartford, Connecticut. To the extent that said Development Services Agreement contains terms, conditions, obligations and requirements pertaining to the design and construction of

> the Project, Design Builder shall comply with such terms, conditions, obligations, and requirements.  To the extent there is a conflict between the provisions contained in the Development Services Agreement and the provisions of this Design Build Agreement, the Development Services Agreement shall control.

(Doc. No. 81-10 at 10 of 119).

The DBC also provides that it is subject to the City's rights with respect to direction or approvals of, *inter alia,* change orders and budgets. However, any change requested by the Owner or the City shall not be considered "scope creep" and

> under no circumstances shall Design-Builder be obligated to perform any work resulting from any changed conditions, change directed by the Owner change directed by the City of Hartford, unless a GMP change order is fully executed.

(DBC, § 7.7, Doc. No. 81-10 at 8-9 of 119, Arch Memorandum Ex. H).

The interplay of these various contracts incorporated into the Performance Bond and Payment Bond created a complex web of conflicting and confusing rights and responsibilities.  There is absolutely no evidence in the record Arch offers in support of its Motion for Summary Judgment that Arch did an analysis of the rights and responsibilities of the parties under these various agreements at any time before it entered into the Takeover Agreement with the City and before it made any of the payments it claims to have made pursuant to the bonds.

The factual evidence the defendants provide in support of the present Memorandum in Opposition shows that at the time the City declared Centerplan in default of the DBA, it was the City that was in default of its obligations. Pursuant to the January 2016 Agreement, DoNo and Centerplan agreed to certain concessions and the City committed to funding the work going forward and

16

funding the change order submitted on December 24, 2015 with reductions agreed to by DoNo and Centerplan.  Landino Aff. Ex. B at ¶¶ 5, 6, 11.  The City never obtained the funding it committed to in the January 2016 Agreement.  Landino Aff. ¶ 54.

At the time Centerplan was wrongfully terminated from the Project, Centerplan had an outstanding requisition due in the amount of $5,989,818.96, not including retainage and cost of work under CCDs and change orders which had not yet been incorporated into a requisition.  Landino Aff. ¶ 86; Landino Aff. Ex. D.  The City did not have the funds to pay for the outstanding requisitions, changes, and the remaining work.  Landino Aff. ¶¶ 89-90.

Under the clear and explicit terms of the Multiple Obligee Rider (Arch Memorandum Ex. J)  Arch was under no liability to the City to take any action under the bonds.  Landino Aff. ¶ 100; Doc. 81-12 at 8 of 9.  The payment obligations of the City, among the clearest obligations under the contracts, had not been met by the City.  At the very least there is a disputed issue of material fact as to whether the City had a right to make any demand under the Performance Bond or Payment Bond.  Arch should be held to the terms of all the contracts it entered into—the Indemnity Agreements and the Bonds.  And, under the Bonds, the City had no right to make a bond claim.  Arch's Motion for Summary Judgment should be denied.

The Requisitions submitted on the Project are based on submissions from subcontractors and suppliers.  *See*, Requisition 16 and Requisition 17, Landino Aff. Exs. C and D.  Information provided by the subcontractors and suppliers in

support of Requisition 17 demonstrates that as of May 30, 2016 the work on the Project was 99.3% complete.  Landino Aff. ¶ 76; Landino Aff. Ex. D.  Arch contends that it paid approximately $16,000,000 for completion costs.  Landino Aff. ¶ 106.  Based on the percentage of completion, the alleged approximately $16,000,000 could only have been spent to correct design defects or for added scope.  Landino Aff. ¶ 107.

Arch made payments to payment bond claimants without regard for its liability or the liability of the principal. Such payments were not incurred as a result of any Bond, nor as a result of any failure by the Principal, and thus were not for losses or expenses.  The Indemnity Agreements and the GIA define Loss as "Any and all liability, losses…that Surety may sustain or incur as a result of executing any Bond or as a result of the failure of Principal or Indemnitors to perform or comply with this Agreement….and…all other amounts payable to Surety according to the terms and conditions of this Agreement or any other agreement between Surety and Principal or Indemnitors."  (Doc. No. 81-5, p. 2; 81-6, p. 2; 81-7, p. 2).

Likewise, alleged payments made to the completion contractor and design professionals to complete the Hartford Stadium Project do not constitute a "Loss" as that term is defined in the Indemnity Agreements and the GIA.  The Indemnity Agreements and the GIA define Loss as "Any and all liability, losses…that Surety may sustain or incur as a result of executing any Bond or as a result of the failure of Principal or Indemnitors to perform or comply with this Agreement….and…all other amounts payable to Surety according to the terms

and conditions of this Agreement or any other agreement between Surety and Principal or Indemnitors." (Doc. No. 81-5, p. 2; 81-6, p. 2; 81-7, p. 2). Arch acted as a volunteer assuming the responsibility to complete the work on the Project and payments it made in that capacity were not incurred as a result of any Bond, nor as a result of any failure by the Principal.

