ARCH INSURANCE COMPANY, :
 Plaintiff, :
  : No. 3:16-CV-01891 (VLB)
 v. :
  :
CENTERPLAN CONSTRUCTION : December 11, 2018
COMPANY, LLC, *et al.*, :
 Defendants. :
  :
  :
  :

## MEMORANDUM OF DECISION GRANTING PLAINTIFF'S MOTION TO DISMISS SECOND AMENDED COUNTERCLAIMS [DKT. 85]

 Before the Court is Plaintiff's / Counterclaim Defendant's Motion to Dismiss the Second Amended Counterclaims ("SACC").  On February 16, 2017, Defendants[1] filed their first responsive pleadings, asserting counterclaims.  Three months later the parties jointly stipulated to dismissal of the counterclaims without prejudice.  The Court accordingly ordered dismissal of the counterclaims pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii) on May 30, 2017.   Then in July 2017, Defendants filed an amended answer with counterclaims on which Plaintiff Arch Insurance Company ("Arch" or "Plaintiff") moved to dismiss.  The Court granted the motion without prejudice on November 8, 2017, and allowed Defendants to

---

[1] Defendants / Counterclaim Plaintiffs are Centerplan Construction Company, LLC ("Centerplan"); Centerplan Development Company, LLC ("Centerplan Development"); RAL Investments, LLC ("RAL Investments"); Walnut Hill Chase, LLC ("Walnut Hill"); Tinker House, LLC ("Tinker House"); GH Development, Inc. ("GH Development"); and Centerplan Communities, LLC ("Centerplan Communities"); and Robert and Kelly Landino (the "Landinos") (collectively referred to in this opinion as, "Defendants").

replead by November 22, 2017.  Defendants timely filed their SACC, and Plaintiff again moved to dismiss.  The Court hereby GRANTS the motion to dismiss as to all counterclaims.

<u>Background</u>

I.  <u>The Project</u>

The following facts are taken from the SACC and from the contracts relating to the Project referenced therein and relied upon by Defendants unless otherwise noted.

The City of Hartford (the "City") entered into an agreement with Connecticut Double Play, LLC d/b/a/ Hartford Yard Goats (the "Ball Club") to bring a minor league baseball team to Hartford, and the City agreed to construct a baseball stadium and parking facilities to host the team (the "Project").  [Dkt. 77 (SACC) at 8-9, ¶¶ 4, 5].  The team scheduled its inaugural season in Hartford to begin in April 2016.  [Dkt. 77 (SACC) at 26, ¶ 38].  To fulfill its obligation to build a baseball stadium, the City solicited contracts to construct the Project.  [Dkt. 77 (SACC) at 21, ¶ 19].  To be awarded the contract for the Project a contractor had to post a payment and performance bond.  [Dkt. 116 (Opp'n Mot. Dismiss SACC) at 2].

On February 4, 2015, the City as Owner awarded the contract to develop the Project to, and entered into a Development Services Agreement ("DSA") with, DoNo Hartford LLC ("DoNo") as Developer to facilitate construction of the Project.  *See* [Dkt. 77 (SACC) at 22, ¶ 24].  On the same day, DoNo as Owner entered into a Design Build Agreement ("DBC") with Centerplan as Design Builder of the Hartford Stadium Project.  [Dkt. 77 at 22–23, ¶ 25].  The City, DoNo, and Centerplan also

entered into a Direct Agreement that day for which the purpose "was to provide the City with the ability to step into the position of DoNo upon the City's termination of the DSA for default." *Id.* at 23, ¶ 26.

As a condition precedent to being awarded the Hartford Stadium Project construction contract, Centerplan was required to post payment and performance surety bonds. [Dkt. No. 1 ¶ 14; Dkt. No 19 ¶ 14]. Arch issued payment and performance bonds on behalf of Centerplan in favor of the Obligees (DoNo, the City, and the Hartford Stadium Authority) for the Project (the "Bonds"). *See* [Dkt. 77 at 20, ¶ 13; Dkt. 82-12 (Mot. Summ. J., Ex. J, Payment and Performance Bonds)]. [2]

The drawings for the Hartford Stadium Project were completed in March of 2015, and the cost of construction was raised by $11 million. [Dkt. 77 at 24, ¶ 30]. The cost of the Project exceeded the budget for a number of reasons and in late 2015, Centerplan advised the City that it could not complete the Project based on the available funds. *Id.* at 26, ¶ 38.

---

[2] The parties did not submit the bonds as exhibits to the Complaint, Counterclaims, or the Motion to Dismiss; they did, however, submit a copy into evidence during the prejudgment remedies ("PJR") hearing as well as with the briefing on the motions for summary judgment, which were filed two weeks before the motion to dismiss the SACC. The Court finds that the bonds, as well as the other contracts at issue here—including the DSA, Direct Agreement, and DBC—are documents which the Counterclaim Plaintiffs/Defendants had in their possession, had knowledge of, and relied on in filing the SACC and therefore the Court cites to them in this opinion on the motion to dismiss. *See Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (explaining that a court considering a motion to dismiss may consider "the factual allegations in plaintiffs' amended complaint, which are accepted as true, . . . documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit").

In January 2016, the City, DoNo, and Centerplan entered into an agreement (the "January Agreement") wherein they agreed to extend the substantial completion date from March 11, 2016 to May 17, 2016, and to increase the maximum price by over $10.3 million to accommodate the December 24, 2015 change orders. *See id.* at 26, ¶ 41. DoNo and Centerplan agreed to reduce their price by $2.8 million and the City agreed to pay the balance of the change orders submitted on December 24, 2014, minus any amount the City procured from the Ball Club. [Dkt. 89-4 (Opp'n Summ. J., Ex. B (January Agreement)) ¶¶ 1, 11]. The Ball Club was not a signatory of the January Agreement.

After the City, Centerplan, and DoNo entered into the January Agreement, the City issued additional change orders and construction change directives ("CCDs") principally at the request of the Ball Club, which added substantial work and prevented Centerplan from being able to complete the Project by the May 17, 2016 substantial completion date. [Dkt. 77 at 27, ¶¶ 44–45]. Change orders could only be issued by agreement of the owner and design builder, in this case Centerplan and DoNO, and only DoNo had authority to issue a CCD without Centerplan's approval. [Dkt. 82-10 (Mot. Summ. J., Ex. H (Design Build Agreement, Ex. A)) §A.7.1.2]. The DBA states the City must fund change orders before they become part of the contract which Centerplan and DoNo are obligated to perform. *See* [Dkt. 77 at 28, ¶ 48]. The SACC alleges that Centerplan and DoNo asked the City to assure them that it would pay for these change orders and CCDs, and because the City was unable to comply, the SACC concludes "[t]he City did not have enough money to pay for the work and as a result before it terminated

4

Centerplan it was in default of the DSA, the BDA [Ballpark Development Agreement] and the DBC." [Dkt. 77 at 28-29, ¶¶ 52-53].

Between May 9 and June 9 of 2016, the City notified Arch of Centerplan's and DoNo's alleged defaults on the Project. *See id.* at 29, ¶ 54. "Arch said it would not perform under the bonds [by constructing the Project] unless and until the City terminated the DSA and DBC." *Id.* at 29, ¶ 54. On June 6, 2016, the City terminated the DSA and the DBC. *See id.* Arch later took over the Project. *See id.* at 30, ¶ 59. Thereafter, Arch made demands that Defendants hold harmless and indemnify Arch for all losses it incurred because of the bonds, and also demanded Defendants put up collateral security. *Id.* at 33, ¶¶ 67-69. When Defendants did not meet its demands, Arch filed this lawsuit against defendants with claims for contractual indemnification, common law indemnification, contractual security, common law exoneration, quia timet, and disclosure of financial information. *See* [Dkt. 1 (Complaint)].

Relying on these facts, the SACC alleges five claims against Arch for 1) breach of contract, 2) breach of the implied covenant of good faith and fair dealing, 3) surety bad faith, 4) tortious interference with contractual relations, and 5) violations of Connecticut Unfair Trade Practices Act ("CUTPA") by violating the Connecticut Unfair Insurance Practices Act ("CUIPA"). *See* [Dkt. 77].

