**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **ARCH INSURANCE COMPANY,** | : | |
| **Plaintiff,** | : | |
| | : | **No. 3:16-CV-01891 (VLB)** |
| **v.** | : | |
| | : | |
| **CENTERPLAN CONSTRUCTION** | : | **February 13, 2019** |
| **COMPANY, LLC, *et al.*,** | : | |
| **Defendants.** | : | |
| | : | |
| | : | |

## MEMORANDUM OF DECISION GRANTING PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT [DKT. 81, 82]

This is a suit brought by Arch Insurance Company ("Arch" or "Plaintiff") to enforce certain indemnity agreements issued by Centerplan Construction Company, LLC ("Centerplan"), Center Earth, LLC ("Center Earth") and certain affiliates (collectively "Defendants"). The indemnity agreements were issued in consideration for Arch's issuance of certain surety bonds. The bonds were issued to assure Defendants' payment and performance obligations as a condition precedent to the award of the contract to Center plan to construct the minor league baseball stadium in Hartford, Connecticut ("Hartford Stadium Project" or "Project") and other construction projects undertaken by Defendants (collectively, "Bonded Projects"). Upon receiving and paying claims on a number of the bonds, including the Hartford Stadium Project bonds, Arch demanded Defendants honor the indemnity agreements. Arch believes that Defendants have breached their obligations under the indemnity agreements by failing to comply with these demands, while Defendants dispute their and Arch's liability under the bonds and

claim that Arch is not entitled to indemnification or collateral security because Arch has acted in bad faith.

On November 16, 2016, Arch filed a complaint against Defendants seeking contractual indemnification, common law indemnification, contractual collateral security, common law exoneration, *quia timet*, and disclosure of financial information. *See* [Dkt. 1 (Compl.)]. Presently pending before this Court are two motions by Arch for summary judgment—a Motion for Summary Judgment on Counts I and II (contractual and common law indemnification) and a second Motion for Summary Judgment on Counts III, IV, V, and VI (contractual collateral security, common law exoneration, *quia timet*, and disclosure of financial information). Defendants oppose each motion. The Court addresses both of these motions in this opinion and order. For the reasons explained below, this Court finds that Arch is entitled to summary judgment on Counts I, III, and VI.


## Background

Arch is a Missouri corporation with its principal place of business in New Jersey, and it is authorized to write surety bonds in Connecticut. [Dkt. 1 (Compl.) ¶ 3]. The Defendants comprise various companies—Centerplan; Center Earth; Centerplan Development Company, LLC ("Centerplan Development"); RAL Investments, LLC ("RAL Investments"); Walnut Hill Chase, LLC ("Walnut Hill"); Tinker House, LLC ("Tinker House"); GH Development, Inc. ("GH Development"); and Centerplan Communities, LLC ("Centerplan Communities")—and Robert and Kelly Landino (the "Landinos"). *See id.* ¶¶ 4-13. Robert Landino is the owner of all

Defendant companies and is the chief executive officer of Centerplan and Centerplan Development. *See id.* Kelly Landino is his spouse. *Id.* ¶ 6.

Defendants Centerplan and Center Earth engage in the construction business and, as a result, require a surety to bond their construction projects and contracts from time to time. [Dkt. 82-1 (Pl.'s Rule 56(a)(1) Statement) at ¶ 1]. Centerplan and Center Earth called on Arch to issue bonds on their behalf for a number of projects. *Id.* In consideration for Arch's issuance of the surety bonds, Centerplan and Center Earth, along with each of the additional defendants, executed General Indemnity Agreements in favor of Arch dated July 10, 2010, October 15, 2010, and January 26, 2016 (the "Indemnity Agreements" or "Agreements"). [Dkt. 90 (Defs.' Resp. to Pl.'s Rule 56(a)(1) Statement) at ¶ 2; Dkt. 82-5 (July 2010 Indemnity Agreement); Dkt. 82-6 (Oct. 2010 Indemnity Agreement); Dkt. 82-7 (Jan. 2016 Indemnity Agreement)]. Each defendant is a party to at least one of the three Indemnity Agreements as Principal/Indemnitor.

Each of the Indemnity Agreements includes a provision obligating the indemnitors to indemnify Arch for any losses and expenses sustained by reason of having executed the bonds. [Dkt. 82-5 at ¶ 1; Dkt. 82-6 at ¶ 1; Dkt. 82-7 at ¶ 3]. The indemnity provisions also establish that the indemnitors will accept vouchers or other evidence of payments by Arch as *prima facie* evidence of the fact and extent of liability of the indemnitors to Arch. *Id.* Further, each indemnity agreement has a provision granting Arch the exclusive right to decide how to handle claims asserted under the bonds, including "the exclusive right to decide and determine whether any claim, liability, suit or judgment made or brought . . . shall or shall not

be paid, compromised, resisted, defended, tried or appealed." [Dkt. 82-5 at ¶ 5; Dkt. 82-6 at ¶ 5; Dkt. 82-7 at ¶ 8].

In reliance on the Indemnity Agreements, Arch issued a large number of bonds between 2010 and 2016 with Centerplan or Center Earth as principal. [Dkt. 82-1 at ¶¶ 7, 12; Dkt. 90 at ¶ 12 Resp.]. These included a performance bond and a payment bond for the Hartford Stadium Project, as well as bonds for a number of other Bonded Projects, including the Storrs Center Phase 2 project, the Asnuntuk Community College Technology Center project, the Hawleyville Sewer Extension project, the Hammonassett Beach State Park Utility Replacement project, the Orchard Hill Elementary School project, the 39 Front Street – Sitework and Site Improvements project, the Harding High School project, and the Trumbull and Pleasant Streets Realignment project. [Dkt. 82-1 at ¶¶ 9, 13].

The penal sum of each of the two Hartford Stadium Project bonds (the "Bonds") was $47,050,000. *Id.* at ¶ 10. The performance bond was conditioned on the faithful performance of Centerplan's Design-Build Agreement ("DBA"), the bonded contract. [Dkt. 90 at ¶ 10 Resp.]. The payment bond was conditioned on the payment of all those who provided labor and materials in furtherance of the DBA and the Hartford Stadium Project. [Dkt. 82-1 at ¶ 10; Dkt. 90 at ¶ 10 Resp.]. A Multiple Obligee Rider was executed and attached to the Hartford Stadium Project Bonds naming the City of Hartford (the "City") and the Hartford Stadium Authority ("HSA") as Obligees, in addition to DoNo Hartford, LLC ("DoNo"), the Owner of the bonded contract. [Dkt. 82-1 at ¶ 11; Dkt. 90 at ¶ 10 n.2, ¶ 11 Resp.].

On February 6, 2015, Centerplan entered into the DBA with DoNo—the developer of the Hartford Stadium Project pursuant to a Development Services Agreement ("DSA") between it and the City—as Owner, and Centerplan as Design Builder agreeing to construct the Hartford Stadium Project. [Dkt. 82-10 (DBA); Dkt. 82-9 (DSA)]. Under the DBA, Centerplan was obligated to achieve substantial completion of the work no later than March 11, 2016, and was to keep the cost of the Hartford Stadium Project at no more than $53,550,000. [Dkt. 82-10 at §§ 3.3, 4.4.3].

Centerplan, DoNo, and the City entered into the "Direct Agreement" on February 4, 2015, allowing the City to assume DoNo's position under the DBA "but only upon an event that would cause or provide Design Builder with cause to terminate the same or termination of the Development Services Agreement by City for a Developer Default thereunder." [Dkt. 82-11 (Direct Agreement) at § 8(a)].

The substantial completion date and cost of the Hartford Stadium Project in the DBA were amended by way of the "Term Sheet" on January 19, 2016. [Dkt. 90 at Add'l Fact ¶ 11]. The substantial completion date was extended to May 17, 2016, and the maximum cost was increased by over $10,300,000 to account for a December 2015 change order. *Id.*

From fall of 2015 through 2017, Arch received claims on a number of payment bonds it had issued on behalf of Centerplan and Center Earth on various Bonded Projects. [Dkt. 82-1 at ¶ 14]. These included claims from subcontractors and suppliers on the Hartford Stadium Project, the Storrs Center Phase 2 project, the Asnuntuk Community College Technology Center project, the Hawleyville

Sewer Extension project, the Hammonassett Beach State Park Utility Replacement project, the Orchard Hill Elementary School project, the 39 Front Street project, the Harding High School project, and the Trumbull and Pleasant Streets Realignment project. *Id.* at ¶ 15. Additionally, Arch received payment bond claims and union wage and fringe benefit bond claims from labor unions which provided labor on the Bonded Projects. *Id.* at ¶ 16. As of December 7, 2017, Arch had paid out a total of $20,500,963.60 in satisfaction of the payment bond claims. *Id.* at ¶ 21.

On May 19, 2016, Howard Rifkin, Corporation Counsel for the City of Hartford, notified DoNo, Centerplan, and Jeffrey M. Donofrio, Esq., on behalf of the City and HSA, that DoNo failed to meet the substantial completion deadline and that DoNo was in default pursuant to the DSA and the Term Sheet Agreement from January 19, 2016. [Dkt. 70 (PJR Hr'g Pl. Ex. 9, Default Letter) at 1]. The letter indicated the City and HSA were entitled to immediate payment of $50,000 and $15,000 per day for each day thereafter until the Project reached substantial completion. *Id.* Arch was copied to the letter. *Id.* at 2. On the same day, the City declared DoNo to be in default of the DSA citing its failure to meet the extended May 17, 2016, substantial completion deadline and demanded payment of liquidated delay damages from DoNo and Centerplan. [Dkt. 82-1 at ¶¶ 28, 29; Dkt. 90 at ¶ 28 Resp.]. Soon after, by letter dated May 27, 2016, the City and HSA provided Arch with "formal notice that [its] principal under the Performance Bond . . . , [Centerplan] is in default of its Design Build Agreement for the Minor League Ballpark," citing Centerplan's failure to reach substantial completion by May 17, 2016, failure to pay liquidated damages, failure to post a letter of credit regarding

said liquidated damages, and numerous construction deficiencies and code violations on the Project. [Dkt. 89-7 (May 27, 2016 Letter)].

Thereafter, on May 31, 2016, Arch attended a meeting at the City's office to discuss the default. *See* [Dkt. 89-7; Dkt. 117 (11.6.2017 PJR Hr'g[1] Tr.) at 112:7-113:23]. Joel Beach, Arch's Assistant Vice President in the surety bond claim department, testified that representatives of DoNo, the City, and Centerplan were in attendance. *Id.* The City requested that Arch become involved in the Project, to which Centerplan objected. [Dkt. 117 at 120:4-7]. Mr. Beach responded that Centerplan was the contractor of record, remained the contractor of record, and that Arch was not going to retain a consultant to oversee Centerplan's work on the job. *Id.* at 122:6-11. Mr. Beach testified that he did not tell anyone that the City had to terminate Centerplan. *Id.* at 122:12-15.

By letter dated June 6, 2016, the City terminated the DBA claiming "continued defaults" by Centerplan. [Dkt. 82-1 at ¶ 30; Dkt. 90 at ¶ 30 Resp.; Dkt. 82-15 (June 6, 2016 City DBA Termination Letter)]. By letter dated June 9, 2016, the City made formal demand on the Hartford Stadium Project performance bond to Arch. [Dkt. 82-16 (June 9, 2016 City Demand Letter)].

Immediately after Centerplan's termination, Arch began an investigation into the Hartford Stadium Project regarding the allegations of default, which lasted from June through September. [Dkt. 134 (1.29.2018 PJR Hr'g Tr.) at 152:20-158:23; Dkt.

---

[1] Though the parties did not cite to testimony provided at the Hearings regarding Arch's Motion for Prejudgment Remedy in their briefing on the Motions for Summary Judgment, the Court takes into account that evidence as well, as allowed by Federal Rule of Civil Procedure 56—"[t]he court need consider only the cited materials, but it may consider other materials in the record."

89-12 (Arch Rog. Resps.) at Rog. 14 Resp.]. Arch employed construction consultant Cashin, Spinelli and Ferretti, LLC ("CSF") to assist in its investigation of the claims. [Dkt. 82-1 at ¶¶ 32-34; Dkt. 89-12 at Rog. 7 Resp.; Dkt. 90 at ¶¶ 32-34]. In addition to CSF, Arch retained Attorney Matthew Horowitz to advise it on legal matters. [Dkt. 89-12 at Rog. 9 Resp.].