### C. THE PERFORMANCE BOND DOES NOT COVER ANY DAMAGES OF THE TYPE COVERED BY PROFESSIONAL LIABILITY INSURANCE REQUIRED UNDER THE CONTRACT.

There are material facts in dispute as to whether, and which, if any, of the alleged losses Arch lists in its Exhibits are covered by the Bonds and therefore the obligation of the indemnitors. As discussed in the previous section, the Performance Bond explicitly provides that it shall not cover any damages of the type to be covered by the professional liability insurance required under the DBC. Landino Aff. ¶¶ 77, 102; Arch Memorandum Ex. J. The DBC required that Centerplan provide errors and omissions insurance. DBC, § A.11.2.1.9, Doc. No. 81-10 at 84 of 119. There is no evidence in the record provided by Arch that Arch considered, let alone analyzed or investigated, this clear carve-out of coverage under the Performance Bond. In fact, the statements Arch offers in terms of the alleged investigation Arch performed (Arch's Memorandum in Support of Motion for Summary Judgment, p. 7) make no mention of any investigation or analysis of insurance coverage.

Joel Beach, Esq. testified in this Court that there were some design problems on the Project. Landino Aff. ¶ 103. He testified that Arch did not use the Contract Documents to complete the Project because Arch believed the

19

Contract Documents were vague and Arch wanted certainty. [*Id*.]. Arch completed the Project without considering the cause of each item for which Arch incurred cost. [*Id*.]. Mr. Beach testified that some of the cost incurred by Arch may have been covered by an architect's professional liability policy. [*Id*.].

Just as the *Capolino* court held in denying a surety's motion for summary judgment, Arch should be held to both agreements it negotiated. *See Capolino* 908 F.Supp. at 200. At the very least there is a disputed issue of material fact as to what extent the losses listed by Arch are damages of the type specified to be covered by the professional liability policy and, hence, outside of any coverage under the bond and outside of any indemnity obligations.

D. **THE ACTIONS OF ARCH CONSTITUTE BAD FAITH DEPRIVING IT OF THE RELIEF IT SEEKS WITH RESPECT TO COUNTS III THROUGH VI OF THE COMPLAINT.**

1. **The Indemnity Agreements impose on Arch a duty of good faith and fair dealing, which Arch breached.**

"[I]t is axiomatic that the … duty of good faith and fair dealing is a covenant implied into a contract or contractual relationship …. In other words, every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement ….

*Capstone Bldg. Corp. v. American Motorists Ins. Co.,* 308 Conn. 760, 794 (2013) (citations omitted; internal quotation marks omitted). This duty of good faith and fair dealing has been applied in many contract scenarios, including contracts between sureties and principals.

*PSE Consulting, Inc. v. Frank Mercede and Sons, Inc.,* is a leading case, and was a case of first impression in Connecticut, on the duty of good faith and fair dealing in the context of the relationship between a surety and its principal

20

and indemnitors.  267 Conn. 279 (2004).  In *PSE,* the surety brought an action seeking indemnification for payments it made in settling a claim against a payment bond.  Mercede, the payment bond principal and an indemnitor, argued that the surety breached the implied covenant of good faith and fair dealing and, therefore, it was not entitled to indemnification.   *PSE Consulting, Inc.,* 267 Conn. at 282.   Mercede claimed that the surety acted in bad faith, as evidenced principally by its failure to conduct an investigation concerning the validity of PSE's claim and its self-interested settlement with PSE for the purpose of obtaining a release of PSE's bad faith claims and avoiding an investigation by the insurance commissioner.   *Id.*  at 296-97, 298.

The *PSE* Court conducted an extensive survey of case law in other jurisdictions on the issue of the interplay of the implied covenant of good faith and fair dealing and indemnity agreements.  *Id.* at 300-01.  The Court found that the implied covenant of good faith and fair dealing applied in the context of an indemnity agreement between surety and principal/indemnitors as well as other contractual relationships.  *Id. At* 302.

The inquiry did not end there, however.  The duty of the surety to act in good faith means that the surety must not act in "bad faith," meaning must not act with an "improper motive" or "dishonest purpose."  *Id.* at 304.  Under the facts of the *PSE* case, the Court found that the surety's failure to conduct a sufficient investigation of a claim upon a payment bond, when coupled with other evidence, may be considered evidence of the surety's bad faith.  *Id.* at 309.  In

21

addition, settling the claim on the bond solely to protect its own self-interest also was evidence of the surety's bad faith. *Id.* at 311, 318.

To the *PSE* court, the existence of a clause in the indemnity agreement at issue in *PSE* making evidence of a payment by the surety to a claimant upon the bond "prima facie evidence" of the propriety of that payment did not defeat the implied covenant of good faith and fair dealing and the obligation of the surety to not act in bad faith. *Id.* at 291. The result in *PSE* was that the surety was not entitled to a directed verdict on its claim for indemnification. The decision in favor of the principal/indemnitor based on the surety's bad faith behavior in conducting an inadequate investigation and settling the performance bond claim based on the surety's self-interest was affirmed.