II.     **Bonds and Indemnity Agreements**

The SACC contains an excerpt from the multiple obligee rider of the performance bond:

> Notwithstanding anything contained herein to the contrary, there shall be no liability on the part of the Principal or Surety under this Bond to

the Obligees, or any of them, unless the Obligees, or any of them, <u>shall make payments to the Principal, or to the Surety in case it arranges for completion of the Contract upon default of the Principal</u>, strictly in accordance with the terms of said Contract as to payments, and shall perform all the other obligations required to be performed under said Contract at the time and in the manner therein set forth.

*Id.* at 31, ¶ 60. The Bond expressly incorporated the Design Build Agreement, or the "DBC." *See* [Dkt. 82-12 at 1, 3]. The SACC alleges that Arch entered into other payment and performance bonds with Defendants, which are not connected to the Project. *See* [Dkt. 77 at 31, ¶ 60].

Defendants executed a series of indemnity agreements in consideration for Arch's issuance of the bonds. *Id.* at 20, ¶ 14. The three indemnity agreements from July 2010, October 2010, and January 2016, (collectively the "Indemnity Agreements") are attached as exhibits to Plaintiff's Complaint. *See* [Dkt. 1-1 (Compl. Ex. A, July 2010 Indemn. Agreement); Dkt. 1-2 (Compl. Ex. B, Oct. 2010 Indemn. Agreement); Dkt. 1-3 (Compl. Ex. C, Jan. 2016 Indemn. Agreement)]. Collectively, the Indemnitors/Principals to all three Indemnity Agreements comprise the Defendants in this action; Centerplan and the Landinos are the only Defendants that are parties to all three agreements.[3] *See* [Dkt. 1-1 at 6 of PDF; Dkt. 1-2 at 7 of PDF; Dkt. 1-3 at 10 of PDF]. These Indemnity Agreements were "made by the undersigned Indemnitors [Defendants] in favor of [Arch] . . . for the purpose

---

[3] All three indemnity agreements contain different signatories who are Defendants to this case, and they are as follows: (1) the July 2010 General Indemnity Agreement ("GIA") is between Arch as Surety and Centerplan and the Landinos as Principals/Indemnitors; (2) the October 2010 GIA is between Arch as Surety and Centerplan, Walnut Hill, Tinker House, GH Development, and the Landinos as Principals/Indemnitors; and (3) the January 2016 GIA is Centerplan, Centerplan Development, Center Earth, Centerplan Communities, RAL Investments, and the Landinos.

of Indemnifying Surety . . . for any Bonds . . . which <u>Surety may have issued, or may hereafter issue</u>, or on which Surety otherwise becomes surety." *See* [Dkt. 1-1 at 2 of PDF; Dkt. 1-2 at 2 of PDF; Dkt. 1-3 at 2 of PDF (emphasis added)]. Under the Indemnity Agreements, the Indemnitors "warrant and represent that they have a material and beneficial interest in Surety's issuance of Bonds on behalf of the Principal, and acknowledge that Surety would not issue such Bonds without each Indemnitor's agreement to reimburse Surety for all losses arising under the bonds." *See* [Dkt. 1-1 at 2 of PDF; Dkt. 1-2 at 2 of PDF; Dkt. 1-3 at 2 of PDF].

The two 2010 Indemnity Agreements are largely identical, but their language of consideration differs slightly from that of the January 2016 Indemnity Agreement. The 2010 Indemnity Agreements state, "IN CONSIDERATION of the execution of any such Bonds for Principal, from which it is acknowledged the Indemnitors derive a <u>substantial material benefit, and as an inducement to such execution or continuation of suretyship and/or the issuance of Bonds by Surety</u>, the Indemnitors, jointly and severally agree [to the following provisions]." [Dkt. 1-1 at 2 of PDF; Dkt. 1-2 at 2 of PDF (emphasis added)]. In slight contrast, the January 2016 Indemnity Agreement states, "IN CONSIDERATION of the foregoing premises and the Surety's execution and delivery of one or more Bonds or its refraining from canceling the same, <u>and intending to be legally bound hereby</u>, the Indemnitors, for themselves and their respective heirs, executors, administrators, successors, and assigns, hereby agree, jointly and severally, to be obligated to the Surety, its successors and assigns, [to the following provisions]." [Dkt. 1-3 at 2 of PDF (emphasis added)].

The Indemnity Agreements also gave Arch broad unfettered discretion to compromise claims. The 2010 Indemnity Agreements state:

> Surety shall have the exclusive right to decide and determine whether any claim, liability, suit or judgment made or brought against Surety on any Bond shall or shall not be paid, compromised, resisted, defended, tried or appealed, and Surety's decision thereon shall be final and binding upon the Indemnitors. . . . [I]f Principal or Indemnitors desire that the Surety litigate such claim or demand, or defend such suit or appeal from such judgment, they shall deposit with the Surety, at the time of such request, cash or collateral satisfactory to the Surety in kind and amount to be used in paying any judgment or judgments rendered, or which might be rendered, against the Surety, together with interest, costs and attorneys fees.

[Dkt. 82-5 at 3; Dkt. 82-6 at 3]. The 2016 Indemnity Agreement, signed after Centerplan indicated that it would not be able to meet the first Substantial Completion Date deadline set by the DBC, includes the exact same provision making Arch's decision not to resist and to adjust and pay claims binding on the Defendants, but adds a provision in which Defendants cede all authority to adjust and pay claims to Arch. [Dkt. 82-7 at 5 ("Surety shall have the *sole* and exclusive right . . .") (emphasis added)].

<u>Legal Standard</u>

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). In considering a motion to dismiss for failure to state a claim, the Court should follow

a "two-pronged approach" to evaluate the sufficiency of the complaint. *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010). "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "At the second step, a court should determine whether the 'wellpleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (internal quotations omitted).

In general, the Court's review on a motion to dismiss pursuant to Rule 12(b)(6) "is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). The Court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass*, 987 F.2d at 150; *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

<u>Analysis</u>

Arch moves to dismiss the SACC in its entirety. "[A] federal court exercising diversity jurisdiction must apply the choice-of-law rules of the state in which that court sits to determine the rules of decision that would apply if the suit were brought in state court." *Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138, 151

(2d Cir. 2013); *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1538–39 (2d Cir. 1997); *Brown v. Strum*, 350 F. Supp. 2d 346, 348 (D. Conn. 2004). It is undisputed that Connecticut law applies to these various state claims.

## I.   Count One: Breach of Contract

The elements of a breach of contract claim under Connecticut law "are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages." *Meyers v. Livingston, Adler, Pulda, Meiklejohn and Kelly, P.C.*, 311 Conn. 282, 291 (2014). Contract language is to be interpreted "with a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." *Southington v. Commercial Union Ins. Co.*, 71 Conn. App. 715, 84 (Conn. App. Ct. 2002) (citing *Rumbin v. Utica Mut. Ins. Co.*, 254 Conn. 259, 286, 757 A.2d 526 (2000)). "A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity, and words do not become ambiguous simply because lawyers or laymen contend for different meanings." *Id.* (citing *Downs v. Nat'l Cas. Co.*, 146 Conn. 490, 494–95, 152 A.2d 316 (1959)).

Defendants bring a breach of contract claim against Arch on several bases.[4] *See* [Dkt. 77 at 34-35, ¶¶ 71-77]. Defendants assert (1) that "Arch has breached the Bond and the Indemnity agreements" by voluntarily performing on the

---

[4] The SACC is 22 pages, with 97 paragraphs. In the interest of making this ruling clear to the parties and demonstrating the Court's consideration of all of the allegations and arguments asserted, the structure of this opinion follows that of the pleading, though that structure is not ideal.

Performance Bond when it had no obligation to perform, *see id* at 34, ¶ 72*,* and (2) that Arch "further breached its contractual duties" by (a) directing the City to terminate the DSA and the DBC, (b) failing to investigate the City's default and inability to pay for the work, (c) the manner and extent of Arch's performance after taking over the Project, and (d) refusing to accept collateral offered by Defendants. *See id.* ¶¶ 74–76. The Court will address each of the allegations in turn.

### 1. *Allegation 1: Arch Had No Obligation Under the Performance Bond*

Defendants' first breach of contract allegation relates to Arch's performance under the bond upon the claim by the City. Defendants argue that Arch was not obligated to perform under the performance bond because Centerplan was not in default on the bonded contract and further because the City itself was in default. *See* [Dkt. 77 ¶ 57].[5] Arch counters that it owed no duties to Defendants under the performance bond because the obligees, not Centerplan, were the entities receiving the benefit of the bond. *See* [Dkt. 85-2 (Mot. Dismiss Mem.) at 10]. Before reaching the substance of the allegation, the Court addresses Arch's position that a breach of contract action cannot be brought on the performance bond because Centerplan did not receive the benefit of the contract.