As a general matter, CSF was charged with investigating and assessing the claims, including reviewing the status of work (i.e., whether the work was performed in compliance with contract documents, what it would cost to finish, and how long it would take to finish). [Dkt. 134 at 152:20-158:23; Dkt. 89-12 at Rog. 7 Resp.]. CSF's investigation was extensive. *See* [Dkt. 134 at 152:20-158:23; 187:7-23]. They did numerous walk-throughs of the Project site, evaluating room by room what work Centerplan had completed and what it had not. *See* [Dkt. 134 at 155:5-15, 182:16-184:15]. CSF held meetings with representatives of the City, DoNo, and Centerplan both at the stadium and off-site. *See id.* at 158:24-163:1, 164:9-167:8. They also inspected voluminous documents throughout the course of the investigation, including plans, specifications, requisitions, change orders, change directives, subcontracts, accounts payable, and correspondence. *Id.* at 152:20-158:23, 163:2-187:22; *see also* [Dkt. 89-12 at Rog. 13 Resp.].

Near the end, but before completing its investigation and submitting its report to Arch, CSF asked DoNo and Centerplan for their input. Both refused to assist CSF assess the claims on the Bonds made by the City and Project subcontractors. [Dkt. 134 at 187:9-22]. Although they were present during parts of the investigation, with one exception, neither DoNo or Centerplan challenged the

claims. Centerplan objected to Arch paying a payment bond claim, arguing the "pay if paid" provision precluded it; Arch looked into the applicability and determined the "pay if paid" clause did not provide a defense for Arch. *Id.* at 79:17-83:11, 85:13-87:19. With the exception of this one instance, there is no evidence that Centerplan or DoNo asked Arch not to pay, compromise, resist, defend, litigate or otherwise challenge the claims; nor is there any evidence that Centerplan or DoNo posted collateral to secure any amount which may be due if Arch unsuccessfully challenged any claim.

CSF also conducted a careful review of the state of the Project financials, including the value of work completed and payments made by the City for that work. *Id.* The DBA and DSA established that Centerplan would submit monthly Applications for Payment, or Requisitions, to DoNo for review and approval, and ultimately submission in the form of a Draw Request to the City. [Dkt. 82-10 (DBA) at § 5.1; Dkt. 82-9 (DSA) at 7-8, § 3(e)(1)]. Upon submission, HSA and the City would review and approve the Draw Request and pay DoNo the approved amount. [Dkt. 82-9 at 7, § 3(e)(1)]. DoNo would then pay Centerplan usually within 30 days of submission of the Requisition. *See* [Dkt. 82-10 at § 5.1.3].

The parties agree, and the evidence shows, that Requisition 16, encompassing work done on the Project in April, as well as all prior requisitions submitted, were paid for by the City. *See* [Dkt. 134 at 64:13-21, 67:7-15, 188:7-18; Dkt. 117 at 138:9-17; Dkt. 118 at 65:2-4]. The parties further agree that Requisition 17, for work done in May, was not submitted to DoNo or the City. *Id.*; [Dkt. 118 at 65:2-4]. The only version of Requisition 17 that Arch knew of during the

investigation in 2016 was an unsigned, unsubmitted draft. *See* [Dkt. 134 at 100:18-20, 101:22-25, 220:13-16]. All the information and documentation available to Arch at the time, and in the record before the Court, establish the City paid all requisitions submitted, and thus amounts due on the Project; and there is no evidence the City received and failed to pay any requisition.

On October 17, 2016, Arch entered into the "Takeover Agreement" with the City and HSA, agreeing to the complete construction of the Hartford Stadium Project. [Dkt. 82-17 (Oct. 17, 2016 Takeover Agreement)]. As of December 7, 2017, Arch had made $16,269,435.81 in payments to complete work on the Hartford Stadium Project. [Dkt. 82-1 at ¶ 37; Dkt. 90 at ¶ 37 Resp.]. Arch provided copies of the vouchers and other evidence of these payments to Defendants. [Dkt. 82-1 at ¶ 40-42; Dkt. 90 at ¶ 41 Resp.].

In multiple letters dated August 5, 2016, Arch gave notice to Defendants of the claims on the Bonds and made demand upon Defendants to procure Arch's discharge from the Bonds issued on the Bonded Projects and hold harmless and indemnify Arch for its losses incurred and to be incurred as a result of having issued the Bonds. [Dkt. 81-22 (Aug. 5, 2016 Arch Demand Letters)]. Additionally, in multiple letters dated August 19, 2016, Arch demanded collateral security in the amount of $18,807,737.47—Arch's estimated pending exposure under the Bonds issued to secure payment and performance on Bonded Projects—from Defendants under the Indemnity Agreements. [Dkt. 81-23 (Aug. 19, 2016 Arch Demand Letters)]. Arch updated the demand on Defendants for collateral security—with Arch's pending exposure under the Bonds then estimated at $38,313,100.82—by

letter dated October 13, 2017. [Dkt. 81-24 (Oct. 13, 2017 Arch Demand Letter)]. Defendants argue that Arch has not incurred losses as a result of having issued the Bonds because Arch volunteered to settle claims and perform work for which they were not liable. Defendants have not provided collateral security or indemnified Arch as demanded.

Arch filed its complaint against Defendants on November 16, 2016, seeking contractual indemnification (Count I), common law indemnification (Count II), contractual collateral security (Count III), common law exoneration (Count IV), *quia timet* (Count V), and disclosure of Defendants' financials under the Indemnity Agreements (Count VI). *See* [Dkt. 1 (Compl.)]. Defendants claim multiple defenses to Arch's demands for indemnification and collateral security, and brought counterclaims against Arch alleging breach of contract, breach of the implied covenant of good faith and fair dealing, surety bad faith, tortious interference with contractual relations, and a violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a, *et seq.* [Dkt. 77 (Second Am. Answer)].

Arch now seeks summary judgment on all of its claims against Defendants.

## Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no genuine factual disputes exist. *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court

is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). This means that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000); *see Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-00481, 2004 WL 2472280, at *14 (D. Conn. Oct. 20, 2004) ("At the summary judgment stage of the proceeding, [the moving party is] required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient.") (citing *Gottlieb v. Cnty of Orange*, 84 F.3d 511, 518 (2d Cir. 1996)); *Martinez v. Conn. State Library*, 817 F. Supp. 2d 28, 37 (D. Conn. 2011). Put another way, "[i]f there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

However, a party who opposes summary judgment "cannot defeat the motion by relying on the allegations in his pleading, . . . or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb*, 84 F.3d at 518 (citations omitted). Nor will "conclusory statements, conjecture, or speculation by the party resisting the motion" defeat summary judgment. *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996). Where

there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726–27 (2d Cir. 2010).

Furthermore, summary judgment is an appropriate method of resolving disputes concerning indemnification agreements. *Gundle Lining Constr. Corp. v. Adams Cnty. Asphalt, Inc.*, 85 F.3d 201 (5th Cir.1996); *Commercial Ins. Co. of Newark v. Pacific–Peru Constr. Corp.*, 558 F.2d 948 (9th Cir.1977); *Cont'l Cas. Co. v. Am. Sec. Corp.*, 443 F.2d 649 (D.C.Cir.1970).


## Analysis

### I.  Indemnification (Counts I and II)

"[A]n action for indemnification is one in which one party seeks reimbursement from another party for losses incurred in connection with the first party's liability to a third party." *Amoco Oil Co. v. Liberty Auto and Elec. Co.*, 262 Conn. 142, 148, 810 A.2d 259, 263 (2002); *see Danbury Bldgs., Inc. v. Union Carbide Corp.*, 963 F. Supp. 2d 96, 103 (D. Conn. 2013).

Arch's Count II is a claim for common law indemnification.  In the absence of a contract to indemnify, a party is entitled to indemnification "only upon proving that the party against whom indemnification is sought either dishonored a contractual provision or engaged in some tortious conduct." *Burkert v. Petrol Plus of Naugatuck, Inc.*, 216 Conn. 65, 74, 579 A.2d 26, 31 (1990) (citing *Kaplan v.*

*Merberg Wrecking Corp.*, 152 Conn. 405, 411, 207 A.2d 732 (1965)). If a claim of indemnification is grounded in tort, "reimbursement is warranted only upon proof that the injury resulted from the 'active or primary negligence' of the party against whom reimbursement is sought." *Id.* (quoting *Kaplan*, at 415). Plaintiff makes no arguments in its motion for summary judgment regarding its entitlement to judgment on its common law indemnification claim. *See* [Dkt. 82-2 (arguing for judgment only based on its right to contractual indemnification)]. Thus, Arch's motion for summary judgment on Count II is DENIED. However, as discussed extensively below, the Court holds that Arch is entitled to summary judgment on Count I for contractual indemnification. Because Count II is an alternative theory of liability to Count I and seeks the same relief the Court grants Plaintiff via Count I, Count II is DISMISSED. *See Wickham Contracting Co., Inc. v. Bd. of Educ. of City of New York*, 715 F.2d 21, 28 (2d Cir. 1983) (a party seeking recovery under multiple theories of liability may only recover once).

Under Connecticut law, a party may seek indemnification based on the terms of an indemnity agreement and the express or implied contractual right to indemnification. *See Danbury Bldgs.*, 963 F. Supp. 2d at 103 (citing *DeCarlo & Doll, Inc. v. Town of Chester*, No. CV075003058, 2008 WL 4416073, at *2 (Conn. Super. Ct. Sept. 17, 2008)). When a party seeks to enforce an indemnity agreement, the court is to apply Connecticut's "well established principles of contract interpretation." *PSE Consulting, Inc. v. Frank Mercede & Sons, Inc.*, 838 A.2d 135, 144 (Conn. 2004). This means that the contract "must be construed to effectuate the intent of the parties, which is determined from the language used interpreted

in the light of the situation of the parties and the circumstances connected with the transaction." *Id.* at 145 (quoting *Poole v. Waterbury*, 831 A.2d 211, 223-24 (Conn. 2003)). The court must discern the parties' intent "by a fair and reasonable construction of the written words" and it must give the language "its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." *Id.* "Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms." *Id.* While the question of the parties' intent is typically a question of fact, "[w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law." *Id.*

The 2010 indemnity agreements contain the following indemnification provision:

> Indemnitors agree to indemnify and hold harmless Surety for any and all Loss[2] sustained or incurred by reason of having executed any and

---

[2] "Loss" is defined in the 2010 indemnity agreements as the following:

> Any and all liability, losses, costs, expenses, and fees of whatever kind or nature, that Surety may sustain or incur as a result of executing any Bond or as a result of the failure of Principal or Indemnitors to perform or comply with this Agreement. Loss includes but is not limited to: (a) sums posted by Surety as a reserve for the payment of potential losses and/or expenses, (b) all costs and expenses incurred in connection with investigating, paying or litigating any claim, and/or enforcing this Agreement, including but not limited to legal fees and expenses, professional and consulting fees, technical and expert witness fees and expenses, (c) all accrued and unpaid premiums owing to the Surety for the issuance, continuation or renewal of any Bonds or for any policy of insurance issued by Surety for the Principal or Indemnitors, (d) funds advanced by Surety to Principal in connection with a Bonded Contract, and (e) all other amounts payable to Surety according to the terms and conditions of this Agreement or any other agreement between Surety and Principal or Indemnitors.

[Dkt. 82-5 at 2; Dkt. 82-6 at 2]. The definition of "Loss" in the 2016 Indemnity Agreement is substantially the same. *See* [Dkt. 82-7 at 2].

all Bonds[3]. . .  In the event of payments by Surety, Indemnitors agree to accept the voucher or other evidence of such payments as prima facie evidence of the fact and extent of the liability of Indemnitors to Surety in any demand, claim or suit by Surety against Indemnitors. . ."