The facts of *PSE*, and the indemnity agreements at issue, are on point with the facts and agreements in the present matter. The Arch indemnity agreements incorporate the covenant of good faith and fair dealing and the obligation to not act in bad faith. The January 2016 Indemnity Agreement (Arch's Brief, Doc. No. 81-7 Ex. E, ¶ 3) explicitly confirms this covenant and states that Arch's entitlement to charge for any disbursements is limited to those made in good faith. As discussed in the following section, the facts show, or at the very least there are disputed issues of material fact, that Arch indeed acted in bad faith and must be barred from the recovery it seeks.

In *Capstone Bldg. Corp. v. American Motorists Ins. Co.,* the Court analyzed several certified questions of law arising in connection with claims against an insurer under a commercial general liability (CGL) policy. 308 Conn. 760 (2013).

22

In discussing the *PSE* case, the Court held that in the absence of a denial of benefits under the contract, *PSE* does not support a bad faith cause of action based solely on an allegedly inadequate discretionary investigation.  *Id.* at 798. In the present matter, there are very real disputed issues of material fact that Arch's actions denied the defendants the benefit of the contracts.

> **2.** **Arch acted in bad faith when it paid subcontractors on payment bond claims without regard to Centerplan's rights and defenses under its subcontracts.**

Centerplan's contracts with its subcontractors on the Project include the following pay if paid provision:

> The obligation of Centerplan to make a payment under this agreement, whether a progress or final payment, or for extra work or change orders or delays to the work, is subject to the express condition precedent of payment by the Owner.  Subcontractor expressly agrees to accept the risk that it will not be paid for work performed by it if Centerplan, for whatever reason, is not paid by the Owner for such work.

Landino Aff. ¶ 116.

In *Lindade Construction v. Continental Casualty Co.,* the court ruled against two subcontractors - bond claimants - finding that "the Plaintiffs assumed the risk that [the general contractor] might not get paid by the owner." No. X10UWYCV5008768S, 2009 WL 765501, at *2 (Conn. Super. Ct. Feb. 25, 2009) (copy attached as Ex. 5). The subcontracts in that case provided:

> 11.3.1 Progress payments to the Subcontractor for satisfactory performance of the Subcontractor's Work shall be made only to the extent of and no later than fifteen (15) working days after receipt by the Contractor of payment from the Owner for the Subcontractor's work. The Subcontractor agrees that the Contractor shall be under no obligation to pay the Subcontractor for any Work until the Contractor has been paid by the Owner. The payment provisions of this Agreement are subject to the condition that the Contractor receive, in good funds from the Owner, progress payments in at least the amounts payable to the Subcontractor on

account of Work done by the Subcontractor on this Project. The Subcontractor expressly acknowledges and agrees that payments to it are contingent upon the Contractor receiving payment from the Owner. The Subcontractor expressly accepts the risk that it will not be paid for Work performed by it if the Contractor, for whatever reason, is not paid by the Owner for such Work. The Subcontractor states that it relies primarily for payment for Work performed on the credit and ability to pay off the Owner and not of the Contractor, and thus the Subcontractor agrees that payment by the Owner to the Contractor for work performed by the Subcontractor shall be a condition precedent to any payment obligation of the Contractor to the Subcontractor. The Subcontractor agrees that the liability of the surety on Contractor's payment bond, if any, for payment to the Subcontractor, is subject to the same conditions precedent as are applicable to the Contractor's liability to the Subcontractor.

In *Lindade*, the owner had not paid the general contractor and was insolvent. The Connecticut Superior Court held that the subcontractors accepted the risk of nonpayment in the "pay if paid" clause of the subcontract agreement. The general contractor and its surety had no payment obligation. The Court held, "the payment bond here does not protect the Plaintiffs [bond claimants] from the owner's default or insolvency since the Plaintiffs have contractually assumed that risk…"  2009 WL 765501, at *7.

Centerplan's subcontractors likewise assumed that risk, but Arch deprived Centerplan of its contractual remedy.  As of June 6, 2016, Centerplan was owed millions of dollars on approved requisitions and for change order and CCD work and the City had advised that it did not have enough funds to pay the approved May requisition nor enough on hand to pay for changes it had ordered.  Landino Aff. ¶¶ 86, 90.  The City suggested that it was bankrupt and could not meet its then-current obligations to Centerplan.  Landino Aff. ¶ 89.  When Centerplan was wrongfully terminated, subcontractors had not been paid on approved requisitions because the City had not paid Centerplan.  Landino Aff. ¶

24

118. Pursuant to the pay if paid provision in the subcontracts, those subcontractors were not entitled to payment.

In *Suntech of Conn., Inc. v. Lawrence Brunoli, Inc.*, 143 Conn. App. 581 (2013), the Connecticut Appellate Court denied a subcontractor's delay claim against the general contractor because condition precedent of Owner approval and payment was not met. Because the contract in *Suntech* clearly and unambiguously required payment by the Owner as a condition precedent to payment by the contractor to the plaintiff subcontractor, the contractor was not liable to the subcontractor for proposed change orders which had been denied by the Owner. *Suntech of Conn., Inc.*, 143 Conn. App. at 585-86.