---

[5] **The SACC alleges that Arch also breached the Indemnity Agreements because "[i]f Arch materially breaches its obligations under the Bonds, then it necessarily materially breaches the obligations it owes to putative indemnitors under the general indemnity agreements." [Dkt. 77 at 34, ¶ 71]. Thus, Defendants' breach of contract claim rests first and foremost on a claim for breach of the Bonds. Therefore, the Court discusses Defendants' allegations as to Arch's breach of the Bonds and, finding the claim insufficiently pled, the Court need not go on to address the reliant claim of breach of the Indemnity Agreements.**

### a) Arch Owed A Duty to Defendants

"[T]he general purpose of a surety contract is to 'guard against loss in the event of the principal debtor's default.'" *Town of Southington v. Commercial Union Ins. Co.*, 254 Conn. 348, 358, 757 A.2d 549 (2000); *see Capstone Bldg Corp. v. Am. Motorists Ins. Co.*, 308 Conn. 760, 792, 67 A.3d 961 (2013) (stating the suretyship's "main purpose is to benefit the owner upon the default by a general contractor"). A suretyship is the result of a third party's promise to a debtor to "assume and pay the debt he owes to a creditor." *Town of Southington*, 254 Conn. at 358. The obligee receives the benefit of the performance bond, because the surety's obligation operates as "an additional assurance to the one entitled to performance of an act that the act will be performed." *Id.*; *see also Capstone*, 308 Conn. at 791 (describing a suretyship as a "form of credit enhancement in which [p]remiums . . . are charged in consideration of the fundamental underwriting assumption that the surety will be protected against loss by the principal"). But the Principal receives a benefit as well.

As Principal and Surety, Centerplan and Arch are in privity of contract despite the performance bond being for the benefit of DoNo, the City, and Hartford Stadium Authority (i.e. the Obligees). *See* § 37:1, *The nature of contracts for the benefit of third parties; the effect on privity of contract*, Williston on Contracts (acknowledging that a contract made for the benefit of third parties means "the third party is treated no differently with respect to the enforcement of the promise *than a party in traditional privity of contract*"); *Crescent Elec. Supply Co., Inc. of New York v. Arch Ins. Co.*, 09 Civ. 3138 (CM) (LMS), 2010 WL 11614253, at *4

(S.D.N.Y. Jan. 4, 2010) (finding the bond issuer to be in privity with the principal with respect to a payment bond claim).

The bond was issued as a condition precedent to the award of the contract to construct the stadium. [Dkt. 1 ¶ 14; Dkt. 19 ¶ 14]. Arch issued the bond at Centerplan's request so that Centerplan could qualify for an award of the Hartford Stadium Project by satisfying this condition precedent. *Id.* Centerplan was awarded the Hartford Stadium Project and therefore received a benefit from the bond at the time it was issued. Centerplan is thus a beneficiary of, a party to, and can sue for breach of the payment and performance bonds.[6]

The other Defendants (the Indemnitors) are also in privity of contract with Arch, having agreed to indemnify Arch in consideration for which Arch committed to issue and maintain surety bonds on behalf of Centerplan. *See* [Dkt. 1-1 at 3; Dkt. 1-2 at 3; Dkt. 1-3 at 1]; *cf. United States v. Fid. & Guar. Co. v. S.B. Phillips Co., Inc.*, 359 F. Supp. 2d 189, 199 (D. Conn. 2005) (dismissing plaintiffs' breach of contract claims because they were not parties to the insurance policies or indemnity agreement and were therefore not in privity of contract with defendant). The 2010 Indemnity Agreements executed by the Indemnitors specify this consideration and the benefit they receive, stating that the Indemnity Agreements are executed "IN CONSIDERATION of the execution of any such Bonds for Principal, from which it is acknowledged that Indemnitors derive a substantial

---

[6] Arch's reference to *Capstone Building Corp. v. Am. Motorist Ins. Co.*, 308 Conn. 760, 67 A.3d 961 (2013) is inapposite here. *Capstone* addresses a commercial general liability insurance contract. Furthermore, Defendants do not seek indemnification under the performance bond as Arch suggests by citing this case.

material benefit." [Dkt. 1-1 at 3; Dkt. 1-2 at 3]. Thus, the Indemnitor Defendants are in privity of contract with Arch and can sue for breach of those contracts.

### b) Arch Had A Duty to Perform On The Bond And Was Not A Volunteer

The Court now addresses Defendants' allegation that Arch acted as a volunteer in taking over the Project because it had no obligation to perform on the performance bond. *See* [Dkt. 77 at 34, ¶ 72].

The performance bond states that Centerplan, as Principal, and Arch, as Surety, "are hereby held and firmly bound unto [the Obligees] . . . in the penal sum of . . . ($47,050,000)." [Dkt. 82-12 at 1]. It further states that the bonded contract is the DBC and that "if the above-named Principal shall well and faithfully do and perform the things agreed by the Principal to be done and performed according to the terms of said Contract, . . . then this obligation shall be void; otherwise the same shall remain in full force and effect." *Id.*

The SACC acknowledges three critical facts. First, the SACC acknowledges that the completion of the Project was guaranteed by the bond issued by Arch. [Dkt. 77 at 20, 31 ¶¶ 13, 60]. Second, that the Project was not complete by either the substantial completion date or the extended substantial completion date. *Id.* at 14, ¶ 28. And third, after the substantial completion date the City informed Arch that Centerplan and DoNo were in default. *Id.* at 14, ¶ 29. The Indemnity Agreements all clearly and unambiguously state that a principal or indemnitor will be deemed in default if they are "declared in default on any Bonded Contract," [Dkt. 1-1 at 1; Dkt. 1-2 at 1; Dkt. 1-3 at 2], and once that happens Arch becomes obligated under the performance bond "in the penal sum of FORTY SEVEN MILLION FIFTY

THOUSAND AND 00/100 DOLLARS ($47,050,000.00), for the payment of which well and truly to be made. . . ."   [Dkt. 82-12 at 2 of PDF; *see also* Dkt. 77 at 29, ¶ 54]. Thus, by asserting these facts, the SACC alleges that Defendants failed to perform the bonded Project guaranteed by the bond, triggering Arch's obligation under the bond and its right not to resist claims and to enter a binding compromise of claims made by the City.

The SACC also acknowledges tacitly Arch's right to adjust claims in its sole discretion.  According to the Indemnity Agreements, Arch had the final binding authority to pay and compromise claims unless Defendants posted cash collateral in the amount sufficient in Arch's judgment to cover any possible judgment.  [Dkt. 1-1 at ¶ 5; Dkt. 1-2 at ¶ 5].  The SACC does not allege that Defendants posted cash collateral satisfactory to Arch and thus tacitly admits that Arch had the exclusive, final and binding authority to pay and compromise any claim made against it on the Bonds. *Id.*; *see also* [Dkt. 77 (failing to allege that Defendants posted collateral for potential judgments rendered in challenging claims on the Bonds)].

The Multiple Obligee Rider of the bond limits Arch's obligation as the following:

> Notwithstanding anything contained herein to the contrary, there shall be no liability on the part of the Principal or Surety under this Bond to the Obligees, or any of them, unless the Obligees, or any of them, <u>shall make payments to the Principal, or to the Surety in case it arranges for completion of the Contract upon default of the Principal</u>, strictly in accordance with the terms of said Contract as to payments, and shall perform all the other obligations required to be performed under said Contract at the time and in the manner therein set forth.

[Dkt. 77 at 31, ¶ 60 (emphasis added); Dkt. 82-12 at 1].  This language establishes that Arch is not liable under the bond unless the Obligees (DoNo, the City, and the

Hartford Stadium Authority) make payments and perform their obligations. "It is a fundamental precept of suretyship law that the liability of the surety is conditioned on accrual of some obligation on the part of the principal; the surety will not be liable on the surety contract if the principal has not incurred liability on the primary contract." *Star Contracting Corp. v. Manway Constr. Cr., Inc.*, 32 Conn. Supp. 64, 66 (Conn. Super. Ct. 1973) (acknowledging general suretyship principles in a public bonds case).