[Dkt. 82-5 at ¶ 1; Dkt. 82-6 at ¶ 1].  The January 2016 indemnity agreement has a slightly different indemnity provision.  It states:

The Indemnitors shall exonerate, Indemnify, and keep indemnified the Surety from and against any and all liability for losses and/or expenses of whatsoever kind or nature (including, but not limited to, pre- and post-judgment interest, court costs and counsel fees, and accounting, engineering and consulting fees, and from and against any and all such losses and/or expenses which the Surety may sustain and incur: (1) By reason of having executed or procured the execution of the Bonds, whether such Bond or Bonds were issued prior to or after the date of this Agreement (2) By reason of the failure of the Indemnitors to perform or comply with the covenants and conditions of this Agreement or (3) In enforcing any of the covenants and conditions of this Agreement or Other Agreements.  In the event of any payment by the Surety the Indemnitors further agree that in any accounting between the Surety and the Indemnitors, the Surety shall be entitled to charge for any and all disbursements made by it in good faith in and about the matters herein contemplated by this Agreement under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed; and that the vouchers or other evidence of any such payments made by the Surety shall be *prima facie* evidence of the fact and amount of the liability to the Surety.  As used in this paragraph, "good faith" means honesty in fact and the absence of malice or fraud.

[Dkt. 82-7 at ¶ 4].  Further, the 2010 Indemnity Agreements contain the following provision regarding the Surety's rights to settle claims:

---

[3] "Bond" is defined as "Any and all bonds, including but not limited to surety bonds, undertakings and any renewals or extensions thereof issued by Surety, or issued by another at the request of Surety, on behalf of Principal, whether issued prior to or subsequent to the effective date of this Agreement."  [Dkt. 82-5 at 1; Dkt. 82-6 at 1].  The definition of "Bond" in the 2016 Indemnity Agreement is substantially the same.  *See* [Dkt. 82-7 at 2].

> Surety shall have the exclusive right to decide and determine whether any claim, liability, suit or judgment made or brought against Surety on any Bond shall or shall not be paid, compromised, resisted, defended, tried or appealed, and Surety's decision thereon shall be final and binding upon the Indemnitors. . . . [I]f Principal or Indemnitors desire that the Surety litigate such claim or demand, or defend such suit or appeal from such judgment, they shall deposit with the Surety, at the time of such request, cash or collateral satisfactory to the Surety in kind and amount to be used in paying any judgment or judgments rendered, or which might be rendered, against the Surety, together with interest, costs and attorneys [sic] fees.

[Dkt. 82-5 at 3; Dkt. 82-6 at 3]. The 2016 Indemnity Agreement includes the exact same provision, except it specifies that *only the surety* has the right to decide how to handle claims. [Dkt. 82-7 at 5 ("Surety shall have the *sole* and exclusive right . . .") (emphasis added)]. The 2016 Indemnity Agreement was entered into around the time the DBA was amended by the "Term Sheet" to extend the substantial completion date and increase the cost of the Hartford Stadium Project beyond the date and amount originally agreed.

Based on these provisions, Arch argues that it is entitled, as a matter of law, to indemnification for any and all disbursements made in good faith regardless of the actual liability of Arch or the principal, and that the evidence it has provided proves the fact and amount of Defendants' liability under the express terms of the 2016 Indemnity Agreement. [Dkt. 82-2 (Mem. to Mot. Summ. J. Counts I & II) at 20].

Defendants do not argue that the contractual provisions are ambiguous. Rather, they argue that the Indemnity Agreements must be construed in connection with the Bonds (and any incorporated contracts) to which they relate. *See* [Dkt. 89 (Opp'n Mot. Summ. J. Counts I & II) at 11]. Defendants contend that Arch must be held to the terms of the Bonds it issued, and further argue that the Bonds

incorporate the DBA such that the terms of the DBA are at play as well.  *Id.* at 12-13.  They suggest that the interplay of the Bonds, the Indemnity Agreements, and the DBA created a complex and contradictory set of rights and obligations which, had Arch bothered to look, would show that the City and certain subcontractors were not entitled to make claims on the Bonds, and therefore, Arch should not have made payments or performed on the Bonds.  [Dkt. 89 at 13-15].

In particular, Defendants invoke the Multiple Obligee Rider, which was executed and attached to the Bonds on February 4, 2015, and which states: "there shall be no liability on the part of the Principal or Surety under this Bond to the Obligees . . . unless the Obligees . . . shall make payments . . . and shall perform all the other obligations required to be performed under said Contract at the time and in the manner therein set forth."  [Dkt. 82-12 (Hartford Stadium Performance and Payment Bonds and Dual Obligee Rider) at 8].  Defendants argue that the City failed to pay Centerplan for work completed in May 2016 as required by the DBA, or at least failed to assure Defendants that it would be able to pay, and, as a result, neither Centerplan nor Arch were liable to the City under the Multiple Obligee Rider.  [Dkt. 89 at 14].

But the terms of the Bonds do not govern Arch's right to indemnification; the Indemnity Agreements do, and specifically the latest Indemnity Agreement.  This is because the parties entered into express contracts with clear and unambiguous terms governing indemnification, with the latest being executed on February 1, 2016.  "[W]hen the parties have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to

the object or extent of such engagement, it is conclusively presumed, that the whole engagement of the parties, and the extent and manner of their understanding, was reduced to writing." *Tallmadge Bros. v. Iroquois Gas Transmission Sys., L.P.*, 746 A.2d 1277, 1290 (Conn. 2000) (quoting *Tie Commc'ns, Inc. v. Kopp*, 589 A.2d 329, 333 (Conn. 1991)). None of the Indemnity Agreements, including the 2016 Agreement, incorporate the terms of the Bonds, nor do they incorporate the terms of the DBA or DSA. As such, Arch's right to indemnification under the Agreements is unaffected by the terms of the Bonds, the DBA, and the DSA.

Even if the Bonds, along with the attached Multiple Obligee Rider, had been incorporated into the 2010 Indemnity Agreements, the 2016 Indemnity Agreement supersedes the terms of the Multiple Obligee Rider. *See Ryder v. Washington Mut. Bank, F.A.*, 501 F. Supp. 2d 311, 318-19 (D. Conn. 2007) (explaining that, under Connecticut law, the test for whether a later agreement substitutes an earlier contract "looks to the terms of the second contract[;] [i]f it contains terms inconsistent with the former contract, so that the two cannot stand together it [exhibits] characteristics indicating a substitute contract") (quoting *Bushnell Plaza Dev. Corp. v. Fazzano*, 460 A.2d 1311, 1314 (Conn. Super. Ct. 1983)) (internal quotations and brackets omitted). The 2016 Indemnity Agreement was executed after the Multiple Obligee Rider, evidencing the parties' latest intentions with respect to Arch's right to indemnification. The clear terms of the 2016 Agreement grant Arch the right to indemnification for payments made "in good faith . . . under the belief that it is or was liable for the sums and amounts so disbursed, or that it

was necessary or expedient to make such disbursements, *whether or not such liability, necessity or expediency existed*." [Dkt. 82-7 at 3 (emphasis added)]. Any conflicting terms in the earlier Multiple Obligee Rider are of no consequence here. *See Ryder*, 501 F. Supp. 2d at 1314-15.

The two cases cited by Defendants in support of their legal proposition that the Bonds and other contracts must be considered are distinguishable.

In *General Insurance Co. of America v. K. Capolino Construction Corp.* (hereinafter "*K. Capolino*"), the court held that material issues of fact as to whether the owner was in default under the bonded contract and whether the surety completed the bonded contract in good faith precluded summary judgment on the surety's claim of contractual indemnification under New York law. 903 F. Supp. 623, 627-28 (S.D.N.Y. 1995). In the initial opinion, which Defendants do not cite, the court explained that New York law prohibits recovery if a party was not obligated to pay or perform and therefore acted as a volunteer. *Id.* at 626. Accordingly, the court reasoned that the surety "may not recover from Capolino unless, under the terms of the performance bonds that [the surety] issued on Capolino's behalf, [the surety] was obligated to complete the . . . projects." *Id.*

The issues at bar are not governed by New York law and there is no Connecticut law that requires the Court to look outside the express terms of the Indemnity Agreements. On the contrary, the Connecticut Supreme Court has explained that "under an indemnity agreement, it is not essential that a principal be liable for the claims upon which the surety seeks to be indemnified," *PSE Consulting*, 838 A.2d at 157 n.15, further confirming the inapplicability of the Bond

terms here.  So too have numerous other courts concluded that actual liability is not a precursor to indemnification under an indemnity agreement.  *See e.g., Fid. & Deposit Co. v. Bristol Steel*, 722 F.2d 1161, 1163 (6th Cir. 1985) (under the letter of the contract, surety had the right to reimbursement for payments made in good faith, whether or not the principal had defaulted and liability existed); *Pacific-Peru*, 558 F.2d at 952 (ruling that the argument that surety suffered no actual liability under its bond is no defense to indemnification under express language of surety agreement); *Frontier Ins. Co. v. Int'l Inc.*, 124 F. Supp. 2d 1211, 1215 (N.D. Ala. 2000) (holding that a principal's actual liability is not a prerequisite to surety's right to reimbursement under indemnity contract); *United States Fid. & Guar. Co. v. Feibus*, 15 F. Supp. 2d 579, 583 (M.D. Pa. 1998) (holding that the terms of the indemnity agreement governed and its language "does not require that payments be made only in the face of actual liability under the bonds"); *Gen. Acc. Ins. Co. of Am. v. Merritt-Meridian Constr. Corp.*, 975 F. Supp. 511, 517 n.4 (S.D.N.Y. 1997) (concluding surety had right to indemnification for claims it reasonably determined it was liable for, regardless of actual liability); *Emp'rs Ins. Wausau v. Able Green, Inc.*, 749 F. Supp. 1100, 1102-03 (S.D. Fla. 1990) (explaining "this case involves interpretation of language contained within a General Indemnity Agreement" and finding surety entitled to reimbursement for payments made in good faith, regardless of whether any liability actually existed); *Fireman's Fund Ins. Co. v. Nizdil*, 709 F. Supp. 975, 976-77 (D. Or. 1989) ("Any claim asserted against the surety, regardless if it is valid or outside the scope of the bond triggers the obligation to indemnify the surety."); *U.S. Use Int'l Bhd. Elec. Workers v. United*

*Pac. Ins. Co.*, 697 F. Supp. 378, 381 (D. Id. 1988) (holding that, "upon the express terms of the Agreement, the Indemnitors are liable to indemnify [Surety] no matter what the legal defenses or other avenues of resolution may have been").  Because actual liability is not required under the Indemnity Agreements, any "volunteer" argument by Defendants fails.

Defendants, though, focus on the *K. Capolino* Court's decision on the motion to reconsider, in which the court "[held] the surety to the terms of both of the agreements it negotiated."  908 F. Supp. 197, 200 (S.D.N.Y. 1995).  The court distinguished its finding from those of many other courts declining to consider the terms of related bonds based on the fact that the other decisions "consider only the issue of contractor default . . . They do not address allegations of owner default."  *Id.* at 199.  This Court does not discern a difference between evidence of owner/obligee default versus contractor/principal default such that a departure from the express terms of the Indemnity Agreements, as well as from case law, is warranted based on the distinguishable facts here.  Either way, Defendants executed express Indemnity Agreements in favor of Arch obligating them to provide indemnification when Arch settled claims in good faith.  In the beginning of 2016, when it was becoming clear that Centerplan would not meet the terms of the DBA, as evidenced by the need for the Term Sheet, Arch had seven of the Indemnitor Defendants execute the 2016 Indemnity Agreement with even stronger and more clear language as to Arch's right to indemnification.  That there is an argument as to potential owner/obligee default on the bonded contract does not

impact Defendants' obligations, or Arch's rights, under the Indemnity Agreements.[4]

The Court does not find *Lumbermens Mutual Casualty Insurance v. Dinow*, No. 06-cv-3881, 2012 WL 4498827 (Sept. 28, 2012 E.D.N.Y.), persuasive either. In that case, also governed by New York law, the court found that there were outstanding issues of fact surrounding the settlement of the obligees' lawsuits against the surety, including whether the obligee had satisfied the conditions of the dual obligee rider and whether the surety settled the claims in good faith. *Id.* at *6. In a follow-up opinion on a motion to reconsider, the *Dinow* Court distinguished the facts from precedent because "in those cases, the surety did not make statements in another proceeding that, if true, amount to a defense, as indeed they were so used in the state court proceeding." No. 06-cv-3881, 2014 U.S. Dist. LEXIS 28459, at *3-4 (E.D.N.Y. Feb. 27, 2014). In light of the surety's claims in its statement of undisputed material facts in the earlier lawsuits, the court concluded that reasonable minds could differ as to whether the surety should have settled the lawsuit and whether doing so was in bad faith. *Id.* at 4. In this case, there is no evidence in the record that the City did not satisfy conditions precedent and that Arch therefore was not liable. Even more important, as the majority of courts have explained, defenses to actual liability do not impact a surety's right to indemnification under an indemnity agreement other than as a consideration of

---

[4] The Court notes that, even if the potential for owner default did create a relevant dispute of material fact, the Court finds *supra* at Section I.B.iii that there is no evidence of default or failure to satisfy conditions precedent on the part of the City by failing to pay amounts due on the Project as required by the DSA and DBA.

whether the surety acted in bad faith. The Court discusses the issue of bad faith *supra* at Section I.B.