The decisions in *Lindade* and *Suntech* are directly applicable to subcontractors' payment bond claims on the Project.  Centerplan told Arch numerous times that amounts in excess of those already compensated or claimed by subcontractors beyond the April 2016 requisition could not be paid by either Arch or Centerplan until such time as the Owner pays for the requisitioned work.  Landino Aff. ¶ 119.  For example, by letter dated October 3, 2016, Centerplan advised Arch that the AP for Decco International through April 2016 was $107,126.50.  Landino Aff. ¶ 120.  Centerplan told Arch, "Our records show that Centerplan has been paid by the City of Hartford through April 2016 and has not been paid for the May 2016 Invoice" *Id.*; Landino Aff. Ex. H.  Centerplan went on, "Article IV para 4 of this Subcontractors (sic) Contract reads:

> The obligation of Centerplan to make a payment under this agreement, whether a progress or final payment, or for extra work or change orders or delays to the work, is subject to the express condition precedent of payment by the Owner.  Subcontractor expressly agrees to accept the risk

25

that it will not be paid for work performed by it if Centerplan, for whatever reason, is not paid by the Owner for such work.

*Id.*

"As such any amounts in excess of those already compensated and/or claimed by this Subcontractor beyond the April 2016 invoice cannot be paid by either Arch or Centerplan until such time as the Owner pays for the Requisitioned work." Landino Aff. ¶ 120.

The Owner never paid for that requisitioned work, but Arch's pleadings in this case demonstrate that Arch paid Decco International $424,177.38 by check issued on November 16, 2016. Landino Aff. ¶ 120; Doc. No. 81-13 at page 1 of 6. Arch did so in contravention of Centerplan's contractual rights. Without regard for Centerplan's contractual rights, Arch paid subcontractors' payment bond claims. Arch voluntarily made payments without investigation and without regard for its own liability or the liability of its principal. Landino Aff. ¶¶ 110, 111, 113, 114, 117. Those payments were made in bad faith and do not constitute Losses under the Indemnity Agreements.

3.   <u>Arch's refusal to take any action until the City terminated Centerplan and Arch's entering into the Takeover Agreement deprived Centerplan and DoNo of critical contractual rights.</u>

As discussed in section III.B. herein, the DBC and the DSA are incorporated into the performance and payments bonds and the mutual obligee rider to the bonds. Arch refused to take any action pursuant to the performance bond until the City terminated Centerplan from the Project. Landino Aff. ¶ 83. Arch entered into a Takeover Agreement with the City some four (4) months later. (Doc. No. 81-

17, Arch Memorandum Ex. O).  The actions of Arch deprived Centerplan and DoNo of critical rights and benefits under the various contracts.

The DBC requires that Centerplan be given notice and the opportunity to cure prior to the Owner having the right to terminate Centerplan.  Landino Aff. ¶ 95; Doc. No. 81-10 at 91 of 119, Arch Memorandum Ex. H, § 14.2.2 (Terms and Conditions).  Centerplan was deprived of this critical contractual right when it was terminated by the City.  Centerplan also is entitled under the DBC to a formal dispute resolution process which required initial referral of a claim to Retired Judge Jonathan E. Silbert and very detailed requirements concerning the neutral's decision and subsequent mediation.  Landino Aff. ¶ 96; Doc. No. 81-10 at 7 of 119, Arch Memorandum, Ex H.  Centerplan was deprived of this contractual right and benefit.

The DBC incorporates the DSA (Doc. No. 81-10 at 10 of 119, Arch Memorandum Ex. H, §8.1.10) and further provides that Centerplan is not obligated to perform any change requested by the City unless and until a fully executed guaranteed maximum price change order is issued. Doc. No. 81-10 at 8-9 of 119, Arch Memorandum Ex. H, §7.7.  As discussed in section II herein, at the time Centerplan was terminated the City had failed to issue fully executed guaranteed maximum change orders for work it was demanding Centerplan perform.

The DSA provides that the City is in default if it fails to make any payment when due. Doc. No. 81-9, Arch Memorandum, Ex. G, § 7(b)(2)i.  The DSA also requires the City to maintain a Project Fund to cover project expenses. Doc. No. 81-9, Arch Memorandum Ex. G, § 3(e)(1).  The City was in default of its payment

27

obligations and did not have the funds to pay the work performed.  Landino Aff. ¶ 90.  The DSA also requires that in the event the City intends to declare Centerplan in default, it must provide written notice and a thirty (30) day cure period.  Doc. No. 81-9 at 20 of 130, Arch Memorandum, Ex. G, §7(b)(1)vi.  Centerplan (and DoNo) lost all of these contractual rights as a result of Arch's actions.