The Second Circuit has interpreted the form of an American Institute of Architects A312 bond requiring payment of the contract price an enforceable condition precedent under New York law. *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 58 (2d Cir. 2004) ("As another condition precedent to the sureties' Obligations under the Bonds, the Obligees, after declaring the Consortium in default, were required to pay the Sureties the 'Balance of the Contract Price' in each of the Contracts . . . a not atypical provision."). The court noted that the condition precedent was satisfied where the obligee sent a letter stating that "[p]ursuant to paragraph 3.3 of the [bond] . . . [obligee] agrees to pay the Balance of the Contract Price to the Sureties." *Id.* at 59 (internal brackets omitted).

The condition in the multiple obligee rider is similar to this condition in the A312 bond, requiring that the Obligees "make payments to the Principal, or the Surety . . . , and shall perform all the other obligations required." [Dkt. 82-12 at 8]. However, while the SACC seems to allege that Arch was not liable because the City had not fulfilled its obligations under the contract, the SACC does not allege that

the City actually failed to make payments or otherwise perform.  Rather, it states that "[t]he City did not have enough money to pay for the work and as a result before it terminated Centerplan it was in default of the DSA, the BDA and the DBC." [Dkt. 77 at 29, ¶ 53].  It also asserts that "Centerplan continued working and the Ball Club refused to provide the money it previously agreed to provide ($2,000,000) or pay for changes it requested.  When Centerplan asked for assurances that it would be paid, the City asserted that it did not have enough money to cover its obligations to Centerplan and DoNo" which the Ball Park refused to pay.  [Dkt. 77 at 13, ¶ 27]. Put simply, the SACC asserts that the City repudiated by stating that it did not presently have funds to satisfy its obligation to fund the change orders and CCDs issued after the January Agreement.

"A repudiation is a manifestation by one party to the other that the first cannot or will not perform at least some of its obligation under the contract.  It may be by words or other conduct."  *Coppola Constr. Co., Inc. v. Hoffman Enters. Ltd. P'ship*, 157 Conn. App. 139, 161 (Conn. App. Ct. 2015) (citing *2 E. Farnsworth, Contracts* (3d Ed. 2004) § 8.21, p. 558)).  The Court finds that the SACC fails to plausibly allege that the City repudiated and therefore was in default for failure to provide the requested assurance.

First, the SACC conflates the December 24, 2015 change orders, which it alleges the City agreed to partially fund, and the subsequent change orders and CCDs, which the SACC does not allege the City agreed to fund.  *See* [Dkt. 77 at 26-27, ¶¶ 42-44].  The SACC fairly read refers to the latter when alleging that the City represented that it would not be able to pay for the additional work it never

undertook to fund.  *See id.* at 28, ¶ 49.  But the City cannot repudiate an obligation it never assumed.

Second, the SACC alleges, the Ballpark Development Agreement states the City must fund change orders before they become part of the contract which Centerplan and DoNo are obligated to perform.  *See id.* at 28, ¶ 48.  The SACC further alleges that the City did not fund that work ahead of time and thus, Centerplan and DoNo were not obligated to implement the change orders and CCDs.  *See id.* at 28, ¶¶ 49, 51.  Therefore, according to the SACC, there was no additional work for which the City was obligated to pay and therefore the City had no obligation to repudiate.

Third, any implication by the SACC that the City was obligated to provide assurances of payment for the later change orders and CCDs is not supported by any asserted fact or document cited in the record.  Thus, the SACC does not clearly and concisely allege the City had an obligation to provide the assurance requested.  Neither the SACC nor any of the relevant agreements referenced in the SACC obligates the City to provide assurances that it has present funds to meet future obligations.  On the contrary, the DBC expressly provides that it does not create a contractual relationship with the City, but reflects that the course of dealing for the Project mandates a dispute resolution procedure for disputed CCDs.  [Dkt. 82-10 at § 1.1, Ex. A at § A.4.1, §A.7.3.8].  The SACC does not allege that the parties engaged in a dispute resolution proceeding obligating the City to provide assurance of payment for the later change orders and CCDs and therefore fails to plausibly allege that the City had such a duty and its refusal constituted a repudiation of that

duty. As such, Defendants fail to plausibly allege that a breach by the City negated Arch's liability under the bond triggered by Centerplan's default.

Further, the Indemnity Agreements, the latest of which was executed in January 2016, after the execution of the Bonds and multiple obligee rider, gave Arch final and binding authority to compromise the competing claims of DoNo, Centerplan, the Ball Club, and the City. Indeed, the 2016 Indemnity Agreement executed by Defendants gives Arch the "sole and exclusive right to decide and determine whether any claim, liability, suit or judgment made or brought . . . shall or shall not be paid, compromised, resisted, defended, tried or appealed, and Surety's decision thereon shall be final and binding upon all Indemnitors." [Dkt. 1-3 at ¶ 8]. Consequently, Arch was not a volunteer when it undertook to complete the project despite the City and the Ball Club's statement that they would not pay for the construction work. Even in light of those statements, Arch's rights to compromise claims in the Indemnity Agreements allowed Arch not to resist the claim and to decide how to handle the bond claim and, indeed, to perform under the bond. The Court therefore concludes that the SACC fails to plead that Arch breached the performance bond and Indemnity Agreements on the ground that it acted as a volunteer. *See Meyers*, 311 Conn. at 291.

In light of the foregoing, the breach of contract claim predicated on the City's failure to provide assurance of payment for change orders and CCDs issued after the January Agreement is DISMISSED without prejudice to filing an amended complaint asserting that claim, but pleading facts, as opposed to legal

conclusions, establishing a specific contractual obligation to provide the specific assurance requested and a breach of that specific duty.

**2.** ___Allegation 2: Arch's Actions Subsequent to Centerplan's Default Violated the Bonds and Indemnity Agreements___

Defendants also argue that "Arch further breached its contractual duties" by (a) "requiring termination of the DSA and DBC;" (b) "failing to fully investigate the City's default and the City's inability to pay for the work;" (c) "acting as a volunteer and assuming the responsibility to complete the work on the Project;" and (d) refusing to accept collateral. *See* [Dkt. 77 at 34, ¶ 74]. Defendants having already alleged breach based on Arch's agreement to perform under the bond in the first place, and the Court having already found that allegation insufficiently pled, the Court interprets allegation (c), "volunteer" performance, to refer to the manner and extent of Arch's performance following its assumption of responsibility for the Project.

As a preliminary matter, the court notes that it is privy to facts entered into evidence in this case at the prejudgment hearing and in the documents filed in relation thereto and Arch's pending Motions for Summary Judgment. This evidence soundly refutes Defendants' claims that Arch failed to adequately investigate the City's claim and refused to accept collateral that Defendants were required to post under the terms of the Indemnity Agreements. For purposes of this decision, however, the Court declines to consider this evidence and will address the evidence in ruling on Arch's pending Motions for Summary Judgment.

Turning to the merits, Arch contends that a breach of contract claim must be dismissed if it fails to cite specific provisions of the contract in dispute. *See*

[Dkt. 85-2 at 7]. In support, Arch cites *Timmons v. City of Hartford*, 283 F. Supp. 2d 712, 718 (D. Conn. 2003) (citing *Posner v. Minnesota Mining & Manuf. Co.*, 713 F. Supp. 562 (E.D.N.Y. 1989)) ("In asserting a breach of contract claim, the complaint must allege the provisions of the contract upon which the claim is based."). In *Timmons*, the plaintiffs failed to specify any written contract or agreement let alone the provisions within. The SACC is distinguishable from the complaints in those cases because it asserts claims based on actual written contracts referenced, namely the Bonds, Indemnity Agreements and other contracts signed by the parties. While there are several incongruous agreements entered into by the City, the Defendants and Arch as surety and it would have been helpful had Defendants cited to the specific provisions of the various agreements on which they rely, viewing the SACC in the light most favorable to the non-movant, the Court finds that the allegations are specific enough to point the Court to the related provisions in the respective contracts. *See Sharp Elecs. Corp. v. Solaire Devel., LLC*, 156 Conn. App. 17, 34–36 (Conn. App. Ct. 2015) (acknowledging that a breach of contract claim need not allege the specifics of the contract provision given that "pleadings must be construed broadly and realistically, rather than narrowly and technically") (internal quotation marks omitted).

Having found Defendants to have sufficiently pointed the Court to the relevant contracts it alleges Arch to have breached, the Court now considers allegations (a) through (d) each in turn.