In contrast, the parties entered into the Indemnity Agreements, which grant Arch the exclusive right to determine how to handle claims on the Bonds, obligate Defendants to indemnify Arch for losses resulting from its issuance of the Bonds, and establish that evidence of payments provided by Arch are *prima facie* evidence of the fact and amount of liability to Arch. [Dkt. 82-5 at 3; Dkt. 82-6 at 3; Dkt. 82-7 at 3-4]. Under the Agreements, Arch's right to indemnification is not conditioned on actual liability. And the 2016 Indemnity Agreement expressly states that the surety is entitled to indemnification for disbursements made "under the belief that it is or was liable . . . or that it was necessary or expedient to make such disbursements, *whether or not such liability, necessity or expediency existed.*" [Dkt. 82-7 at ¶ 3 (emphasis added)]. Indemnity and right-to-settle provisions such as these are typical of indemnity agreements in the surety industry and courts have routinely upheld the validity of similar or identical provisions. *PSE Consulting*, 838 A.2d at 291 (surveying relevant case law and finding that such provisions are typical in the industry and routinely upheld by courts); *see also Bristol Steel*, 722 F.2d at 1163 (finding that such provisions "while strict, are common in contracts of indemnification executed by contractors and others to induce the execution of performance bonds by compensated sureties, and they have been uniformly sustained and upheld"); *Transamerica Ins. v. Bloomfield*, 401 F.2d 357, 362 (6th Cir. 1968) ("Provisions in indemnity agreements granting to the indemnitors the right to compromise and settle claims, and providing that vouchers and other evidence

24

of payment shall be prima facie evidence of the propriety thereof, have been upheld as not against public policy and enforced by courts.").

The Indemnity Agreements expressly state that Arch's submission of "vouchers or other evidence" of payments shall be "prima facie evidence of the fact and amount" of liability. [Dkt. 82-5 at 3; Dkt. 82-6 at 3; Dkt. 82-7 at 3-4.] Arch has submitted the affidavit of Joel Beach, the claims attorney principally tasked with handling claims on the Bonds, and summary charts of the many checks and wire transfers made as payments to resolve the claims on the Bonds.[5] [Dkt. 82-2 at 25-26; Dkt. 82-4 (Aff. of Joel Beach) at ¶¶ 51-63, 83-90; 91-103]. The documents establish that Arch has made $15,238,593.02 in payments to address claims made on the Hartford Stadium payment bond, $5,262,370.58 in payments to address claims made under the other payment bonds and wage and fringe benefit bonds, $16,269,435.81 in payments related to the Hartford Stadium performance bond, and $2,336,935.06 in payments for attorney's fees, consultant fees, and expenses incurred under the bond claims and in this action. [Dkt. 82-13 (Ex. K Summary List of Losses incurred under payment bond claims); Dkt. 82-18 (Ex. P Summary List of Losses incurred under Hartford Stadium Performance Bond Claim); Dkt. 82-19 (Ex. Q Summary List of fees and expenses)].

Arch introduced unrefuted evidence in support of its contention that these payments were made "in good faith and under the belief that it was liable under the

---

[5] Arch has provided copies of the checks and wire transfers to Defendants but prepared the summary chart for the Court pursuant to Rule 1006 of the Federal Rules of Evidence given the significant volume of this evidence. [Dkt. 82-2 at 25-26].

Bonds for the amounts paid or that it was necessary or expedient to make such payments." [Dkt. 82-4 at ¶¶ 63, 90, 103]. In testimony before the Court at the prejudgment remedy hearing Mr. Beach explained the exhaustive process Arch used to fully investigate the status of the Hartford Stadium Project and the Bond claims. [Dkt. 82-4 at ¶¶ 51, 73] Arch conducted the investigation with the assistance of construction consultant CSF whose representative testified as well. *Id.*]. The testimony and other evidence demonstrate that CSF's investigation was extensive. *See* [Dkt. 134 at 152:20-158:23; 187:7- 23]. CSF walked-through the Project site numerous times with representatives of HSA, the City, DoNo, Centerplan, the Architect, and others to assess what work Centerplan had completed and what work remained to be completed. *See* [Dkt. 134 at 155:5-15, 182:16-184:15]. In addition, CSF met with representatives of the City, DoNo, and Centerplan off-site to evaluate the status of the Project. *See id.* at 158:24-163:1, 164:9-167:8. They also reviewed countless documents throughout the course of the investigation, including plans, specifications, requisitions, agreements, change orders, change directives, correspondence, subcontracts to requisitions, accounts payable, and the cost to complete. *Id.* at 152:20-158:23, 163:2-187:22; *see also* [Dkt. 89-12 at Rog. 13 Resp.]. CSF solicited Defendants' input, but Defendants refused to ass8st. *Id.* at 79:17-83:11, 85:13-87:19. Demand letters sent by Arch to Defendants further represent that Arch undertook investigations before settling claims on the bonds. *See* [Dkt. 81-23 (Ex. U, Aug. 19, 2016 Demand Letter) at 4]. This evidence

constitutes *prima facie* showing that Arch made good faith investigation and is also *prima facie* evidence of the Defendants' liability under the Indemnity Agreements.[6]

Once a surety has provided *prima facie* evidence that it has made good faith payments upon the bonds, the burden under Rule 56 shifts to the principal/indemnitors to prove that the surety did not act in good faith such that there is a genuine issue of material fact for trial. *PSE Consulting*, 838 A.2d at 293 (finding that courts "routinely have concluded that, upon a finding that a surety has made a payment to a claimant upon a bond, the burden of proof shifts to the indemnitors to prove that the surety had not made the payment in good faith").

The burden is now on Defendants to present facts creating a genuine issue of material fact that Arch did not act in good faith. *Gundle Lining Constr. Corp. v. Adams County Asphalt*, 85 F. 3d 201, 211 (5th Cir. 1996) (granting summary judgment where surety had offered prima facie evidence of payments under the bond and the defendant had failed to present a genuine issue of material fact that would controvert evidence that the payments were made in good faith); *U.S. Fid. & Guar. V. Neri Constr., LLC*, No. 3:02-cv-524, 2006 U.S. Dist. LEXIS 70210, at *12 (D. Conn. Sept. 28, 2006) (Once vouchers were presented, "[plaintiff] established liability of defendants, and with respect to the amount of liability, the burden shifted

---

[6] Mr. Landino's Affidavit claims that "Arch has not provided copies of all of the checks and wire transfers that it claims are evidence of the Indemnitors' liability" but does not specify what Defendants believe they still need. [Dkt. 89-2 at ¶ 122]; *see also* [Dkt. 90 at p.31 ¶ 38]. Upon review by the Court, Arch's summary reports of payments made on the bond claims appear to match the amounts it claims. [Dkt. 82-13 (Ex. K, Summ. List of Losses under Payment Bond Claims; Dkt. 82-18 (Ex. P, Summ. List of Losses Under Performance Bond Claim); Dkt. 82-19 (Ex. Q, Summ. List of Costs and Expenses)]. Under the Indemnity Agreements and Federal Rule of Evidence 1002, the summary charts are sufficient evidence of liability.

to the defendants to prove that fees/costs are excessive."); *Feibus*, 15 F. Supp. 2d at 582 (finding that "courts have routinely held that once a surety has submitted the required documentation of payments, the burden under Rule 56 shifts to the principal to prove the existence of a genuine issue of material fact for trial").

Here, the 2016 Indemnity Agreement explicitly limits Arch's "entitle[ment] to charge" to those "disbursements made by it in good faith." [Dkt. 82-7 at ¶ 3]. As for the 2010 Indemnity Agreements, the Connecticut Supreme Court has held that this good faith limitation is inherent in every contract even when not specifically stated in the contract. *PSE Consulting*, 838 A.2d at 150 ("[J]urisdictions that recognize the existence of an implied covenant of good faith and fair dealing in every contract have concluded that a surety owes a duty of good faith to its principal irrespective of whether the indemnity agreement expressly imposes that duty."). The only exception to Arch's right to indemnification under the Indemnity Agreements arises if Arch made payments in bad faith.

In their opposition memorandum, Defendants argue that Arch acted in bad faith in settling claims on the performance and payment bonds for the Hartford Stadium Project. They did not, however, argue that Arch acted in bad faith in settling claims on the other bonds.

A. *Undisputed Bond Claims*

Arch is entitled to summary judgment on the undisputed bond claims because Arch has provided *prima facie* evidence of the fact and extent of liability

based on payments it made in good faith and Defendants do not argue that said payments were made in bad faith.

Arch has submitted a summary chart of all the Losses incurred for payment bonds it issued on behalf of Defendants Centerplan and Center Earth. *See* [Dkt. 82-13 (Mot. Summ J. Ex. K, Summ. Chart Payment Bond Claims)]. Exhibit K indicates that Arch made the following payments on non-Hartford Stadium projects:

- **Wage/Welfare Bond – IBEW Local 90 Trust Funds**: $36,739.70

- **Wage/Welfare Bond – IBEW Local 35 Trust Funds**: $150,000.00

- **Storrs Phase II**: $2,050,000.00

- **Trumbull, Windsor, Pleasant – Roads Relocation**: $14,751.82

- **Warren G. Harding HS**: $957,535.17

- **UConn Hartford – 39 Front Street**: $92,390.49

- **Orchard Hill Elementary School**: $162,645.18

- **Hammonassett Beach State Park**: $1,112,022.28

- **Hawleyville Sewer Extension**: $680,001.91

- **Asnuntuk Community College**: $6,284.03

These payments total $5,262,370.58. Absent defenses or counterclaims, the Court concludes the payments made on all projects not related to the Hartford Stadium constitute undisputed evidence of the Indemnitors' liability; therefore, Arch is entitled to indemnification on these payments for a total of $5,262,370.58.

**B. _Hartford Stadium Project – Application of the Bad Faith Standard_**

A close analysis of the record evidence of the facts and circumstances surrounding Arch's payment and performance is essential to determine whether it acted in bad faith as Defendants claim. *PSE Consulting*, 838 A.2d at 160. Bad faith requires more than negligence; it requires action taken with improper motive or dishonest purpose. *Id.* at 152-53. The Connecticut Supreme Court has explained that "this standard preserves a proper balance between affording the surety the wide discretion to settle that it requires, while ensuring that the principal is protected against serious and willful transgression." *Id.* at 153.

While "good faith" does not mean "reasonableness," a court may consider the reasonableness of a surety's actions in analyzing bad faith. *Id.* Specifically, "[u]nreasonable conduct can be evidence of improper motive and is a proper consideration where parties are bound by a contract that gives unmitigated discretion to one party." *Id.* Further, "[b]ad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.,* 269 Conn. 424, 432–33, 849 A.2d 382 (2004) (internal citations and quotation marks omitted).

### i. Settling subcontractor's payment bond claims

First, Defendants argue that Arch "acted in bad faith when it paid subcontractors on payment bond claims without regard to Centerplan's rights and

defenses under its subcontracts." [Dkt. 89 at 21]. Defendants specifically take issue with Arch having made payments on claims of subcontractors who had accepted the risk of nonpayment by the City via the pay if paid clauses in the subcontract agreements. *Id.* at 22. Defendants argue that the City had not paid Centerplan and, consequently, Centerplan was not obligated to pay the subcontractors under the pay if paid provisions such that Arch was not obligated to make payments to the subcontractors for their claims on the payment bond. *Id.* This argument, though, is not about Arch's good or bad faith payments, but about the fact of the principal's liability.