At no time did Arch assert any of the rights and remedies of its principal and indemnitors pursuant to the contracts with respect to the City.  Instead, Arch entered into the Takeover Agreement and by doing so obtained a release of itself but not a release of DoNo or Centerplan.  (*See*, Doc. No. 81-17).  The Takeover Agreement specifically states that DoNo and Centerplan are not being released.  (*See*, Doc. No. 81-17, Takeover Agreement § VII.12 at 7 of 84).  Arch further was released from any claim for delay or liquidated damages by the City.  (*See*, Doc. No. 81-17, Takeover Agreement § VII.15.b at 8 of 84).  Arch further agreed not to assert any claims against the City or HSA so as not to incur liability for any claims that the City might assert against Centerplan or DoNo.  Arch Memorandum Ex. O, § 15; Doc. No. 81-17, Takeover Agreement § VIII at 8 of 84.

Arch's actions clearly are the sort of self interest that is at the core of bad faith.  In *PSE* the court found that the surety's obtaining a release of itself, but not of its principal/indemnitor, was evidence of bad faith.  *PSE Consulting, Inc. v. Frank Mercede and Sons, Inc.,* 267 Conn. at 310.  In *Auto-Owners Ins. Co. v. Southwest Floating Docks, Inc.,* 571 F.3d 1143 (4th Cir. 2009) the Court employed the same analysis as in *PSE* in determining the surety's actions constituted bad faith.  The actions of Arch clearly constitute bad faith as defined in *PSE* and

*Capstone.*  Arch is not entitled to summary judgment on the Indemnity

Agreements.

### E. ARCH'S OBLIGATION UNDER THE PERFORMANCE BOND DID NOT MATURE AS THE CITY DID NOT MEET THE CONDITIONS PRECEDENT. ARCH HAD NO OBLIGATION TO PERFORM UNDER THE BOND.

Courts in this District have held, and the Second Circuit has affirmed, that

"the surety's obligation under a bond only matures if the obligee complies with

all conditions precedent."  *Stonington Water Street Assoc., LLC v. Hodess Bldg.*

*Co., Inc.,* 792 F.Supp.2d 253, 262 (2011) (citations omitted.); *aff'd, 472 Fed.Appx.*

*71 (2d Circ. 2012).*  A condition precedent is defined as:

> "a fact or event which the parties intend must exist or take place before there
> Is a right to performance….If the condition is not fulfilled, the right to enforce
> the contract does not come into existence." *Id. (citations omitted).*

The *Stonington Water Street* court went on to hold that compliance with the

conditions precedent under the bond is necessary to invoke the surety's

obligation under the bond and failure to do so is fatal to the obligee's claim for

coverage.  *Id.* at 263*.*  This requirement of compliance with conditions precedent

has been recognized by numerous courts.  *See, e.g., Enter. Capital, Inc. v.  San-*

*Gra Corp.,* 284 F.Supp.2d 166 (D. Mass. 2003); *Roel P'ship v. Amwest Sur. Ins.*

*Co.,* 258 A.D. 2d 780 (1999).

In *Lumbermens Mut. Cas. Co. v. Dinow,* the surety moved for summary

judgment seeking specific enforcement of general indemnity agreements,

contractual indemnification, and common law contractual indemnification against

its indemnitor under indemnity agreements whose terms were virtually identical

to those at issue in the present matter No. 06-CV-3881 TCP, 2012 WL 4498827, at

*1 (E.D.N.Y. 2012) The indemnitor raised factual issues regarding whether the obligee had complied with the conditions precedent to bringing a claim under the performance bond.  The *Lumbermens* court refused to enter summary judgment, finding that the factual issues relating to whether the obligee had complied with the conditions precedent necessitated a trial of the matter.

As has been discussed at length in the previous sections, the contractual obligations contained in the DBC and DSA were incorporated into the bonds.  The Multiple Obligee Rider specifically requires the City to have performed all of its obligations under the contracts, including but not limited to its obligation to make payments to Centerplan. (Doc. No. 81-12, Arch Memorandum Ex. J).  As the City failed to satisfy the conditions precedent to calling the performance bond, Arch had no obligation under the performance bond.  Arch is not entitled to summary judgment.

Centerplan is entitled to have its objectively reasonable expectations with respect to the bond protected.  *See, R.T. Vanderbilt Co. v. Cont'l Cas. Co.,* 273 Conn. 448, 463 (2005).  The bond clearly requires that the City satisfy its obligations under the contracts.  Centerplan is entitled to rely on that language and to expect that Arch would enforce such language.  Arch is not entitled to summary judgment.