### a) Termination of the DSA and DBC

"A suretyship is a three-party relationship where the surety, [in this case Arch], undertakes to perform to an obligee, [in this case the City and DoNo], if the principal, [Centerplan], fails to do so." *See Elm Haven Const. Ltd. Partnership v. Neri Const., LLC*, 281 F. Supp. 2d 406 (D. Conn. 2003), *aff'd,* 376 F.3d 96 (2d Cir. 2004). Under Connecticut law, a suretyship has been described as a "contract . . . to guard against loss in the event of the principal debtor's default. . . . The obligation of a surety is an additional assurance to the one entitled to the performance of an act that the act will be performed. . . . The liability of sureties is to be determined by the specific conditions of the bond." *Id.* (quoting *Ames v. Comm'r of Motor Vehicles*, 70 Conn. App. 790, 797 (App. Ct. 2002)).

A court looks to "standard principles of contract interpretation to determine the rights and obligations of a surety under a bond." *Braspetro Oil*, 369 F.3d at 51. "One of those principles is that, before a surety's obligations under a bond can mature, the obligee must comply with any conditions precedent." *Id.*; *Elm Haven Constr. Ltd. P'ship v. Neri Constr. LLC*, 376 F.3d 96, 100 (2d Cir. 2004) (citing *Braspetro* in a surety performance bond dispute governed by Connecticut law).

The SACC first alleges that, in telling the City that it would not act under the bond until the City had terminated the DSA and DBC, Arch improperly treated termination of the DSA and DBC as a condition precedent to Arch's performance under the bond. [Dkt. 77 at 34, ¶ 74]. The SACC provides little indication of which contract was breached and how.

In the leadup to the alleged statement by Arch, Centerplan and DoNo had failed to perform its obligations under the DBC by, among other things, failing to complete the project by the extended Substantial Completion Date. Based on this failure and others, the City had informed Arch that Centerplan was in default. At which point, the SACC alleges that Arch "said it would not perform under the bonds unless and until the City terminated the DSA and the DBC." *Id.* at ¶ 54.

The SACC does not allege that Arch directed the City to terminate Centerplan and DoNo, nor does it allege that the statement constituted a breach of any specific contract provision. The Court has reviewed the contracts referenced in the SACC and failed to discern any provision which Arch would have breached by informing the City of the conditions precedent to its taking over the project. Nor can the Court conceive of any. It would have been impracticable for both Arch and Centerplan to attempt to complete the project simultaneously. Nor do Defendants cite any law or other legal authority that requires Arch to supervise or partner with Centerplan to complete the project. On the contrary, the relevant agreements explicitly authorized Arch to take over the Project. *See* [Dkt. 1-1 ¶¶ 6 (granting Arch "the right, but not the obligation, to take possession of the work under any and all Bonded Contracts, and complete or consent to the completion of such Bonded Contracts at the expense of the Indemnitors"); Dkt. 1-2 ¶¶ 6 (same); Dkt. 1-3 ¶¶ 9 (same)]. Considering the contractual provisions of which the Court is aware, and in the absence of Defendants' pleading any contractual obligation to the contrary, Defendants have failed to allege breach of contract on this ground.

### b) *Failure to Investigate*

As for Defendants' claim that Arch breached by failing to properly investigate, neither the bond nor Indemnity Agreements has a provision requiring Arch to investigate the Owner's default prior to fulfilling its obligation under the bond. This situation is decidedly similar to the breach of contract counterclaim asserted in *Philadelphia Indem. Ins. Co. v. Ohana Control Sys.*, 289 F. Supp. 3d 1141, 1147 (D. Haw. 2018). In *Ohana*, the defendant argued that the surety breached its duty to investigate the claims made by the owner of the project. The district court stated the following:

> The Counterclaim, however, fails to identify the contract and contractual provision at issue, whether Defendants performed or were excused from performance of their obligations under the contract, and when and how Philadelphia allegedly breached the contract. Instead, the Counterclaim simply alleges that Philadelphia had a duty to investigate DOE claims made on the performance bonds before bringing suit against Defendants, without mentioning the basis of any such purported duty. The court has examined the performance bonds and the General Indemnity Agreement and found no provision imposing a duty to investigate.

*Id.* Like in *Ohana*, the Court has inspected the performance bond and indemnity agreements and cannot find any provisions creating the duty to investigate alleged by Defendants. Nor have Defendants cited any. The multiple obligee rider negating liability under the bond if the obligees fail to perform clearly does not include such an investigation requirement and the Court cannot read one into the unambiguous contract. Finally, the Indemnity Agreements give Arch unilateral binding authority to compromise claims as it sees fit and imposes no duty to investigate. *See* [Dkt. 1-1 ¶¶ 4, 6; Dkt. 1-2 ¶¶ 4, 6; Dkt. 1-3 ¶¶ 4, 9]. Thus, Defendants fail to allege a breach of contract for an alleged failure to investigate the City's default.

### c) Arch's Performance After Taking Over the Project

Defendants next allege that Arch's performance after taking over the Hartford Stadium Project constitutes a breach of contract. [Dkt. No. 77 at 34, ¶ 74]. The SACC alleges that "after Arch commenced completion of the Project, it performed work that was not within the scope of work covered by the Performance bond and paid subcontractors amounts not covered by the Payment bond." [Dkt. 77 at 33, ¶ 59; *see also* Dkt. 77 at 33 ¶¶ 65-66]. Thus, the SACC alleges that the manner and extent to which the surety completed the Hartford Stadium Project violated unspecified "contractual duties," and accordingly Arch "cannot recover anything paid on any bond from any indemnitor." [Dkt. 77 ¶¶ 72, 74].

These assertions invoke two clear and unambiguous provisions of the Indemnity Agreements: the surety's rights regarding default and the surety's rights regarding claims. *See* [Dkt. 1-1 ¶¶ 4, 6; Dkt. 1-2 ¶¶ 4, 6; Dkt. 1-3 ¶¶ 4, 9]. The paragraph entitled "Surety's Rights Re: Default" grants Arch "the right, but not the obligation, to take possession of the work under any and all Bonded Contracts, and complete or consent to the completion of such Bonded Contracts at the expense of the Indemnitors." [Dkt. 1-1 ¶ 6; Dkt. 1-2 ¶ 6; Dkt. 1-3 ¶ 9 (with the same text of the paragraph but entitled "Surety's Right to Complete Work")]. In addition, the paragraph of the Indemnity Agreements entitled "Surety's Rights Re: Claims" grants Arch the "exclusive right to decide and determine whether any claim, liability, suit or judgment made or brought against Surety on any Bond shall or shall not be paid, compromised, resisted, defended, tried or appealed, and Surety's decision thereon shall be final and binding upon the Indemnitors." [Dkt. 1-1 ¶ 5; Dkt. 1-2 ¶ 5; Dkt. 1-3 ¶ 8].

These provisions of the Indemnity Agreements give Arch broad discretion to handle claims and binds Defendants to Arch's decisions in doing so. *See* [Dkt. 1-1 ¶ 5, 6; Dkt. 1-2 ¶ 5, 6; Dkt. 1-3 ¶ 8, 9]. Arch had the authority to compromise claims, including the authority to compromise and/or forbear in demanding payment in consideration of performance. This authority allowed Arch to perform work that may not have been directly within the scope of covered work in the DBC and to pay subcontractors despite potential defenses to their claims. The performance bond does not specify or limit the manner in which Arch must ensure payment of the penal sum. Thus, contrary to Defendants' allegation, the unambiguous terms of the Indemnity Agreements establish that Arch had the unambiguous and unilateral right to determine whether and how to settle the City's claim on the performance bond, as well as the subcontractors' claims on the payment bond.

At the prejudgment remedy hearing Centerplan and DoNo made much ado about bad faith, asserting that Arch and the City acted in bad faith in finishing the Project. The SACC pleads no facts to support such a claim. It fails to assert that Arch had any improper motive in taking over and completing the Project. Nor does it point to any benefit Arch derived by paying to complete the Project. Indeed, when asked by the Court what would have happened had Arch not stepped-in Defense counsel was unresponsive.

In light of the clear and unambiguous provisions of the Indemnity Agreements granting Arch significant discretion in handling claims and completing work, and in the absence of any other contractual provisions provided by

Defendants which support their allegation that Arch breached some obligation in handling the City's and subcontractors' claims the way it did, the Court concludes that Defendants have not asserted facts plausibly alleging a cognizable claim for breach of contract on this ground.