Defendants cite two cases in support of their argument, both of which concern the *subcontractor's* right to collect payment from the contractor and/or surety when the subcontract includes a pay if paid provision and neither of which discuss bad faith implications. *See* [Dkt. 89 at 22-23 (citing *Lindade Constr. v. Cont'l Cas. Co.*, No. X10UWYCV5008768S, 2009 WL 765501, at *4 (Conn. Super. Ct. Feb. 25, 2009) (holding the subcontractor was statutorily entitled to file a mechanics lien before the contractor's liability accrued to the subcontractor because date of cessation of work, not date of payment of the amount owed for the work, determined the deadline to file mechanics lien and the issue presented was whether a pay for pay provision provides a valid defense to an action on the payment bond or whether it is void pursuant to the Connecticut mechanics lien statute, General Statutes § 42-158l); *Suntech of Conn., Inc. v. Lawrence Brunoli, Inc.*, 72 A.3d 1113, 1118 (Conn. App. Ct. 2013) (holding that the subcontract's pay-when-paid provision only required the general contractor to pay the subcontractor

for work already performed within a certain time after the owner had paid for the work where subcontractor agreed owner had authority to determine the work for which payment would be made). These cases are inapposite because the Indemnity Agreements gave Arch the discretion to compromise and determine when to pay claims. Indeed, this discretion was the dispositive fact in *Suntech*. *See Suntech*, 72 A.3d at 1118. Neither case held a surety with authority to compromise claims was obligated to reject claims where reason dictated the claims be paid. Thus, the issue is whether Arch paid the claims in good faith.

Here, Arch presented ample evidence to suggest that it settled the payment bond claims in good faith. *See* [Dkt. 134 at 247:2-22, 249:2-250:2]. Mr. Beach and Michael Spinelli, of CSF, both testified at the PJR hearing that Arch and CSF investigated the impact of the pay if paid provisions and concluded that they were not a viable defense to liability. *Id.* at 79:21-86:19, 247:2-22, 249:2-250:2. Part of this assessment was based on the fact that, while the City had paid Centerplan for Requisition 16, Centerplan had not used that money to fully compensate its subcontractors for the Requisition 16 work. *Id.* at 81:15-85:24. Thus, for some work, the City paid Centerplan, but Centerplan did not pay its subcontractors, eliminating the viability of the pay if paid defense.

Additionally, they found that the best way to finish the project was to pay, and then continue using, the existing contractors. *Id.* at 70:19-71:8, 247:2-250:2. Arch reached this conclusion because of the inchoate state of work. *See id.* at 182:23-184:15. Subcontractor work was not only incomplete, but also concealed behind walls and other building elements such that only the subcontractors could

quickly and accurately assess the work remaining to be done. *Id.* In addition, Arch had no authority to demand or leverage to induce subcontractors which Defendants had not paid to continue working on the Stadium Project unless it agreed to pay them. *Id.* at 247:7-248:25, 249:16-250:2. Arch concluded the safest and most expedient course was to keep the existing subcontractors on the Stadium Project, even at a marginally greater cost. *Id.* Thus, the evidence suggests that Arch exercised its discretion under the 2016 Indemnity Agreement to compromise claims to avoid construction defects and mitigate the damage of further delay in the completion of the Project.

Defendants offer and there is no other evidence on the record suggesting Arch had an impermissible motive. Defendants neither allege or present evidence to so little as suggest Arch derived or was promised any benefit from paying the subcontractors, aside from mitigating the risk of further delay and construction defects.

Defendants claim to have notified Arch on numerous occasions that Arch should not pay subcontractors' claims because the City had not yet paid Centerplan and Arch's decision to go ahead and settle those claims evidences bad faith. *See* [Dkt. 89-2 ¶ 114; Dkt. 89-10 (Oct. 3, 2016 Letter from Centerplan to Arch)]. First, Mr. Landino's affidavit asserts legal conclusions not facts; and, critically, Defendants do not provide any evidence to show that they requested Arch litigate these claims. *See* [Dkt. 82-5 ¶ 5; Dkt. 82-6 ¶ 5; Dkt. 82-7 ¶ 8]. Moreover, they failed to post the collateral to cover the cost of any judgment that might result from that

litigation as required by the Indemnity Agreements to transfer the discretion to compromise claims from Arch to Defendants. *Id.*

The Indemnity Agreements state, "if Principal or Indemnitors desire that the Surety litigate such claim or demand, or defend such suit, or appeal from such judgment, they shall deposit with the Surety, at the time of such request, cash or collateral satisfactory to the Surety in kind and amount to be used in paying any judgment or judgments rendered, or which might be rendered, against the Surety, together with interest, costs and attorneys [sic] fees."  [Dkt. 82-5 at 3; Dkt. 82-6 at 3; Dkt. 82-7 at 5].  Defendants do not claim to have told Arch to challenge the subcontractors' claims.  Nor do they claim to have posted cash or collateral for the cost and potential judgment associated with making such a challenge, as required by the Indemnity Agreements' right to settle claims provisions.  Thus, Defendant's protests do not oblige Arch to defer to their judgment.

Courts have found that this weighs against, and can even defeat, a claim that the fact of a surety's settlement evidences bad faith. *Feibus*, 15 F. Supp. 2d at 586 ("Courts have held that a principal's failure to deposit collateral security, in violation of a surety agreement, weighs against a finding that the surety acted in bad faith in settling claims."); *Merritt-Meridian*, 975 F. Supp. at 517-18 (holding surety entitled to summary judgment because defendant did not deposit collateral security and request surety defend against claims and because there was no evidence of bad faith); *Able Green*, 749 F. Supp. at 1103 (concluding that argument that payments on claims made in order to forego litigation evidenced bad faith could not withstand indemnitor's failure to request that surety litigate or defend

against claim and post collateral for expenses and potential losses). The argument that Arch's settlement of the subcontractors' payment bond claims despite the pay if paid clauses was in bad faith is defeated by Defendants' own failure to request and support such a fight.

Even further, courts have held that a surety is not acting in bad faith by settling a claim even where the principal objected and raised colorable defenses. *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718, 721 (5th Cir. 1995) (finding surety's settlement of litigation over principal's objections not bad faith); *Merritt-Meridian*, 975 F. Supp. at 518 (finding no bad faith wherein surety settled claims despite possible defenses by principal). This is because actual liability is not a prerequisite to indemnity of a surety. *See PSE Consulting*, 838 A.2d at 157 n.15. As such, the fact that Arch made a payment where a potential defense existed is not evidence of bad faith on its own.

While Centerplan claims to have had viable defenses to liability on the contractors' payment bond claims, it does not allege, and there is nothing on the record to indicate, that they raised with Arch those defenses in a manner and at a time which rendered Arch's act of settling those claims in bad faith. The fact that they may have had defenses does not mean that Arch's payments were in bad faith, especially in light of the evidence to the contrary and Defendants' failure to produce evidence beyond the payments themselves. Thus, Defendants have failed to raise an issue of material fact as to whether Arch acted in bad faith in settling claims on the payment bonds due to the pay if paid provisions.

ii. Alleged self-interested actions

Next, Defendants argue that evidence of alleged self-interested actions established a factual basis upon which a reasonable jury could conclude Arch acted in bad faith. In support, they argue that Arch's admission that settling certain payment bond claims was "expedient" evidences self-interested settlement and bad faith. [Dkt. 89 at 24]. Additionally, Defendants argue that Arch's refusal to take any action pursuant to the performance bond until the City terminated Centerplan and its subsequent engagement in the Takeover Agreement to complete performance of the DBA were in bad faith. [Dkt. 89 at 25-27].

Notably, as the Connecticut Supreme Court explained in *PSE Consulting*, "even though motives of self-interest *may* constitute bad faith under some circumstances, it does not follow that the self-interested exercise of rights under a contract *necessarily* constitutes a per se violation of the implied covenant of good faith and fair dealing." *PSE Consulting*, 838 A.2d at 159 (emphasis in original). This must be the case because, due to the tripartite relationship among surety, principal, and claimant, a surety would otherwise subject itself to claims of bad faith simply by choosing either side—defending the principal and refusing to settle a bond claim or making a payment to settle a bond claim. *Id.* Finally, "public policy support[s] the discretion afforded a surety under an indemnity agreement, in that, such agreements make it possible for a surety to compensate unpaid subcontractors and vendors or to complete a project in response to a performance bond claim without having to await the adjudication of every possible defense by the principal." *Id.* Arch and other profit-making businesses must be able to act in

their own interests, even at the expense of their customers, when doing so is within reason.

Thus, only "a self-interested settlement, when accompanied by other evidence of improper motive, can constitute bad faith." *Id.* at 160. In *PSE Consulting*, the Court upheld the denial of a motion for directed verdict, finding that "the self-interested settlement . . . was tainted by a confluence of circumstances from which a jury could properly have inferred improper motive." *Id.* at 159. In particular, the defendant had presented evidence that the surety paid the claimant because it was concerned about a possible action by the insurance commissioner based upon the surety's failure to process the claim properly. *Id.* at 156, 159. The defendant also presented evidence upon which a jury could have concluded that the surety settled the claim in order to obtain release from claims that it had acted in bad faith in violation of CUTPA. *Id.* at 155-56. The defendant offered admissible testimony from multiple witnesses as well as documentary evidence that the surety was singularly concerned with getting rid of the bad faith and CUTPA claims. *Id.* With tangible evidence of a self-interested and improper motive for settling the claim, the court concluded that a jury could have found bad faith.

In contrast, courts have upheld self-interested settlements when there is evidence that they were made in good faith, rather than rankled by evidence of bad faith. *Gundle Lining*, 85 F.3d at 210 (finding that surety did not act in bad faith by settling claim when principal would not cooperate); *Bloomfield*, 401 F.2d at 362 (finding surety has right to settle and compromise claims as long as it does so in good faith); *Bristol Steel*, 722 F. 2d at 1166 (finding no bad faith in settling a claim

where "the action . . . was reasonable and was, as a matter of law, tainted with neither bad faith nor fraud") (internal quotation marks omitted); *Able Green*, 749 F. Supp. at 1103 (finding surety did not act in bad faith by settling claims where principal failed to request that surety litigate claims or post collateral to cover legal expenses as required under indemnity agreement).  For instance, in *Feibus*, the plaintiff surety tried to work with the defendants in settling claims and completing projects it had defaulted on, but the defendants were "less than cooperative" and "refused to reimburse plaintiff for even one of the[] claims" or provide collateral security.  15 F. Supp. 2d at 586.  Because of this, the court concluded that the surety's self-interested settlement of the claims was not in bad faith.  *Id.*

Here, Defendants suggest that Arch's settlement of payment bond claims was self-interested because Arch admitted that such settlements were "expedient" and Arch never raised the pay if paid defense.  [Dkt. 89 at 24-25].  The Court has already held that the argument regarding the pay if paid provisions is unfounded.

As for the expediency argument, the Court finds that admitting that payments were "expedient" does not necessarily mean that they were self-interested and improper, especially given that Defendants signed a contract agreeing that Arch "shall be entitled to charge for any and all disbursements made by it in good faith . . . under the belief that it is or was liable for the sums and amount so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed."  [Dkt. 82-7 at 3]. The contracts signed by Defendants specifically allow Arch to settle claims when it determines doing so is expedient.  Further, as discussed above, Defendants did

not request that Arch litigate the claims and post collateral, even further reducing the merit to any claim of bad faith by Arch in not doing so. In addition, the testimony evidences Arch's good faith in settling the payment bond claims, having concluded that they would save money, complete the project faster, and avoid construction defects, thereby mitigating damages, by bringing the original subcontractors back on the job. [Dkt. 134 at 247:2-250:2]. As noted above, Defendants have presented no evidence that Arch was motivated by any objective other than mitigating further delay, construction defects and attendant costs or damages.

Defendants also suggest that Arch's actions in settling the City's performance bond claim—declining to step in while Centerplan was still engaged and later entering into the Takeover Agreement—were self-interested and in bad faith. [Dkt. 89 at 25]. Mr. Landino claims that, at a meeting between the City, Arch, DoNo, and Centerplan, Mr. Beach told the City that Arch would only step in and serve as contractor if the City terminated Centerplan, the DBA, and the DSA. *Id.*; [Dkt. 89-2 at ¶ 83]. Defendants further claim that Arch entered into the Takeover Agreement for the project in its own unspecified interest after failing to investigate the City's conduct and claim of Centerplan's default, as well as Centerplan's allegations that it was the City that was in default. [Dkt. 89 at 25; Dkt. 89-2 at ¶¶ 112, 118-19].