F.     ARCH IS NOT ENTITLED TO SPECIFIC PERFORMANCE OR
       INJUNCTIVE RELIEF ON COUNT III (COLLATERAL SECURITY)
       BECAUSE ARCH HAS FAILED TO PROVE AN INADEQUATE REMEDY
       AT LAW AND IRREPARABLE HARM.

Specific performance is a form of injunctive decree in which the court orders the defendant to perform the contract. *Gager v. Gager & Peterson, LLP*, 76 Conn. App. 552, 560 (2003). The availability of specific performance is not a matter of right, but depends rather upon an evaluation of equitable considerations. *Id.* (Internal citation omitted). To be entitled to an order of specific performance, the moving party must establish that it does not have an adequate remedy at law. *In re Flour City Bagels, LLC*, 557 B.R. 53, 74 (Bankr. W.D.N.Y. 2016), *leave to appeal denied*, No. 16-CV-6667-FPG, 2017 WL 1433339 (W.D.N.Y. Apr. 24, 2017).

The irreparable injury requisite for a preliminary injunction overlaps with the need to establish an inadequate remedy at law to obtain an order of specific performance. *See Nw. Nat. Ins. Co. of Milwaukee, Wisconsin v. Alberts*, 937 F.2d 77, 80 (2d Cir. 1991). In other words, to establish an inadequate remedy at law, the movant must establish irreparable harm. *See id.*

A contract cannot define irreparable injury. *Baker's Aid v. Hussmann Food Service Co., 830 F.2d 13, 16 (2d. Cir. 1987).* Rather, the moving party must prove irreparable harm to obtain the extraordinary remedy of injunctive relief or specific performance. *See Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania*, 934 F.2d 30, 34 (2d Cir. 1991). "Irreparable harm exists only where there is a threatened imminent loss that will be very difficult to quantify at trial." *Westchester Fire Ins. Co.* 177 F. Supp. 3d 810, 812 (S.D.N.Y. 2016) (citations omitted; internal quotation marks omitted). Where monetary damages may provide adequate compensation, there is no showing of irreparable harm. *Id.*

31

Here, Arch has failed to prove an inadequate remedy of law entitling it to specific performance or injunctive relief on Count III for collateral security. The contractual language in the collateral security provisions, which indicates that the indemnitors' failure to pay the surety shall cause irreparable harm for which the surety has no adequate remedy at law, is unenforceable. *See, Baker's Aid* 830 F.2d at 16. Likewise, Arch's argument that it will lose its status as a secured creditor is without merit. *See, Ins. Co. of the State of Pennsylvania v. Lakeshore Toltest JV, LLC*, No. 15 CIV. 1436 (ALC), 2015 WL 8488579, at *2 (S.D.N.Y. Nov. 30, 2015) (finding that a surety's loss of its' status as a secured creditor is not irreparable harm). Rather, "[t]he test for inadequacy of a remedy at law is whether a judgment could be obtained, not whether, once obtained it will be collectable." *SME Racks, Inc. v. Sistemas Mecanicos Para, Electronica, S.A.*, 243 F. App'x 502, 504 (11th Cir. 2007).

Moreover, Arch's delay in filing its motion for specific performance and injunctive relief years after it allegedly received claims against several bonds indicates that Arch is unlikely to suffer irreparable harm in the absence of an immediate order granting it contractual security. *See* Beach Affidavit, ¶¶ 47-49; *Tough Traveler, Ltd. v. Outbound Products*, 60 F.3d 964, 968 (2d Cir.1995) (finding no irreparable harm where the plaintiff moved for a preliminary injunction a year after the alleged injurious conduct).

Arch has failed to prove it has an inadequate remedy at law or that it will suffer irreparable harm. As such, Arch's motion for summary judgment and injunctive relief on Count III must be denied.

32

### G. ARCH IS NOT ENTITLED TO SPECIFIC PERFORMANCE OR INJUNCTIVE RELIEF ON COUNT III BECAUSE THERE ARE GENUINE ISSUES OF MATERIAL FACT CONCERNING ARCH'S RIGHTS UNDER THE COLLATERAL SECURITY CLAUSE.

The Collateral Security provision of the 2016 General Indemnification Agreement states:

> 4. POSTING OF COLLATERAL – If the Surety determines, in its sole discretion and judgment, that potential liability exists for losses, fees, costs, or expenses, *for which the Principal and Indemnitors will be obligated to indemnify the Surety under the terms of this Agreement or Other Agreements,* the Principal and Indemnitors shall deposit with the Surety, promptly on demand, a sum of money equal to the amount the Surety determines or collateral security of a type and value satisfactory to the Surety, to cover that liability, whether or not the Surety has; (a) established a reserve; (b) made any payments; or (c) received any notice of claims under the Bonds. The Surety shall have the right to use the collateral, or any portion thereof, *in payment or settlement of any such liabilities for which the Principal and Indemnitors would be liable to the Surety under this Agreement or Other Agreements with respect to payments made by the surety...* Indemnitors acknowledge that the failure of Indemnitors to pay to Surety, immediately upon demand, the sum demanded by Surety hereunder shall cause irreparable harm to Surety for which the Surety has no adequate remedy at law. Indemnitors agree that Surety shall be entitled to temporary, preliminary and final injunctive relief for specific performance of their obligations hereunder, including the obligation to pay to Surety the sum demanded, and waive any defenses thereto...." (emphasis added). Arch Memorandum Ex. E.