Defendants also fail to assert damages on these grounds, stating only that they need not indemnify Arch under the bond.[7]  *See Damages*, Black's Law Dictionary (10th ed. 2014) ("Money claimed by, or ordered to be paid to, a person as compensation for loss or injury.").  The SACC fails to identify and the Court has found no provision of any agreement which affords the Defendants this remedy for the breach it claims.

### d) Collateral

Finally, Defendants alleges that "Arch further breached the Indemnity Agreements when it refused to accept collateral offered by the defendants."  [Dkt. 77 at 35, ¶ 76].  As explained below, this claim is insufficiently plead.  The SAC does not allege that Defendants offered collateral required to be posted.  In a slight of hand, the SACC alleges facts constituting an admission that Mr. Landino offered Arch less than the full amount the Indemnitors were obligated to post.  *See* [Dkt. 77 at 33, ¶ 68].  The SACC alleges Defendants offered collateral which "would cover most if not all of the potential exposure."  That allegation can only be construed to

---

[7] Defendants argue in their opposition that "[a]s a result of Arch's actions, the Defendants have suffered damages."  [Dkt. 116 at 17].  This conclusory statement without specifying the loss is insufficient. A pleading cannot be amended by a statement in a memorandum of law. *Bruno v. City of Schenectady*, No. 1:12-cv-0285, 2014 WL 689664, at *16 (N.D.N.Y. Feb. 20, 2014) (declining to "extra-liberally construe [plaintiff's] opposition memorandum of law as effectively amending her Amended Complaint").

plead Defendants offered contingent or partial collateral or both. The SAC utterly fails to allege Defendants offered the contractually required collateral or that Arch was contractually obligated to compromise and accept anything less or other than the contractually required collateral.

The SACC does not allege that Arch had a duty to accept the collateral offered because there is no nebulous or crafty way to plead around the fact that the Indemnity Agreements state the exact opposite. Indeed, the Indemnity Agreements make clear that Arch has the power to determine the type and amount of necessary collateral security—requiring Indemnitors to deposit "promptly on demand, a sum of money equal to the amount the Surety determines or collateral security of a type and value satisfactory to the Surety." [Dkt. 1-3 at ¶ 4]. As such, Defendants have not plausibly alleged that Arch somehow breached a contract by not accepting whatever collateral Mr. Landino may have offered.

Because Defendants have failed to allege facts amounting to a plausible breach of contract claim, Count I is DISMISSED.

II. <u>Count Two: Breach of Implied Covenant of Good Faith and Fair Dealing</u>

Plaintiff argues that the SACC fails to sufficiently plead a breach of the implied covenant of good faith and fair dealing for two reasons: (1) it does not specify the contract or terms, and (2) it does not allege facts sounding in bad faith. Defendants dispute both arguments.

"Every contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Gaudio v. Griffin Health Servs. Corp.*, 249

Conn. 523, 564, 733 A.2d 197 (1999) (internal quotation marks omitted); *see also Macomber v. Travelers Prop. & Cas. Corp.*, 261 Conn. 620, 638, 804 A.2d 180 (2002) ("It is axiomatic that the . . . duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship."). The implied covenant of good faith and fair dealing applies to a surety that is party to an indemnity agreement. *See PSE Consulting Inc. v. Mercede & Cons, Inc.*, 267 Conn. 279, 301 (2004). "To constitute a breach of that covenant, the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." *Alexandru v. Strong*, 81 Conn. App. 68, 80–81 (Conn. App. Ct. 2004).

The SACC identifies the bonds and Indemnity Agreements as the contracts relevant to Arch's alleged breach of the implied covenant of good faith and fair dealing. [Dkt. 77 at 35, ¶ 79]. The Indemnity Agreements clearly state that they were made in consideration of the execution of bonds. [Dkt. 1-1 at 2; Dkt. 1-2 at 2; Dkt. 1-2 at 2; Dkt. 1-3 at 1].[8] Thus, Defendants may assert their rights as established by entering into contract with Arch.

---

[8] Specifically, the consideration language from the July 2010 and October 2010 indemnity agreements is as follows: "IN CONSIDERATION of the execution of any such Bonds for Principal, from which it is acknowledged the Indemnitors derive a substantial material benefit, and as an inducement to such execution or continuation of suretyship and/or the issuance of Bonds by Surety, the Indemnitors, jointly and severally, agree as follows. . . ." [Dkt. 1-1 at 2; Dkt. 1-2 at 2]. The consideration language outlined in the January 2016 indemnity agreement states, "IN CONSIDERATION of the foregoing premises and the Surety's execution and delivery of one or more Bonds or its refraining from canceling the same, and intending to be legally bound hereby, the Indemnitors for themselves and their respective heirs, executors, administrators, successors, and assigns, hereby agree, jointly and severally, to be obligated to the Surety, its successors and assigns, as follows." [Dkt. 1-3 at 1].

The question then becomes whether Defendants have properly pleaded bad faith. In the surety context, "bad faith" is defined as "an 'improper motive' or 'dishonest purpose' on the part of the surety." *PSE*, 267 Conn. at 304–05; *Blumberg Assocs. Worldwide, Inc. v. Brown & Brown of Connecticut, Inc.*, 132 Conn. App. 85, 100 (Conn. App. Ct. 2011) (stating "bad faith" means "both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive"). Such "improper motive" must be more than negligence, *see PSE*, 267 Conn. at 303, but need not rise to the level of fraud, *see id.* at 305. It may be said that "bad faith may include one party's performance or interpretation of the contract in a manner that evades its spirit and is unfaithful to its purpose, resulting in a denial of the justified expectations of the other party." *See Landry v. Spitz*, 102 Conn. App. 34, 48 (Conn. App. Ct. 2007).

Paragraphs 1 through 53 of the SACC assert facts related to the Hartford Stadium Project that do not involve Arch. *See* [Dkt. 77 at 18–29, ¶¶ 1–53]. Arch only comes into the picture at paragraph 54 out of 69 of the Facts section. *See id.* at 29–33, ¶¶ 54–69. The Court expresses no opinion as to whether the preceding 53 paragraphs could plausibly establish a breach of the implied covenant of good faith and fair dealing against the parties involved in the DBC and DSA, but it finds that Defendants have not pled facts sufficient to confer bad faith on Arch vicariously.

It is not until paragraph 54 that Defendants raise assertions that could plausibly be construed as speaking to Arch's motive; but even then, they either rely on some of the same positions dismissed above or fail to successfully allege bad faith. The SACC alleges that "Arch breached its obligation of good faith and fair dealing by, among other things, requiring termination of the DSA and DBC, failing to investigate the City's conduct, the facts underlying the City's claim that Centerplan was in default and Centerplan's allegations that the City was in default. Arch, [sic] acted as a volunteer assuming the responsibility to complete the work on the project." *Id.* at 30, ¶ 58.

Additionally, Defendants assert that, around the time of Centerplan's termination from the Project, "it was apparent to Arch that the City had ordered Centerplan to perform additional work for which the City did not have funds to pay and that the design for which the City was responsible was not complete." *Id.* at 32, ¶ 64. Nonetheless, "Arch did not take a position with the City that Arch did not have any obligation to complete the work under the Performance Bond because of the City's breaches of the Agreements between Centerplan and DoNo." *Id.* Third, the SACC alleges that "Arch has been forced or elected to perform work, or authorized payment for work, which Arch knows was not covered by the contracts existing at the time Centerplan was wrongfully terminated." *Id.* at 33, ¶ 65. The SACC further alleges that "Arch has demanded even more money to cover the work that neither Centerplan nor Arch was obligated to perform but that the City and/or Ball Club claimed was necessary to perform so that the Project could be completed." *Id.* at 33, ¶ 69. Defendants added the majority of these allegations into

the SACC in response to the Court's direction that the First Amended Complaint did not satisfy Rule 8 of the Federal Rules of Civil Procedure. *See* [Dkt. 74 (Order)]. Despite these additions, the SACC fails to allege any facts constituting or even suggestive of deceit or improper motive.