Defendants offer no actual evidence that any of these actions were beneficial to Arch. They assert only labels and conclusions that Arch took these actions in bad faith. Mr. Landino's affidavit includes conclusory allegations of insufficient

investigation and bad faith by Arch, but provides very little detail and no sources for these claims, and no supporting testimony or documentary evidence. The contracts Defendants invoke and Arch's actions on their own do not show any improper motive or dishonest purpose. Absent admissible evidence of any motive other than to complete the long-delayed Stadium Project while minimizing the risk of construction defects, much less an improper motive, the Court finds no issue of fact for a jury to decide. On the contrary, the record facts point in the other direction.

For instance, the Direct Agreement executed by Centerplan, DoNo, and the City corroborates Arch's statement that it could not act while the DSA and DBA were still operative is consistent with Section 8 of the Direct Agreement which provides that the City may step into DoNo's shoes as Owner of the bonded contract (the DBA) "but only upon . . . termination of the [DSA] by the City for a [DoNo] Default thereunder." [Dkt. 82-11 (Direct Agreement) at 7]. Thus, under the Direct Agreement, the City would only have rights under the DBA, including the right to make a claim upon the bond, if it terminated the DSA. Therefore, Arch's statement that it could not act on the City's claim of default and demand on the bond until there was a termination does not seem to have been a misrepresentation or in bad faith, but rather, a necessity. Defendant's offer no evidence to refute the reasonableness of Arch's interpretation and no evidence of an ulterior motive for what appears to be a reasonable interpretation of the operative agreements.

Additionally, even if Arch could, it makes sense that Arch would decline to step in and supervise the stadium project while Centerplan was still contractor of

record.  Arch was not unreasonable in deciding not to usurp the role of its principal while the principal was still performing under the contract.  *See* [Dkt. 117 at 184:22-185:12].  The decision was also consistent with Centerplan's position, its representative having told Mr. Beach at the meeting that Arch should decline the request to become involved in the Project because doing so would validate the City's position that Centerplan was in default.  *Id.* at 120:4-121:3, 184:5-11.  Thus, there is no evidence that Arch's statements were made in bad faith.

As for the Takeover Agreement, Arch negotiated the preservation of Centerplan's and DoNo's rights and defenses in consideration for taking over the completion of the Stadium Project.  The Takeover Agreement specifically reserves all rights of Centerplan and DoNo against the City, including but not limited to claims and defenses under the DBA and the performance bond.  *See* [Dkt. 82-17 (Takeover Agreement) at 6].  Further, it provided an avenue for Arch and the City to move forward with completing the Project rather than letting the situation continue to deteriorate and potential damages continue to build, mitigating damages for which Defendants would be liable as well.  The fact that it also included a release provision for Arch does not mean that it was entered into in bad faith.  Sureties must be able to engage in logical and efficient business practices while also protecting their own interests without an automatic conclusion of bad faith.  Defendants have provided no evidence outside the Takeover Agreement—which in and of itself does not show bad faith—that Arch entered into the agreement with an improper motive or dishonest purpose.  And "[c]onclusory allegations of bad faith are insufficient to defeat a motion for summary judgment

in favor of a surety seeking to enforce an indemnification agreement." *Merritt-Meridian*, 975 F. Supp. at 518.

### iii. Arguments of deficient investigation

Finally, Defendants argue that Arch acted in bad faith by not investigating certain of the claims, failing to use a construction consultant to review each claim, and failing to ask Centerplan or Center Earth about each and every claim. [Dkt. 89 at 24; Dkt. 89-2 at ¶¶ 113-15]. Additionally, as noted *infra*, Defendants contend that Arch failed to investigate the City's termination of the DBA and declaration of default against Centerplan, as well as the City's own potential default status. [Dkt. 89-2 at ¶¶ 112; Dkt. 90 at 15-16]. These facts and arguments also fail to raise an issue of material fact as to whether Arch acted in bad faith.

A surety is under an obligation to conduct a proper investigation and a deficient investigation, along with other evidence of improper motive, may evidence a surety's bad faith. *PSE Consulting*, 838 A.2d at 154. But "a deficient investigation is not, *by itself*, sufficient to support a finding of bad faith" because a defendant must establish more than negligence or unreasonable conduct to show bad faith. *Id.* at 155; *Auto-Owners Ins. Co. v. Se. Floating Docks, Inc.*, 571 F.3d 1143, 1146 (11th Cir. 2009) (finding that "unreasonable conduct, including a negligent investigation of a claim, does not by itself constitute bad faith" and evidence of improper motive is required to give rise to such an inference); *Feibus*, 15 F. Supp. 2d at 587 (rejecting principal's argument that surety had acted in bad faith where principal failed to submit evidence of dishonest purpose or improper motive in surety's failure to investigate claims).

Arch received claims from over 100 claimants under ten different bonds it issued on behalf of Centerplan and Center Earth. [Dkt. 82-1 at ¶ 17]. Arch has provided evidence that, with the assistance of construction consultant CSF, it investigated the claims made on the bonds, asked Centerplan for their position on the claims, and then determined if it had liability for each claim. [Dkt. 82-4 (Beach Aff.) at ¶¶ 51-54]. In correspondence from Arch to Defendants dated August 19, 2016, Arch explained that its investigation of the claims on the Hartford Stadium Project Bonds "has focused substantially on determining the financial status of the contract funds, the financial status of each of the subcontracts and the remaining work scope of each subcontractor, and the scope of work and the costs necessary to complete the Stadium Project." [Dkt. 81-23 (Aug. 19, 2016 Demand Letter) at 4-5]. Arch further explained that it had "attempted to investigate the financial condition of [Centerplan], the status of the other Bonded Projects and the merits of [the City's] termination decision." *Id.* at 5.

At the Hearing on Arch's Motion for PJR, Mr. Spinelli testified that CSF was tasked with investigating and evaluating the claims, including looking into whether the work was performed in compliance with contract documents, what it would cost to finish, and how long it would take to finish. [Dkt. 134 at 154:9-155:23]. He further testified that CSF inspected voluminous documents throughout the course of the investigation, including plans, specifications, requisitions, agreements, change orders, change directives, correspondence, subcontracts to requisitions, accounts payable, and the cost to complete. *Id.* at 152:20-158:23, 163:2-187:22. CSF also held meetings with representatives of the City, DoNo, and Centerplan both at the

stadium and off-site. *See id.* at 1158:24-163:1, 164:9-167:8. Even further, CSF asked them, but DoNo and Centerplan refused to help it assess the claims made by the City and Stadium Project subcontractors. *Id.* at 187:9-22.

To combat this evidence of good faith investigation regarding payment bond claims, Defendants merely provide vague and conclusory statements in the affidavit of Mr. Landino claiming Arch did not take such steps with respect to each and every claim, without any evidentiary support. *See* [Dkt. 89-2 at ¶ 113-15]. Even if Defendants presented facts tending to show Arch failed to present some claims to Defendants, this would only indicate negligence but would not amount to evidence of bad faith on its own. *See Feibus*, 15 F. Supp. 2d at 586 ("The fact that a surety makes payments without giving notice to the principal is not evidence of bad faith."). Further, Defendants have not provided any evidence that Arch's failure to present some claims was based on an improper motive.

With regard to the performance bond claim, Defendants rely on a review of the performance bond, the DBA, and the work that Arch ultimately did to complete the Hartford Stadium Project as compared with what Centerplan believes was necessary, as well as Mr. Landino's affidavit, in arguing that Arch either did not conduct a sufficient investigation or knowingly elected to perform work that wasn't covered by the DBA. [Dkt. 89-2 at ¶ 101, 94-100]. Again, Defendants argue that Arch had no obligation to act under the performance bond because of the City's own default and alleged inability to pay and that Arch completed the project, executing substantial work outside the DBA, without regard for potential defenses

to liability, such as the exclusion of liability for costs/work covered by professional liability insurance.  [Dkt. 89-2 at ¶¶ 100-103].

These arguments fail for multiple reasons.  First, evidence on the record refutes Defendants' claims.  Second, Mr. Landino's opinion unsupported by any facts is not evidence of Arch's bad faith; it is merely a conclusory label devoid of factual content insufficient to surmount summary judgment.  Third, Mr. Landino ceded total discretion to compromise claims to Arch in the 2016 Indemnity Agreement.  Finally, a difference of professional judgment or opinion as to a course of action alone does not constitute bad faith.

Regarding the City's inability or failure to pay, Mr. Landino asserts that "[a]s of June 5, 2016, Centerplan was owed millions of dollars based on the accounting on Requisition 17" and that "Centerplan also had claims for additional compensation to cover the Change Order work and CCD work which for the most part was underway or committed and not reflected in the requisition."  [Dkt. 89-2 at ¶ 86].  Additionally, Mr. Landino claims that "[a]s of June 6, 2016, the City had advised Centerplan and the Surety that it did not have enough funds on hand to pay for the changes it had ordered and specifically did not have the money to pay the May requisition which had been approved by the Architects and the City's Owners Representatives and was in process to be approved the following day at the scheduled HSA meeting."  *Id.* ¶ 90.  Accordingly, Defendants claim that the City had failed to pay Centerplan for the "outstanding requisitions, changes, and the remaining work," [Dkt. 89 at 15], and that "Arch should have known that the City did not have the funds."  [Dkt. 89-2 ¶ 97].  Defendants contend that Arch's

performance under these circumstances constitutes bad faith. *See id.* ¶ 112. Despite these conclusory claims, the actual evidence and relevant contracts show that the City had made payments for all requisitions that were submitted as required by the contracts and the Multiple Obligee Rider.

The DBA establishes that DoNo will make progress payments to Centerplan based upon "Applications for Payment" covering one calendar month. [Dkt. 82-10 (DBA) at § 5.1]. Centerplan is to submit to DoNo the itemized "Application for Payment," notarized and supported by data substantiating the requested payments. *Id.* at § A.9.3.1. The DSA establishes that DoNo is "responsible for reviewing, approving, and submitting Draw Requests" to be paid out to Centerplan for work done on the Project. [Dkt. 82-9 (DSA) at 7, § 3(e)(1)]. Under the DBA, DoNo "shall, within seven days after receipt of [Centerplan's] Application for Payment, issue to [Centerplan] a written acknowledgement of receipt . . . indicating the amount [DoNo] has determined to be properly due and, if applicable, the reasons for withholding payment in whole or in part." [Dkt. 82-10 at § A.9.4.1]. DoNo must submit the Draw Request associated with the Application "for review and approval of the Executive Director of the Hartford Stadium Authority (the 'HSA Director') and the City's Representative." [Dkt. 82-9 at 7, § 3(e)(1)]. If DoNo receives an Application for Payment by the 10th day of the month, DoNo will pay Centerplan by the 10th day of the following month, and if received after the 10th day of the month, DoNo will pay Centerplan within 30 days of receipt of the Application. [Dkt. 82-10 at § 5.1.3].

The parties agree that Requisition 16, for work done on the Project in April, as well as all prior requisitions, were affirmed and paid for by the City. *See* [Dkt. 134 (1.29.18 PJR Hr'g Tr.) at 64:13-21, 67:7-15, 188:7-18; Dkt. 117 (11.06.17 PJR Hr'g Tr.) at 138:9-17; Dkt. 118 (2.15.18 PJR Hr'g Tr.) at 65:2-4]. There is no evidence that any requisition was submitted to the City after Requisition 16.

As for Requisition 17, for the work done on the Project in May, Mr. Landino testified at the PJR Hearing that Centerplan never submitted it to DoNo, [Dkt. 118 at 65:2-4], and thus DoNo never submitted a Draw Request for Requisition 17 to the City for payment. The version of Requisition 17 submitted by Defendants in opposition to Arch's motions for summary judgment corroborates Mr. Landino's testimony. In addition, that version was not in the form required for submission for payment. That version does not include the Architect's signature certifying the requested payment, as the form appears to require. *Id.*

It also impeached Mr. Landino's testimony suggesting it was submitted to the City for payment because it was signed by Centerplan's representative on June 22, 2016, see [Dkt. 89-6 (Requisition 17 Draft) at PDF p. 2], more than two weeks after Mr. Landino claims the Architects and the City's Owners Representatives had approved the Requisition.