(GIA, Doc. No. 81-7 at 4 of 24, Arch Memorandum, Ex. E).

The 2010 indemnity agreements contain similar provisions.

The language of the collateral security provision specifically ties Arch's right of collateral security to "losses, fees, costs, or expenses for which the Principal and Indemnitors *will be obligated to indemnify* the Surety under the terms of this Agreement or Other Agreements..." GIA at ¶ 4 (emphasis added), Doc. No. 81-7, Arch Memorandum, Ex. E. Likewise, the collateral security provision only applies to losses for which the Indemnitors "would be liable" *Id.*

Centerplan has raised genuine issues of material fact concerning whether Arch has acted in bad faith in determining liability on claims made against the various payment and performance bonds; and therefore, whether Arch is entitled to indemnification for such claims.   Arch's determinations concerning its liability under the bonds have been made in bad faith because, *inter alia*, the City wrongfully terminated Centerplan on the Hartford Stadium Project and Arch disregarded Centerplan's contractual rights against its subcontractors, including without limitation, applicable pay-if-paid provisions.

It is well established that an indemnitor's defense of surety bad faith is relevant to the analysis of a surety's right to indemnification.  *See, PSE Consulting, Inc.* supra, 267 Conn. at 305.   It is also well established that despite contractual language indicating that a surety may act in its "sole discretion," every contract contains an implied covenant of good faith and fair dealing.  *See, id.* at 301.

Knowing that Centerplan has viable defenses to Arch's indemnity claims, Arch tries to draw a distinction between Centerplan's right to raise bad faith as a defense to its indemnification claims and Centerplan's right to raise a defense to Arch's claims for collateral security.  Nevertheless, where, as here, the surety's right to collateral security is expressly linked to only those losses for which the Principal and Indemnitors "will be obligated to indemnify" the surety, analysis of an indemnitor's surety bad faith defense is appropriately considered.  *See id.*

Likewise, there are genuine issues of material fact concerning whether the losses for which Arch seeks collateral security are liabilities for which the

34

indemnitors "would be liable."  *See* GIA, ¶ 4, Doc. No. 81-7, Arch Memorandum,

Ex. E.   Here, the City defaulted on the Hartford Stadium Contract and then

wrongfully terminated Centerplan on the Hartford Stadium Project.  Arch admits

that when Centerplan was terminated, the City owed Centerplan money.

Accordingly, there are genuine issues of material fact as to whether the City even

had rights under the Hartford Stadium performance bond, and therefore whether

Arch should have spent and is entitled to recover from the defendants the alleged

$16,000,000.  *See,* Doc. No. 81-18, Arch Memorandum, Ex. P.   *See, also,*

*Lumbermens Mut. Cas. Co., supra,* 2012 WL 4498827, at *5 (denying surety's

motion for summary judgment where there were outstanding issues of fact

surrounding whether the obligee was entitled to make a claim against the

performance bond in the first instance).

### H.  A BALANCE OF THE EQUITIES FAVORS A DENIAL OF ARCH'S MOTION FOR SUMMARY JUDGMENT AND INJUNCTIVE RELIEF ON COUNT III (COLLATERAL SECURITY).

Given Centerplan's bad faith defense to Arch's claims of losses, a balance

of the equities tips in Centerplan's favor.  Arch will not suffer prejudice if its

motion is denied, as it has already delayed bringing this action.  Moreover, as

Arch highlights in its brief, its liability is secondary to that of its principal.  Arch

Memorandum p. 15, ¶ (b).  Here, there are genuine issues of material fact

concerning Counterplan's liability under the Hartford Stadium performance bond.

Centerplan has brought direct claims against the City, which claims support a

denial of collateral security.  *See U.S. Fid. & Guar. Co. v. Neri Const. LLC,* 109 F.

App'x 457, 459 (2d Cir. 2004) (subcontractor not required to provide surety with

collateral security).  As such, Arch's motion for summary judgment and injunctive relief on Count III must be denied.

### I.   ARCH IS NOT ENTITLED TO SUMMARY JUDGMENT OR INJUNCTIVE RELIEF ON COUNT IV (COMMON LAW EXONERATION) OR COUNT V (COMMON LAW *QUIA TIMET*).

Arch is not entitled to summary judgment on Count IV of the Complaint for common law exoneration or Count V of the Complaint for common law *quia timet* because there are genuine issues of material fact concerning whether Centerplan is liable for the underlying debts.  *Quia timet* and exoneration share common elements.  "Specifically, the surety must establish that the debt is presently due (exoneration) or will come due (*quia timet*), *that the principal is or will be liable for the debt*, and, that absent equitable relief, the surety will be prejudiced because it will be forced to advance the money to the creditor."  *Borey, supra,* at 33 (2d Cir. 1991) (citation omitted) (emphasis added).