Connecticut Superior Court cases concerning claims of breach of the implied covenant of good faith and fair dealing help guide the analysis. In *Seven Oaks Partners, LP v. Vigilant Ins. Co.*, the trial court denied a motion to strike a breach of implied covenant of good faith and fair dealing claim for a mortgage insurance dispute on the basis that "[a]lthough the plaintiff's factual allegations regarding the defendant's intent are somewhat bare, the plaintiff does provide sufficient facts that could support its contention that the defendant acted in bad faith." No. FSTCV095012672S, 2010 WL 3038435, at *3 (Conn. Super Ct. July 7, 2010). The complaint stated that "[t]he purpose of the Defendant Vigilant's failure to adjust the claim in good faith and accordance with the contract was to intentionally and dishonestly avoid payment of the claim. . . . The Defendant's purposeful and intentional refusal to adjust the claim in a timely manner is a breach of the implied covenant of good faith and fair dealing." *Id.* The trial court denied the motion to strike, finding that, "[a]s the plaintiff alleges that the purpose of the defendant's actions was to intentionally and dishonestly avoid paying the claim, the plaintiff alleges more than a mere failure to make insurance payments." *See id.*

Another instructive case is *Management Strategies, Inc. v. West Haven Housing Authority* which concerned a contract dispute between a contractor and

the West Haven Housing Authority, which hired the contractor to make improvements to a Section 8 housing project.  No. CV126030581, 2014 WL 818601, at *5 (Conn. Super. Ct. Feb. 3, 2014).  In that case, the plaintiff alleged that the defendant had no intention of paying the plaintiff and knowingly and intentionally sought to evade its contractual obligation in a number of ways.  *Id.*  Because the plaintiff contractor alleged that the bad acts were intentional and evidence of a dishonest purpose, the court denied the motion to strike the claim.  *Id.*

Additionally, in *Longo*, the court denied a motion to strike a claim for breach of the covenant of good faith where plaintiff pleaded specific facts tending to show that the defendant conducted a limited liability company of which they were both members in specific ways contrary to their agreement and the plaintiff's interests and which precluded the plaintiff from being involved in and knowing the financial position of the company and exposed him to liability.  *Longo v. Longo*, No. FSTCV 106003946S, 2012 WL 2334128, at *3 (Conn. Super. Ct. May 15, 2012) ("If construed in a manner most favorable to the pleader, it can be inferred from these allegations that Salvatore R. Longo intentionally acted in bad faith when he committed these acts.").

These Connecticut cases make clear that a plaintiff seeking to prove a bad faith claim must allege dishonesty or malintent.  Indeed, bad faith means more than mere negligence, the claim must allege an improper motive, dishonest purpose, or performance "that evades [the] spirit" of the contract.  *Landry*, 102 Conn. App. at 48; *see also Capstone Bldg. Corp. v. Am. Motorists Ins. Co.,* 308 Conn. 760, 794-95,

67 A.3d 961 (2013) (at the very least the counterclaim must allege some improper motive).

A plaintiff pursuing such a claim in federal court must satisfy the federal pleading standard as it is "federal law [that] governs the degree of particularity with which such an allegation must be pled in a federal complaint." *Martin v. Am. Equity Ins. Co.*, 185 F. Supp. 2d 162, 164 (D. Conn. 2002). Under the federal pleading standard, a claim "does not need detailed factual allegations." *Starr v. Sony BMG Music* Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (internal quotation marks omitted). In addition, a Court must accept as true all factual allegations of the complaint and must draw all reasonable inferences in favor of the plaintiff. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A counterclaim plaintiff need only allege enough facts "to raise a right to relief above the speculative level," and "state a claim to relief that is plausible on its face." *Id.* (internal quotation marks omitted).

Federal Rule of Civil Procedure 9(b) states that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *See Martin*, 185 F. Supp. 2d at 163 (finding the "plaintiff's conclusory allegations provide no basis for this Court to reasonably infer bad faith" in a breach of implied covenant of good faith and fair dealing claim).

Unlike in the Connecticut cases discussed above, the SACC does not assert an improper motive or dishonest purpose prompting Arch to spend tens of millions of dollars required because of Centerplan's default. Even taking the factual allegations as true and construing them in the light most favorable to Defendants

does not lead to a plausible claim of bad faith. It would be entirely speculative to conclude that Arch's decision to perform under the performance bond, as it was entitled to do under the Indemnity Agreements, was improperly or dishonestly motivated. It would also be entirely speculative to conclude that Arch's representation to the City that it would not act under the bond until the DSA and DBC were terminated was improperly motivated in light of § 8 of the Direct Agreement. Section 8 of the Direct Agreement provides that the City may step into DoNo's shoes as the Owner of the DBC—putting it in a position to bring a claim under the performance bond—"but only upon . . . termination of the [DSA] by City for a [DoNo] Default thereunder." [Dkt. 82-11 (Direct Agreement) at § 8]. Thus, the City would only have the right to declare Centerplan in default and make a claim upon the performance bond, prompting Arch to act, if it first terminated the DSA. This even further undercuts any plausible arguments that Arch's statement was dishonestly motivated. Finally, the allegation that Arch paid construction costs which may not have been part of the contract does not tend to show bad faith either because Defendants gave Arch binding authority to compromise and negotiate claims under the terms of the Indemnity Agreements.

Defendants do not allege facts that suggest that Arch acted as it did in order to evade some contractual or legal obligation or that some other improper motive animated Arch's decisions. Slapping on the bad faith label without providing facts that could support such a finding does not meet the federal pleading standard. Defendants' failure to allege facts supporting a finding of improper motive for Arch's payment/performance is fatal.

Further, the allegations supporting Defendants' breach of covenant of good faith counterclaim are essentially identical to those relied upon for their breach of contract counterclaim, making the counterclaim duplicative and highlighting the lack of allegations rising to the level of bad faith. "[A]n implied-covenant claim is not a valid alternative theory of recovery when it is based on the exact same allegations as a breach-of-contract claim, as it is here." *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 64 (S.D.N.Y. 2016); *see also Shibata v. Lim*, 133 F. Supp. 2d 1311, 1321-22 (M.D. Fl. 2000) (dismissing the plaintiff's breach of implied covenant claim because "[t]here is no difference between the factual underpinnings" of that claim and his breach of contract claim).

For the foregoing reasons, Count Two is DISMISSED.

III. <u>Count Three: Surety Bad Faith</u>

Arch argues that Count Three should be dismissed because it is duplicative of Count Two. Defendants disagree, but they do not provide a meaningful analysis as to how or why both a breach of the implied covenant of good faith and fair dealing claim as well as a tortious bad faith claim may be brought as separate counts in the same case.

Arch cites *Nationwide Mut. Ins. Co. v. Pasiak*, Superior Court, No. Xo8FSTCV094015401, 2011 WL 6413817 (Conn. Super. Ct. Nov. 30, 2011), in support of its argument that Connecticut state law does not recognize an independent tortious bad faith claim. In this insurance policy dispute, the trial court struck the counterclaim plaintiff's tortious bad faith claim as duplicative of the breach of implied covenant of good faith and fair dealing claim. The trial court recognized

the well-settled Connecticut Supreme Court precedent that there is always an "an independent cause of action in tort arising from an insurer's common law duty of good faith," irrespective of a separate statutory or contractual duty. *See id.* at *3 (citing *Buckman v. People Exp., Inc.*, 305 Conn. 166, 170, 530 A.2d 596 (1987). But for this particular case, the trial judge reasoned that "[a] cause of action labeled as 'breach of the implied covenant of good faith and fair dealing' is the same cause of action as one labeled 'tortious bad faith,'" when the basis for each claim is the contractual relationship. *See id.* (citing *Votre v. Cty. Obstetrics & Gynecology Grp., P.C.*, 113 Conn. App. 569, 580, 966 A.2d 813, cert. denied, 292 Conn. 111, 971 A.2d 17 (2009) (it is "not the label . . . placed on each count of [the] complaint that is pivotal but the nature of the legal inquiry")). As further support, the trial court reflected on the Connecticut Supreme Court's acknowledgment that "bad faith," "lack of good faith," and "breach of the covenant of good faith and fair dealing" are often used interchangeably, *see PSE*, 267 Conn. at 296 n.7, and the fact that courts typically do not differentiate the analysis of these types of claims. *See id.* (citing cases).

Defendants cite *PanSAmSat Corp. v. Millennium Television Network*, No. CV010181722, 2001 WL 951320 (Conn. Super. Ct. July 20, 2001) in support of their position that Connecticut state law recognizes a surety bad faith claim. But *PsnSAmSat Corp.* involves only one count of bad faith in derogation of the plaintiff's rights under the payment bond. *See id.* at *2. Therefore, this case is not at odds with *Pasiak* or *PSE*, which recognize the courts' tendencies to use "bad faith," "lack of good faith," and "breach of the covenant of good faith and fair

dealing" interchangeably. *See PSE*, 267 Conn. at 296 n.7; *Pasiak*, 2011 WL 6413817, at *3. It is irrelevant, however, to the question at bar: whether a plaintiff may assert a breach of implied covenant of good faith and fair dealing claim and a tortious bad faith claim as two separate counts.