There is no evidence in the record that Centerplan submitted a fully executed version of Requisition 17 to DoNo—there is no notice of receipt as called for by the DBA or other transmittal documentation. There is no evidence that it was approved by DoNo, sent to the City, and approved by the Architects, the City, and HSA as required by the contracts. And there is no evidence whatsoever that the City

received the Requisition and declined or withheld payment. Nor do Defendants go so far as to allege that these events took place; no doubt because they did not.

Prior to the PJR Hearing, Arch representatives had knowledge only of an unsigned draft Requisition 17, and saw the incomplete version signed by Centrplan alone only days before the hearing on January 29, 2018. *See* [Dkt. 134 at 100:18-20, 101:22-25, 220:13-16]. The only evidence that Arch had during the summer of 2016, and indeed that the Court has now, is that the City paid all Requisitions submitted for payment by Defendants. Arch cannot be held responsible for failing to take into account non-payment by the City when evidence of said non-payment did and does not exist. Not only is there no evidence that Arch failed to adequately investigate the City's default, but there also is no evidence that the City was in default by failing to make payments to Centerplan.

Defendants also seem to suggest that Arch acted in bad faith by performing despite the City's representation of its inability to pay for the changes it ordered. *See* [Dkt. 89-2 at ¶ 90]. But no contract required the City to affirm its ability to pay future Draw Requests. The contracts required the City to pay the amounts reviewed, approved, and requested by DoNo, which the City faithfully did.

Arch, through CSF, reviewed the change orders and CCDs extensively as part of its investigation. *See* [Dkt. 134 at 189:11-14, 190:8-23, 198:23-203:21]. CSF looked at each line item to determine the nature of the change, concluding that the majority of the changes were the result of building code compliance issues and design errors and omissions, with few owner add-on items. *Id.* at 163:6-164:8. The City paid for the work associated with these change directives which had already

been reported in a requisition and submitted to the City. *See* [Dkt. 134 at 64:13-21, 67:7-15, 188:7-18; Dkt. 117 at 138:9-17; Dkt. 118 at 65:2-4]. Defendants do not suggest that the City failed to pay for the work associated with the changes, only that the City represented that it did not have the money to pay. Until Centerplan submitted a Requisition / Application for Payment, with respect to the change directive work or otherwise, which the City failed to pay—which never occurred—Arch could not have been expected to find the City in default or failure to satisfy conditions precedent to making a demand on the performance bond. Nor could Arch reasonably come to such a conclusion based on the fact that the City had not affirmatively stated that it would be able to pay future Draw Requests.

Further, Arch's ultimate determination that entering into the Takeover Agreement and completing the project for around $16,000,000 made more sense than litigating the claim and allowing the incomplete project to continue to decline with potential damages climbing towards the penal sum of $47,050,000 was not unreasonable. "[E]vidence that a surety paid claims to lessen its own liability does not support a finding of bad faith" on its own. *Feibus*, 15 F. Supp. 2d at 587. Further, Arch's completion of the Hartford Stadium Project in a manner Defendants disagree with—performing some work that may have been outside the DSA—does not evidence bad faith on its own, especially in light of the apparent reasonableness of Arch's actions. *See Engbrock v. Fed. Ins. Co.*, 370 F.2d 784, 786-87 (allegation that surety made excessive payments at most alleges negligence); *Feibus*, 15 F. Supp. 2d at 587 (evidence of excessive payments on claims does not rise to the level of bad faith); *Nizdil*, 709 F. Supp. at 976-77

(allegation that surety overpaid claim failed to raise issue of material fact); *Able Green*, 749 F. Supp. at 1103 (surety's management of projects on which principal had defaulted was not in bad faith just because it did not have complete copies of all construction agreements).  Absent evidence suggesting that Arch's actions had an improper motive or dishonest purpose, Defendants claims of bad faith fail.

Because Defendants have failed to provide evidence from which a jury could reasonably conclude that Arch acted on the Hartford Stadium payment and performance bonds in bad faith, there is no dispute as to an issue of material fact, and Arch is entitled to indemnity for payments on these claims as a matter of law. Specifically, Arch is entitled to indemnification for $15,238,593.02 in payments to address claims made on the Hartford Stadium payment bond and $16,269,435.81 in payments related to the Hartford Stadium performance bond, for a total of $31,508,028.83.  *See* [Dkt. 82-13 (Ex. K Summary List of Losses incurred under payment bond claims); Dkt. 82-18 (Ex. P Summary List of Losses incurred under Hartford Stadium Performance Bond Claim)].

### C. *Costs and Fees*

Under the 2010 and 2016 Indemnity Agreements, Loss includes "costs, expenses, and fees of whatever kind or nature, that Surety may sustain or incur as a result of executing any Bond or as a result of the failure of Principal or Indemnitors to perform or comply with this Agreement."  [Dkt. 82-5 at 3; Dkt. 82-7 at 3].  Arch has provided a summary report under Federal Rule of Evidence 1006 representing that it has receipts and vouchers showing $2,336,935.06 in payments

for attorney's fees, consultant fees, and expenses incurred under the bond claims and in this action.  [Dkt. 82-19 (Ex. Q Summary List of fees and expenses)].  This is prima facie evidence under the indemnification agreements and, per the discussion *infra*, Defendants have failed to provide evidence that these costs and fees were incurred in bad faith.   As such, Arch is entitled to indemnification for the $2,336,935.06 in costs and expenses related to the bonds.

Arch having provided prima facie evidence of the fact and extent of liability required by the Indemnity Agreements, and having found that Defendants failed to provide evidence sufficient for a finding of bad faith, this Court GRANTS Arch summary judgment on Count I.


II.   Contractual Collateral Security (Count III)

Arch argues that it is entitled to summary judgment on its contractual collateral security claim.[7]  Specifically, Arch seeks collateral security in the amount of $38,313,100.82, which relates to 11 bonds for 11 different projects.  *See* [Dkt. 81-24 (Oct. 13, 2017 Demand Letter)].[8]

The collateral security provisions differ between the 2010 Indemnity Agreements and the January 2016 Indemnity Agreement.  The 2010 Agreements state the following in relevant part:

---

[7] The Court notes that it does not appear Connecticut courts have addressed the enforcement of an indemnity agreement's collateral security provision.  The Court will therefore look to the Second Circuit, this district, and courts from other jurisdictions to interpret the enforceability of collateral security provisions.

[8] Arch initially requested collateral security in the amount of $18,807,737.47 on August 19, 2016, relating only to the Hartford Stadium Project and the Storrs II Project.  *See* [Dkt. 82-23 (Aug. 19, 2016 Demand Letter)].

> Indemnitors agree to deposit with Surety, immediately upon demand by Surety, an amount equal to the greater of (a.) the amount of any reserve established by Surety to cover any actual or potential Loss, or (b.) the amount of any claim or claims or other liabilities asserted against Surety as a result of issuing any Bond.  Surety may, in its sole discretion, use any part of all the collateral in settlement or payment of any Loss or other liability or expense for which the Indemnitors would be required to reimburse Surety under the terms of this Agreement.

[Dkt. 81-5 at ¶ 4; Dkt. 81-6 at ¶ 4].

The January 2016 Agreement, in contrast, states in relevant part:

> **If the Surety determines, in its sole discretion and judgment, that potential liability exists for losses, fees, costs, or expenses, for which the Principal and Indemnitors will be obligated to indemnify the Surety under the terms of this Agreement or Other Agreements**, the Principal and Indemnitors shall deposit with the Surety, promptly on demand, a sum of money equal to the amount the Surety determines or collateral security of a type and value satisfactory to the Surety, to cover that liability, whether or not the Surety has: (a) established a reserve; (b) made any payments; or (c) received any notice of claims under the Bonds.  At the Surety's sole option, such collateral shall be in addition to and not in lieu of any other collateral that has been previously been provided to the Surety with any Bond or Bonds. The Surety shall have the right to use the collateral, or any portion thereof, in payment or settlement of any such liabilities for which the Principal and Indemnitors would be liable to the Surety under this Agreement or Other Agreements with respect to payments made by Surety. The Surety shall have no obligation to invest or provide a return on any collateral provided under this Agreement.  Indemnitors acknowledge that the failure of Indemnitors to pay to Surety, immediately upon demand, the sum demanded by Surety hereunder, shall cause irreparable harm to Surety for which Surety has no adequate remedy at law. **Indemnitors agree that Surety shall be entitled to temporary, preliminary and final injunctive relief for specific performance of their obligations hereunder, including the obligation to pay to Surety the sum demanded, and waive any defenses thereto. To the extent Surety accepts collateral other than money, Surety shall not be liable to any Indemnitor for any diminution in value, loss or destruction of such collateral and shall have no obligation to maintain or insure such collateral**.

[Dkt. 81-7 at ¶ 4].

Defendants do not dispute Arch's position that the language is clear and unambiguous. *See* [Dkt. 81-2 (Mot. Summ. J. Counts III-VI Mem. of Law) at 20; Dkt. 91 (Opp'n Mot. Summ. J. Counts III-VI) at 33–35 (failing to address language from the 2010 indemnity agreements)]. The Court agrees that the language at issue is clear and unambiguous. Defendants make a number of other arguments as to why Arch is not entitled to summary judgment on this count.

First, Defendants argue that the indemnity agreements must be reviewed in conjunction with the Bonds and other contracts relating to the Hartford Stadium Project, and that, in light of everything, there is a disputed issue of material fact as to whether Arch and/or the principals were liable under the Bonds for the "Loss." [Dkt. 91 at 13-17]. Defendants again cite *K. Capolino* and *Dinow* in arguing that the Court must consider the related contracts and the liability of the surety and principal thereunder. For the same reasons the Court explained *infra* at Section I.A., this Court does not find either case persuasive. Even more importantly, those cases analyzed indemnification provisions, rather than collateral security provisions. As such, their analysis is not on point here. *See Safeco Ins. Co. of Am. v. Hirani/MES, JV*, 480 F. App'x 606, 608 (2d Cir. 2012).

Defendants also suggest that defenses to liability on the claims defeat Arch's motion for summary judgment as to collateral security. But success of this argument would controvert the purpose of collateral security. Collateral security is an interim remedy meant to provide protection to a surety guarantor in the face of anticipated exposure as a result of bonds issued on behalf of the principal. A surety is entitled to such protection because its obligation is always secondary to

the principal's.  Refusing to provide security until after liability is litigated would defeat the very purpose of it.  Courts have routinely enforced clear and unambiguous collateral security provisions, such as those here, prior to determination of liability.  *Am. Motorists Ins. Co. v. United Furnace Co., Inc.*, 876 F.2d 293, 302 (2d Cir. 1989) (finding surety entitled to collateral security under indemnity agreement upon demands against surety regardless of defenses); *Safeco Ins. Co of Am. v. Schwab*, 739 F.2d 431, 433-34 (9th Cir. 1984) (finding collateral security provision entitled surety to hold sum as security against any loss on any bond after a demand is made, rather than only indemnity after incurring loss); *Int'l Fid. Ins. Co. v. Vimas Painting Co., Inc.*, No. 2:07-cv-298, 2009 U.S. Dist. LEXIS 14962, at *15 (S.D. Ohio Feb. 26, 2009) (finding collateral security provision did not provide for preliminary assessment of merits of claims prior to posting security).  Because of this, Defendants arguments as to Arch's actual liability are irrelevant.

Defendants argue that the January 2016 Indemnity Agreement's language, "will be obligated," ties Arch's right to collateral security to indemnification.  *See* [Dkt. 91 at 33].  As such, Arch may not obtain collateral security at this stage because there is a genuine issue of material fact as to whether Arch acted in bad faith in settling bond claims.  *See id.* at 33–34.  In addition, Defendants argue there are genuine issues of material fact as to whether the losses for which collateral security is sought are within the scope of liabilities for which the Indemnitors would be liable.  *Id.* at 34–35.

Defendants' focus on "will be obligated" fails to consider the other part of the sentence: that the surety has "*sole discretion*" to determine whether "*potential liability exists* . . . for which the Principal and Indemnitors will be obligated to indemnify the Surety. . . ." [Dkt. 81-7 ¶ 4]. In at least one other case, the district court granted summary judgment on a surety's demand for collateral security based on substantially the same language—"that potential liability exists for losses and/or fees, costs and expenses for which the Indemnitors and Principals will be obligated to Indemnify. . . ." *Liberty Mut. Ins. Co. v. Sumo-Nan LLC*, No. 14-00520 DKW-KSC, 2015 WL 7303523, at *4 (D. Haw. Nov. 18, 2015).