Arch has not and cannot establish that Centerplan is or will be liable for the underlying debts; and therefore, its motion for summary judgment must fail.  A surety is not entitled to *quia timet* or exoneration where the principal has a defense against either the surety or the creditor on the primary obligation.  *Id.* at 33.  Here, Centerplan has both.  *Inter alia*, Centerplan has defenses against Arch for surety bad faith (Doc. # 77, ¶¶ 83-85); defenses of wrongful termination against the City's Hartford Stadium performance bond claims; and pay-if-paid and breach of contract defenses against subcontractor performance bond claims. These defenses extinguish or reduce Centerplan's liability on the underlying

debts.  As such, Arch's motion for summary judgment on Counts IV and V must be denied.  *See, Borey* 934 F.2d at 33.

Moreover, exoneration and *quia timet* are equitable remedies that require proof of an inadequate remedy at law.  *See, Borey* 934 F.2d. at 32; *Nw. Nat. Ins. Co. of Milwaukee, Wisconsin v. Alberts*, 937 F.2d 77, 80 (2d Cir. 1991) (the irreparable injury requisite for the preliminary injunction overlaps with the absent lack of adequate remedy at law necessary to establish the equitable rights).  As discussed more fully below, Arch has failed to establish irreparable harm, and thus, has failed to establish an inadequate remedy at law.  As such, Arch's motion for summary judgment on Counts IV and V must be denied.

Likewise, Arch is not entitled to a preliminary injunction granting it common law exoneration or *quia timet* because it has not carried its burden in proving irreparable harm and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor. *See Baker's Aid, supra,* 830 F.2d at 15.  Indeed, Arch's memorandum of law fails to address its claims for injunctive relief on Counts IV and V[4].  (*See* Doc. # 81-2).

---

[4] Arch's memorandum of law and supporting documents further fail to offer any evidence explaining the $38,313,100.32 sought under the two separate theories of relief - exoneration and *quia timet.*  Rather, Arch offers the same universe of documents in support of both its claims for exoneration, on debts that have allegedly matured, and its claim for *quia timet*, on debts that it allegedly reasonably anticipates it will incur.  Arch's use of one lump sum number and the same set of documents in support of both claims raises issues of material fact concerning how these amounts were determined and what amounts, if any, may be recovered under each respective theory of liability.

As indicated above, Centerplan has defenses to the primary obligations, which defenses bar Arch's entitlement to common law exoneration and *quia timet*. *See Borey* 934 F.2d at 33. As such, Arch cannot prove that it would be successful on the merits of this claim or that a balance of the hardships tips in its favor. Therefore, Arch's motion for injunctive relief on Counts IV and V must be denied.

Additionally, Arch has not and cannot prove irreparable harm. It is well established that "'[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Borey* 934 F.2d at 34 (citations omitted; internal quotation marks omitted). Generally, monetary loss does not amount to irreparable harm. *Id.* Similarly, the loss of a surety's right to exoneration or *quia timet* relief does not "cause serious or irreparable consequences" entitling it to injunctive relief. *Id., citing, Abish v. Nw. Nat. Ins. Co. of Milwaukee, Wis.*, 924 F.2d 448, 453 (2d Cir. 1991). Here, Arch has failed to establish irreparable harm. As such, its motion for injunctive relief on Counts IV and V must be denied.

IV.   <u>CONCLUSION</u>

This matter presents complex and disputed issues of material fact, as well as issues of law, as to whether Arch is entitled to the relief it seeks and the dollar amount of losses, if any, incurred by Arch. These issues cannot be decided on the basis of summary judgment and necessitate a trial.

The Defendants respectfully request that the Court deny Arch's motion in its entirety.

THE DEFENDANTS

/s/      Jane I. Milas
Jane I. Milas (ct01271)
Raymond A. Garcia (ct05655)
Garcia & Milas, P.C.
44 Trumbull Street
New Haven, CT  06510
PH: (203) 773-3824
Fax: (203) 782-2312
jmilas@garciamilas.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on January 19, 2018, a copy of the foregoing

*Memorandum* was filed electronically and served by mail on anyone unable to

accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by

operation of the Court's electronic filing system or by mail to anyone unable to

accept electronic filing as indicated on the Notice of Electronic Filing.  Parties

may access this filing through the Court's CM/ECF system.

**/s/     Jane I. Milas**
**Jane I. Milas (ct01271)**
**Raymond A. Garcia (ct05655)**
**Garcia & Milas, P.C.**
**44 Trumbull Street**
**New Haven, CT  06510**
**PH: (203) 773-3824**
**Fax: (203) 782-2312**
jmilas@garciamilas.com