In reviewing the parties' briefing and relevant legal authority, the Court agrees with Arch. Count Two and Count Three are both based on the same facts, which relate to disputes involving the contracts at issue in this case. Given that the counts are duplicative and Defendants have not provided any legal or factual basis to differentiate these two counts, this count fails for the same reasons Defendants' breach of implied covenant counterclaim fails.

## IV.     Count Four: Tortious Interference with Contractual Relations

Connecticut "has long recognized a cause of action for tortious interference with contract rights or other business relations." *Robert S. Weiss & Assocs., Inc. v. Wiederlight*, 546 A. 2d 2016, 222 (Conn. 1988) (quoting *Blake v. Levy*, 464 A. 2d 52 (1983). But "not every act that disturbs a contract or business expectancy is actionable." *Id.* In order to successfully plead tortious interference, a plaintiff must allege facts that support those elements essential to the claim. *Id.* The elements are: "(1) the existence of a contractual or beneficial relationship; (2) the defendant's knowledge of that relationship; (3) the defendant's intent to interfere with the relationship; (4) that the interference was tortious; and (5) a loss suffered by the plaintiff that was cause by the defendant's tortious conduct." *Rioux v. Barry*, 283 Conn. 338, 351, 927 A.2d 304 (2007).

Thus, "an action for intentional interference . . . requires the plaintiff to plead and prove at least some improper motive or improper means . . . . [A] claim is made out only when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself." *Weiss*, 546 A. 2d at 536 (quoting *Blake*, 464 A. 2d at 56) (internal brackets omitted). Thus, the party must plead that the conduct was tortious. Instances of tortious conduct are those sounding in fraud, misrepresentation, intimidation, molestation, or that "the defendant acted maliciously." *Daley v. Aetna Life & Cas. Co.*, 734 A. 2d 112, 135 (Conn. 1999). "In the context of a tortious interference claim, the term malice is meant not in the sense of ill will, but intentional interference without justification . . . In other words, the plaintiff bears the burden of alleging and proving lack of justification on the part of the defendant." *Am. Diamond Exchange, Inc. v. Alpert*, 920 A. 2d 357, 363 (Conn. App. 2007) (quoting *Downes-Patterson Corp. v. First Nat'l Supermarkets, Inc.*, 64 Conn. App. 417, 429, 780 A. 2d 967 (2001)) (internal quotations and brackets omitted).

The allegations for Count Four are sparse. Defendants allege interference with the DSA and the DBC; Arch is not a party to either contract. *See* [Dkt. 77 at 28, ¶ 48]. Defendants allege that Arch told the City "it would not take action under the bonds unless and until the City terminated the DSA and the Design Build Contract" and that such a representation was made "knowing that the City would rely on it to take the action to terminate the DSA and the Design Build Contract." *See id.* at 28, ¶¶ 48–49. These allegations are identical to those set forth in the First Amended Complaint. The SACC also adds that this was "an intentional

misrepresentation" in that, "[c]ontrary to Arch's assertions, termination of the DSA and the DBC was not a condition precedent to Arch's performance under the Bonds." *See id.* at 34, 37 ¶¶ 74, 88. These allegations fail to allege a plausible tortious interference claim.

First, there is no contract term under the performance bond or the Indemnity Agreements that would require Arch to act simultaneously with Centerplan. And Defendants do not point to any contract provision or provide any facts that support the conclusion that Arch's statement—that it would not act under the bond until the City terminated the contracts—was an intentional misrepresentation or was otherwise improper. Second, such a claim is defeated by § 8 of the Direct Agreement, which required the City to terminate the DSA before it could step into DoNo's position as Owner/Obligee of the DBC (the bonded contract) such that it would be in a position to make a claim on the performance bond. *See* [Dkt. 82-11 at § 8]. According to the Direct Agreement, until the City terminated the DSA, it had no rights under the DBC and was not able to make a legitimate claim under the bond. As Arch stated, only after the City terminated the DSA and assumed DoNo's role as Owner/Obligee of the bonded contract would Arch be obliged to respond to its claim on the bond.

Finally, as noted above, the purpose of a performance bond is to assure the completion of a construction project where the contractor is in default. The surety assumes through the issuance of the performance bond the duty to step in and complete the contract. Thus, it is axiomatic that the surety would require the owner to terminate the contractor first to trigger the surety's obligation to perform; and

second to make it practicable for the surety to perform as both the principle and the surety cannot perform the construction contract simultaneously. *Hicks & Warren LLC v. Liberty Mut. Ins. Co.*, No. 10 CIV. 9457 SAS, 2011 WL 2436703, at *3 (S.D.N.Y. June 16, 2011) (citing *United States Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 67 (2d Cir.2004)). The surety has a duty to either step in and perform in the contractor principal's stead or provide the owner funds with which to complete the project. *See U.W. Marx, Inc. v. Mountbatten Sur. Co., Inc.*, 770 N.Y. S.2d 777, 780 (3d Dep't 2004).

Because Defendants have failed to plausibly allege that Arch committed some tort, they have not sufficiently alleged tortious interference with contractual relations and Count Four is DISMISSED. *See Toro v. Arnold Foods Co., Inc.*, No. 3:07-cv-1356, 2008 WL 4000632, at *2 (D. Conn. Aug. 28, 2008) (holding that "bare allegations" that the defendant had "conducted a campaign" to interfere with the plaintiff's contractual relations by "making untrue and inflammatory statements" were insufficient to allege improper motive as required for the claim).

V.  <u>Count Five: CUTPA Violation</u>

Section 42-110b(a) of CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. 42-110b(a). "[T]o prevail on a CUTPA claim, the plaintiffs must prove that (1) the defendant engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce . . . and [plaintiff suffered] ascertainable loss of money or property as a result of the defendant's acts or practices." *Neighborhood Builders, Inc. v. Town of Madison*,

294 Conn. 651, 657, 986 A.2d 278 (2010) (quoting Conn. Gen. Stat. § 42–110b(a); Conn. Gen. Stat. § 42–110g(a)). It is quite clear that Defendants suffered an ascertainable financial loss in their termination from the Project as well as a loss of their reputation, what is not clear is the extent to which these losses were caused by Arch or by their failure to deliver the stadium in a timely and merchantable manner. The Court need not answer this question because the question of whether Defendants have sufficiently alleged that Arch engaged in "unfair or deceptive acts or practices" is dispositive.

In determining whether a practice is unfair, Connecticut courts have traditionally applied the "cigarette rule" established by the Federal Trade Commission, which asks whether a practice (1) "offends public policy . . . established by statutes, the common law, or otherwise"; (2) "is immoral, unethical, oppressive, or unscrupulous"; or (3) "causes substantial injury to consumers. . . ." *State v. Acordia*, 310 Conn. 1, 29-30, 73 A.3d 711 (2013); *Am. Car Rental, Inc. v. Comm'r of Consumer Prot.*, 273 Conn. 296, 306-07, 869 A.2d 1198 (2005). For the same reasons the Court has granted Arch's motion to dismiss Defendants' breach of implied covenant of good faith and fair dealing counterclaim as well as their tortious interference with contractual relations counterclaim, the Court finds that Defendants have failed to alleged conduct by Arch which could be reasonably interpreted as "immoral, unethical, oppressive, or unscrupulous." Defendants have not set forth how Arch's alleged activities were offensive to public policy, or even which public policy the alleged actions offend. This is fatal to Defendants' CUTPA claim. *See Priority Sales Mgmt, Inc. v. Carla's Pasta, Inc.*, No. 10-cv-1918,

2011 WL 3819748, at *3 (D. Conn. Aug. 26, 2011) (striking CUTPA claim because "merely stating that the defendant's conduct violate public policy or is unfair and/or deceptive is not sufficient to sustain a CUTPA claim"). Therefore, Count Five is DIMISSED.

## Conclusion

For the above reasons, the Court GRANTS the motion to dismiss and the Counterclaim, Counts One through Five, are DISMISSED.

IT IS SO ORDERED

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: December 11, 2018