The Court finds the January 2016 provision clearly and unambiguously confers a right on Arch to demand collateral security when it determines in its sole discretion the Principal or Indemnitors will potentially be liable to indemnify it on certain agreements. *See Hirani/MES*, 480 F. App'x at 608 ("Under the plain, unambiguous language of the contracts, Defendants were required to provide collateral security upon demand if Safeco became exposed to potential losses and expenses under the surety bonds and, therefore, Safeco was entitled to partial summary judgment as to its right to collateral security.").

The Court recognizes that Defendants rely almost entirely on an argument that Arch acted in bad faith to defeat the clear language of the Indemnity Agreements giving Arch the right to demand and receive collateral security and to support Defendants' contention that they have no obligation to post collateral security under those agreements or Connecticut prejudgment remedy law. Yet Defendants have presented no evidence to support their conclusion that Arch

acted in bad faith.  *See infra* at Section I.B.  Even if they had, it would be unavailing to defeat Arch's demand for collateral security.  The Second Circuit has made clear that claims of bad faith are irrelevant to a surety's right to collateral security under an indemnity agreement.  *Hirani/MES*, 480 F. App'x at 608–09 ("Because Defendants' allegations of bad faith do not implicate Safeco's right to the interim remedy of collateral security, the District Court did not err in granting partial summary judgment.").  Therefore, Defendants' reference to their defenses is inapposite here.

Arch issued numerous bonds on behalf of Centerplan or Center Earth as principal in reliance on the 2010 and 2016 indemnity agreements.  Beginning in the fall of 2015 and continuing through 2017, Arch received a number of claims on those bonds.  By letters dated August 5, 2016, Arch made demand that Defendants discharge, hold harmless, and indemnify Arch for all losses incurred and to be incurred as a result of having issued the bonds.  Arch made a cash collateral demand for $18,807,737.47 in August 2016, which it updated in October 2017, demanding $38,313,100.82 in cash collateral.  Defendants did not post the cash collateral demanded by Arch at any time or in any amount.

Having received demands on bonds issued on behalf of Centerplan and Center Earth, Arch was entitled to demand, and receive, collateral security from Defendants under the express terms of the Indemnity Agreements.  [Dkt. 81-5 at ¶ 4; Dkt. 81-6 at ¶ 4; Dkt. 81-7 at ¶ 4]. The question then becomes whether Arch is entitled to specific performance.

The test for specific performance is flexible and requires showing that "(1) a valid contract exists between the parties, (2) the plaintiff has substantially performed its part of the contract, and (3) plaintiff and defendant are each able to continue performing their parts of the agreement." *Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F.2d 430, 433 (2d Cir. 1993); *Ohio Cas. Ins. Co. v. Fratarcangelo*, 7 F. Supp. 3d 206, 213 (D. Conn. 2014). "Specific performance may be ordered where no adequate monetary remedy is available and that relief is favored by the balance of equities, which may include the public interest." *NML Cap., Ltd. v. Republic of Argentina*, 699 F.3d 246, 261 (2d Cir. 2012); *Hirani/MES*, 480 F. App'x at 608 (holding a plaintiff must establish "that remedies at law are incomplete and inadequate to accomplish substantial justice"); *Fratarcangelo*, 7 F. Supp. 3d at 214 (holding a plaintiff can show equity favors granting specific performance "by showing that it has no adequate remedy at law, and that the harms it will suffer if the court does not grant the motion, including irreparable harm, outweigh the harms that will be caused to the Defendants").

Defendants do not challenge any of the elements for specific performance but rather argue Arch fails to establish an inadequate remedy at law. *See* [Dkt. 91 at 32].[9] But in surety cases where liability has "not yet been determined but claims

---

[9] The Court does not find Defendants' discussion of preliminary injunction cases to be dispositive here given that "[a]s an initial matter, [t]he requirements for the grant of a preliminary injunction are more stringent than those for specific performance." *Westchester Fire Ins. Co. v. DeNovo Constructors, Inc.*, 177 F. Supp. 3d 810, 813 (S.D.N.Y. 2016) (internal quotation marks and citations omitted); *Ins. Co. of the State of Pennsylvania*, 2015 WL 8488579, at *2 ("Again, the meaning of 'inadequate remedy at law' in the equitable remedy context does not transfer automatically to the preliminary injunction context."). A plaintiff may ultimately be

[are] expected," a surety may recover "an equitable remedy for specific performance of the collateral security provision." *United Furnace*, 876 F.2d at 300; *see also Hirani/MES,* 480 F. App'x at 608 (finding a collateral security provision must be enforced because the "damage resulting from the failure to give security is not ascertainable, and the legal remedy is therefore inadequate") (internal citations and quotation marks omitted); *Safeco Ins. Co. of Am. v. M.E.S. Inc.*, No. 09-cv-3312 (ARR) (ALC), 2010 WL 3928606, at *3 (E.D.N.Y. Oct. 4, 2010) (same). A surety must also be able to recover under specific performance because, as a creditor, it must "have the security position for which [it] bargained. . . ." *Fratarcangelo*, 7 F. Supp. 3d at 214. "The rationale behind granting specific performance in these situations, when the surety is essentially seeking only money damages, is that the surety has specifically bargained for prejudgment collateralization and a judgment for money damages alone would deprive the surety of prejudgment relief to which it is contractually entitled." *Id.* (internal quotation marks and citations omitted).

Like other courts before it, this Court finds that Arch does not have an adequate remedy at law in the absence of specific performance. Namely, Arch cannot be made whole were it to be denied the benefit of its bargain: pre-judgment monetary relief to assure payment of sums ultimately determined to be due.

When determining the amount of collateral security, a district court need not reduce the total of collateral security "by amounts that were disputed or still

entitled to specific performance even if it is not entitled to a preliminary injunction. *See DeNovo Constructors, Inc.*, 177 F. Supp. 3d at 813.

uncertain." *See Hirani/MES*, 480 F. App'x at 609. That being said, courts have held that indemnification is the proper remedy for payments *already made* whereas specific performance is more appropriate for *unpaid or future claims. See M.E.S., Inc.*, 2010 WL 3928606, at *4 ("[W]here there is no question as to the full amount of loss incurred, and a sum is made certain and *paid* by the time the surety seeks relief, courts have found indemnification to be the only proper remedy."); *see also Safeco Ins. Co. of Am. v. Lawrence Brunoli, Inc.*, 599 F. App'x 9, 11 (2d Cir. 2015) (requiring the district court to "determine what claims are still pending and award collateral security in the first instance"); *see generally Fratarcangelo*, 7 F. Supp. at 215 (acknowledging that a surety does not have an adequate remedy at law in failing to enforce the collateral security provision when the plaintiff would "be required to expend its own funds to defend the claims"); *but see Int'l Fidelity Ins. Co. v. Vimas Painting Co., Inc.*, No. 2:07-cv-298, 2009 WL 485494, at *5 (S.D. Ohio Feb. 26, 2009) ("IFIC has the right to demand the collateral security as soon as liability is asserted against it, regardless of whether IFIC has made any payments.")

The evidence indicates that Arch has made payments on all of the claims for which it originally foresaw exposure and demanded collateral security. *See* [Dkt. 81-24 at 4]. Arch's demand for indemnification has already been addressed *infra* at Section I. To the extent Arch continues to anticipate exposure and potential liability related to bonds it issued on behalf of Centerplan or Center Earth, it is entitled to collateral security and may file additional briefing with such demands.


III.  **Common Law Exoneration and *Quia Timet* (Counts IV & V)**

The common law doctrines of a surety's right to exoneration and *quia timet* are closely related and may be addressed together. "*Quia timet* is the right of a surety to demand that the principal place the surety 'in funds' when there are reasonable grounds to believe that the surety will suffer a loss in the future because the principal is likely to default on its primary obligation to the creditor." *Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania*, 934 F.2d 30, 32 (2d Cir. 1991). Exoneration, on the other hand, is "the surety's right, after the principal's debt has matured, to compel the principal to honor its obligation to the creditor." *Id.* Both claims are essentially alternative theories of liability to Arch's contractual claims for indemnification and collateral security, on which the Court has granted summary judgment. Because the parties defined their relative rights and responsibilities in a contract, those terms determine Arch's entitlement to relief. As such the Court does not need to consider these alternative theories and Counts IV and V are DISMISSED.

IV. <u>Disclosure of Financial Information (Count VI)</u>

All three Indemnity Agreements expressly require the Indemnitors to disclose their financial records upon request by the surety. Specifically, the three indemnity agreements state that "Surety, including its designated agents, shall, at any and all times, have unrestricted access upon reasonable notice to review all books and records of Principal and Indemnitors, including all books and records pertaining to their financial condition, and to the status of each unbonded and Bonded Contract." [Dkt. 82-5 ¶ 9; 82-6 ¶ 9; 82-7 ¶ 14].

It is based on these provisions that Arch has demanded disclosure of all Indemnitors' financial records. *See* [Dkt. 81-2 at 32; Dkt. 82-4 ¶ 109]. The language clearly and unambiguously requires the Indemnitors to disclose records about their financial conditions upon request and "at any and all times" without restrictions. Defendants do not address or dispute Count VI; they do not challenge Arch's notice or the types of records requested. Therefore, the Court GRANTS summary judgment in favor of Arch. Defendants are required to complete the requested disclosures outlined in Exhibit R of Arch's Motion for Summary Judgment within 21 days of this order. *See* [Dkt. 82-20].

## V.    Preliminary Injunction

Arch requests a preliminary injunction in its Motion for Summary Judgment on Counts III through VI. [Dkt. 81-2 at 32]. In this Order and Opinion, the Court grants summary judgment for Arch and orders specific performance of the collateral security and financial disclosure provisions of the Indemnity Agreements. As a result, Arch's motion for preliminary injunction is moot.

## Conclusion

For the above reasons, the Court GRANTS Arch's motion for summary judgment as to Counts I, III, and VI and DISMISSES Counts II, IV, and V, and DENIES as moot the motion for preliminary injunction.

Defendants are ORDERED to serve on Plaintiff the financial disclosures outlined in Exhibit R of Arch's Motion for Summary Judgment, *see* [Dkt. 82-20], within 14 days of this order.

Based on the preceding, the Court holds that Arch is entitled to indemnification for all Loss, totaling $39,107,334.47. This includes all of those losses listed in Arch's Motion for Summary Judgment on Counts I and II Exhibit K, Summary List of all the losses incurred by Arch under the Centerplan and Center Earth Payment Bond Claims, in the amount of $20,500,963.60; Exhibit P, Summary List of all the losses incurred by Arch under the Hartford Stadium Performance Bond Claim, in the amount of $16,269,435.81; and Exhibit Q, Summary List of all the attorney's fees and consultant fees incurred by Arch under the Payment Bond Claims and the Hartford Stadium Performance Bond Claim, in the amount of $2,336,935.06.

Defendants suggest in Mr. Landino's Affidavit and their Statement of Facts in Opposition that Arch has not provided copies of all the checks and wire transfers for which Arch now claims indemnification. [Dkt. 90 at ¶ 38; Dkt. 89-2 at ¶ 122]. But Defendants do not say which copies they believe they are missing. *See id.* Defendants are ORDERED to file a list specifying which documents, including all receipts, invoices, checks, and vouchers Arch has failed to provide within 14 days of this order.

Arch is ORDERED to file an affidavit within 14 days of the date of receipt of Defendant's list of unproduced documents verifying that such documents have

been provided to Defendants or explaining why such production should not be made.

The definition of Loss includes fees and expenses "incurred in connection with investigating, paying or litigating any claim, and/or enforcing [the Indemnity Agreements], including but not limited to legal fees and expenses, professional and consulting fees, technical and expert witness fees and expenses." [Dkt. 82-5 at 3; Dkt. 82-6 at 3; Dkt. 82-7 ¶ 1.h.]. This necessarily means Arch will have incurred costs in addition to those listed in Exhibit Q, [Dkt. 82-19], as a result of this litigation—those costs incurred after the date Exhibit Q was filed.

Arch is further ORDERED to submit a schedule of Losses it incurred after the filing of the Motions within 14 days of the filing of the aforementioned affidavit.

Defendants have 14 days from the filing of the new schedule to object to entry of an award in the amount of $39,107,334.47 plus the additional costs.

IT IS SO ORDERED

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: February 13, 2019