UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ARCH INSURANCE COMPANY,           :
    Plaintiff,                              :
                                     :           No. 3:16-CV-01891 (VLB)
v.                                            :
                                       :
CENTERPLAN CONSTRUCTION              :          July 15, 2019
COMPANY, LLC, *et al.*,                :
    Defendants.                          :
                                       :

## MEMORANDUM OF DECISION GRANTING PLAINTIFF'S MOTION TO DISMISS DEFENDANTS' THIRD AMENDED COUNTERCLAIM [DKT. 160]

Before the Court is Plaintiff / Counterclaim Defendant Arch Insurance Company's ("Arch" or "Plaintiff") Motion to Dismiss the Third Amended Counterclaim ("TACC") of Defendants / Counterclaimants Centerplan Construction Company, LLC ("Centerplan"); Center Earth, LLC; Centerplan Development Company, LLC; RAL Investments, LLC; Walnut Hill Chase, LLC; Tinker House, LLC; GH Development, Inc.; Centerplan Communities, LLC; and Robert and Kelly Landino (collectively, "Defendants") for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). [Dkt. 160 (Mot. to Dismiss Third Am. Countercl.)]. For the following reasons, the Court GRANTS Arch's Motion to Dismiss.

### Background

### I.   Factual Background

In its previous Memorandum Decision and Order Granting Arch's Motion to Dismiss Defendants' Second Amended Counterclaim, [Dkt. 156], this Court set out in detail the underlying facts of this case. To briefly summarize, Arch brought this

action against Defendants seeking collateral security and indemnification for costs incurred as a result of Arch's settlement of claims made on the payment and performance bonds issued by Arch on behalf of Centerplan and Center Earth. Primarily at issue are the payment and performance bonds (the "Bonds") issued by Arch on behalf of Centerplan as principal and in favor of DoNo Hartford, LLC ("DoNo"), the City of Hartford (the "City"), and the Hartford Stadium Authority ("HSA") bonding the Design-Build Agreement ("DBA") for design and construction of the Hartford Minor League Baseball Stadium (the "Hartford Stadium Project").

On January 26, 2015, the City and Connecticut Double Play, LLC (the "Ball Club"), the owner of all rights, title and interest in the Class AA Minor League Baseball franchise in the area, executed the Ballpark Development Agreement ("BDA") contemplating the design, development, and construction of the new ballpark in downtown Hartford, Connecticut. [Dkt. 159 at ¶ 25]. Shortly thereafter, the City entered into a Development Services Agreement ("DSA") with DoNo, as Developer, to design, develop, and construct the Hartford Stadium Project. *Id.* at ¶ 26; [Dkt. 82-9 (DSA)]. Pursuant to the DSA, on February 6, 2015, DoNo, as Owner, and Centerplan, as Design-Builder, entered into the DBA for the construction of the Hartford Stadium Project. [Dkt. 159 at ¶ 27, 29-30; Dkt. 82-10 (DBA)]. The DBA established a Substantial Completion Date of March 11, 2016 and guaranteed maximum price ("GMP") of $53,550,000 for the Hartford Stadium Project. [Dkt 159 at ¶ 31; Dkt. 82-10 at § 3.3]. The City, DoNo, and Centerplan also executed the Direct Agreement, which allowed the City to step into the position of DoNo upon the City's termination of the DSA for default. [Dkt. 159 at ¶ 36; Dkt. 82-11 (Direct Agreement)].

In order to receive the contract, Centerplan requested that Arch issue the Bonds guaranteeing Centerplan's performance to the owners of the DBA and payment to subcontractors and suppliers under various construction contracts. [Dkt. 159 ¶ 14, 28]. Arch issued the Bonds, dated February 4, 2015, each with a penal sum of $47,050,000. [Dkt. 82-12]. The Bonds included a Multiple Obligee Rider which established:

> [T]here shall be no liability on the part of the Principal or Surety under this Bond to the Obligees, or any of them, unless the Obligees, or any of them, shall make payments to the Principal, or to the Surety in case it arranges for completion of the Contract upon default of the Principal, strictly in accordance with the terms of said Contract, as to payments, and shall perform all obligations required to be performed under said Contract at the time and in the manner therein set forth.
>
> *Id.*

In return, Arch required Centerplan and the other Defendants to execute three General Indemnity Agreements ("GIAs") in its favor. The GIAs established, among other things, Arch's unfettered rights to compromise and settle claims on the Bonds following a declaration of default on the part of Centerplan and Defendants' obligation to indemnify Arch for any losses incurred as a result of having issued the Bonds. *See* [Dkt. 82-7 (2016 GIA); Dkt. 82-5 (July 2010 GIA); Dkt. 82-6 (Oct. 2010 GIA)].

Construction of the Hartford Stadium Project commenced quickly in February 2015. [Dkt. 159 at ¶ 39]. The Project experienced issues over control of the design and changes to the work. *Id.* at ¶¶ 37-38, 41-44. The City, the Ball Club, DoNo, and Centerplan executed a term sheet on January 16, 2016 (the "Term Sheet") to resolve some of the disputes surrounding changes ordered by the City

and the Ball Club, extending the Substantial Completion Date to May 17, 2016 and increasing the GMP by approximately $10,300,000. *Id.* at ¶¶ 49-51; [Dkt. 89-4 (Term Sheet)]. The City agreed to cover approximately $5,500,000 of that cost, as well as an additional $2,000,000 in the event the Ball Club could not provide that amount. [Dkt. 159 at ¶¶ 53-54; Dkt. 89-4]. Following this agreement, the City and the Ball Club directed additional changes be made to the Project designs via Change Orders and six Construction Change Directives (CCDs) issued in April, May, and June 2016. [Dkt. 159 at ¶¶ 55-56].

Defendants allege that the City was required under the DSA and BDA to set aside funds to pay for the additional work. *Id.* at ¶¶ 58-59. Defendants further allege that the City did not set aside those funds or even have the funds to cover the changes, but ordered Centerplan to execute the work anyway. *Id.* at ¶¶ 60, 65-67.

Defendants allege that, due to these changes, Centerplan was unable to meet the amended Substantial Completion Date of May 17, 2016. *Id.* at ¶ 68. The City reported Centerplan's defaults to Arch by letters in May and June 2016 and served formal notice of Centerplan's default and its claim on the Performance Bond by letter dated May 27, 2016. *Id.* at ¶ 69. The City terminated the DSA and DBA on June 6, 2016. *Id.* at ¶ 72. Defendants allege that the City owed Centerplan an extension of the Substantial Completion Date as a result of the additional work ordered and that the DSA required the City to provide Centerplan to the opportunity to remedy any default and mediate any disputes. *Id.* at ¶¶ 68-70, 73. Defendants further allege that, when the City declared Centerplan in default, the City itself was

in default under the various contracts because "it ordered additional work for which it could not pay." *Id.* at ¶ 69.

On October 17, 2016, the City, HSA, and Arch entered into a Takeover Agreement for Arch to step into Centerplan's place and complete the Hartford Stadium Project using a completion contractor. *Id.* at ¶ 75. Defendants allege that "Arch had a duty under the Bond to the indemnitors and Principal to not pay claims under the Bond if the Owner has failed to strictly perform under the contracts, or any amount that should be covered by professional malpractice insurance." *Id.* at ¶ 76, 77. Defendants allege that entering into the Takeover Agreement and Arch's subsequent actions to complete the Project constitute breach under the Bond because, not only was Centerplan was not in default, but the City was in default due to its inability to pay and failure put up funds for the additional work it ordered. *Id.* at ¶ 74, 76, 83.

II.  <u>Procedural Background</u>

On November 16, 2016, Arch filed its Complaint against Defendants to enforce its rights to collateral security and indemnification for losses incurred by Arch as a result of issuing bonds on behalf of Defendants Centerplan and Center Earth and subsequently settling claims on those bonds upon Defendants' asserted default on the bonded contracts. *See* [Dkt. 1 (Compl.)]. On February 16, 2017, Defendants filed their Answer and Counterclaim. *See* [Dkt. 19 (Answer & Countercl.)]. Arch filed a motion to dismiss the Counterclaim and the parties subsequently stipulated to Defendants' voluntary dismissal of the Counterclaim without prejudice. *See* [Dkt. 32 (Countercl. Dismissal Stipulation)].

Pursuant to the stipulation, Defendants filed their Amended Answer and Counterclaim on July 14, 2017. *See* [Dkt. 37 (First Am. Answer & Countercl.)]. The First Amended Counterclaim alleged breach of contract, breach of implied covenant of good faith and fair dealing, surety bad faith, tortious interference with contractual relations, and violation of Connecticut Unfair Trade Practices Act ("CUTPA"). *Id.* Arch moved to dismiss all counts of the First Amended Counterclaim on July 27, 2017. *See* [Dkt. 39 (Mot. to Dismiss First Am. Countercl.)]. On November 8, 2017, the Court granted Arch's motion, dismissing the Counterclaim in its entirety for failure to plead sufficient facts which state a plausible claim to relief. *See* [Dkt. 74 (11.08.2017 Order on Mot. to Dismiss)]. The Court granted Defendants leave to replead their Counterclaim, requiring it "state with the requisite specificity all claims and defenses, giving the factual basis in support." *Id.* at 2.

On November 22, 2017, Defendants timely filed their Second Amended Answer and Counterclaim. *See* [Dkt. 77 (Second Am. Answer & Countercl.)]. Arch moved to dismiss on December 29, 2017. *See* [Dkt. 85 (Mot. to Dismiss Second Am. Countercl.)]. The Court's Memorandum of Decision on the Motion to Dismiss the Second Amended Counterclaim thoroughly lays out the factual background of the case, including the provisions of the Indemnity Agreements and Bonds implicated in the Counterclaim. *See* [Dkt. 156 (Mem. of Decision on Mot. to Dismiss. Second. Am. Countercl.) at 2-8]. The Court concluded that Defendants had failed to plead facts alleging plausible claims, including a claim that Arch had breached its contractual duties to Defendants under the Bonds' Multiple Obligee Rider based

6

on the City's failure to provide assurance of payment for change orders and CCDs after the January Agreement. *Id.* at 10-19. The Court's dismissal with respect to that breach of contract claim was "without prejudice to filing an amended complaint asserting that claim, but pleading facts, as opposed to legal conclusions, establishing a specific contractual obligation to provide the specific assurance requested and a breach of that specific duty." *Id.* at 19-20. Thus, the Court allowed Defendants to replead their breach of contract claim to the extent they could provide factual support for their assertion that the City had a contractual obligation to assure Arch and Defendants that it would be able to pay future amounts due on the Project, which it breached, triggering the Multiple Obligee Rider exculpatory clause.

On January 9, 2019, Defendants filed a Third Amended Counterclaim. *See* [Dkt. 159 (Third Am. Countercl.)]. Defendants' Third Amended Counterclaim reasserts their breach of contract claim, again alleging Arch breached the Bond by performing when the City had failed to pay or put up funds for work on the Project. It also alleges other breaches by Arch under the Bond, beyond the specific allowance of the Court. Arch moved to dismiss the Third Amended Counterclaim, arguing that Defendants failed to allege (1) that Arch owes any contractual obligations to Defendants under the Bonds such that they have a claim for money damages for breach and (2) that Arch acted as a volunteer based on the City's breach of a specific relevant contractual duty. [Dkt. 160-6 (Mem. re Mot. to Dismiss Third Am. Countercl.)].

On February 13, 2019, the Court granted Arch summary judgment on its indemnification, collateral security, and financial disclosure claims. [Dkt. 171 (Order on Summ. J.)]. The Court concluded that the GIAs executed in Arch's favor by Defendants entitled Arch to indemnity for the full extent of claimed loss resulting from its issuance of the Bonds, irrespective of Centerplan and Arch's actual liability on the Bond claims. The Court further found that Defendants had failed to provide any evidence that Arch's performance and settlement of claims on the Bonds was in bad faith. This decision resolved nearly all issues in the case, having confirmed Arch's lack of bad faith and right to indemnification.

The Court now considers Arch's motion to dismiss the Third Amended Counterclaim.

<u>Legal Standard</u>

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint. *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010). "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "At the

second step, a court should determine whether the 'wellpleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (internal quotations omitted).

In general, the Court's review on a motion to dismiss pursuant to Rule 12(b)(6) "is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). The Court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass*, 987 F.2d at 150; *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

<u>Discussion</u>

As laid out above, the Court granted Defendants leave to replead their breach of contract claim to sufficiently allege that the City had an identifiable contractual obligation to represent that it would be able to pay future amounts due on the Stadium Project and its breach of that duty triggered the Bonds' exculpatory clause. *See* [Dkt. 156 at 19-20]. The Court will only consider whether Defendants

sufficiently pled that breach of contract allegation and will not address any other breach allegations included in the Third Amended Counterclaim.[1]

Arch moves to dismiss the Third Amended Counterclaim on two grounds. First, Arch argues that Defendants have not pled facts sufficient to demonstrate that Arch owed a contractual obligation to Defendants under the Bonds. [Dkt. 160-6 at 9]. Second, Arch argues that Defendants have not pled facts establishing that Arch breached the Bonds by acting as a volunteer when no obligation to perform existed due to a breach of any specific contractual obligation on the part of the City, as obligee, which excuses Arch's performance as surety under the Bonds. *Id.*

    1. <u>Defendants Fail To Allege A Duty</u>

Centerplan and Arch, as Principal and Surety on the Bonds, are in privity of contract, as the Court discussed in its decision on the motion to dismiss the Second Amended Counterclaim. See [Dkt. 156 at 12-13]. The other Defendants, as Indemnitors, are also in privity of contract with Arch, having executed the GIAs in consideration for Arch's issuance of the Bonds. *See id.* However, in order to allege a breach of contract claim, a plaintiff (or counterclaimant) must allege breach of an existing obligation under the contract by the other party.[2]

---

[1] Accordingly, the Court does not consider Defendants' arguments that Arch breached by performing because (a) Centerplan was not in default under the DBA; (b) the City did not provide Centerplan 7 days to cure any alleged default; (c) Arch failed to adequately investigate; (d) Arch overpaid; and (e) Arch did not act in good faith.

[2] The Court's Memorandum of Decision on the Motion to Dismiss the Second Amended Counterclaim concluded that Arch and Defendants are in privity of contract and that Defendants therefore can bring suit against Arch for breach of the Bonds, *see* [Dkt. 156 at 12-13], but did not conclude that Defendants alleged an actual duty on the part of Arch in favor of Defendants. The Court considers the second issue now.

A breach of contract claim requires showing "the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages." *Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, 311 Conn. 282, 291 (2014). Courts "look to the standard principles of contract interpretation to determine the rights and obligations of a surety under a bond." *United States Fid. & Guar. Co. v. Braspetro Oil Servs.*, 369 F.3d 34, 51 (2d Cir. 2004). Accordingly, "[t]he liability of sureties is to be determined by the specified conditions of the bond." *Elm Haven Const. Ltd. P'ship. V. Neri Const., LLC*, 281 F. Supp. 2d 406, 412 (D. Conn. 2003), *aff'd*, 367 F.3d 96 (2d Cir. 2004)

"A suretyship is a three-party relationship where the surety, [Arch], undertakes to perform to an obligee, [DoNo, the City, and HSA], if the principal, [Centerplan], fails to do so." *Id.* In other words, "[t]he general purpose of a surety contract is to guard against loss in the event of the principal debtor's default. . . . The obligation of a surety is an additional assurance to the one entitled to the performance of an act that the act will be performed." *Id.* (quoting *Ames v. Comm'r of Motor Vehicles*, 70 Conn. App. 790, 797 (2002)).

In order to allege a viable breach of contract claim, Defendants must allege that Arch had an obligation to Defendants. Defendants contend that "Arch had a duty under the Bond to the indemnitors and Principal to not pay claims under the Bond if the Owner has failed to strictly perform under the contracts[.]" [Dkt. 159 at ¶ 76. But the Bonds establish no such duty.

The Bonds obligate the Surety (Arch) and the Principal (Centerplan) to pay the Obligees (DoNo, the City, and HSA) up to the penal sum unless the Principal

well and faithfully performs the terms of the bonded contract (the DBA) and compensates subcontractors.  *See* [Dkt. 82-12].  The Multiple Obligee Rider to the Bonds states the following:

> [T]here shall be no liability on the part of the Principal or Surety under this Bond to the Obligees, or any of them, unless the Obligees, or any of them, shall make payments to the Principal, or to the Surety in case it arranges for completion of the Contract upon default of the Principal, strictly in accordance with the terms of said Contract, as to payments, and shall perform all obligations required to be performed under said Contract at the time and in the manner therein set forth.

*Id.* This exculpatory clause establishes that the Surety and Principal are not liable under the Bonds unless the Obligees perform their obligations under the bonded contract.  *Id.*  Thus, the Multiple Obligee Rider establishes a condition precedent to Arch and Centerplan's liability under the Bonds.  It does *not* create an affirmative duty to Defendants on the part of Arch not to pay claims under the Bonds in the event the City fails to strictly perform under the bonded contract.  It only establishes that Arch would have no obligation to the Obligees to pay claims on the Bonds under such circumstances.  The plain language of the exculpatory clause clearly evidences the intent of the parties—to limit the Surety and Principal's obligation to the Obligees if the Obligees fail to satisfy their duties under the bonded contract.

While the consideration of parole evidence is not appropriate given the clarity of the Bonds, reference to the GIAs support the conclusion here.  The Court notes the relevant provision not in construing the Bonds, but only in reaffirming that the conclusion based on the plain language of the Bonds is consistent with the other contract involving Arch.  The GIAs, executed by Defendants in Arch's

favor, grant Arch the "exclusive right to decide and determine whether any claim, liability, suit or judgment made or brought against Surety on any Bond shall or shall not be paid, compromised, resisted, defended, tried or appealed, and Surety's decision thereon shall be final and binding upon the Indemnitors."  [Dkt. 82-5 at ¶ 5; Dkt. 82-6 at ¶ 5; Dkt. 82-7 at ¶ 8].  Interpreting the Bonds as Defendants suggest would not only be contrary to the plain language but would negate this right that Arch contracted for and thus cannot be what was intended when Arch issued the Bonds.

Additionally, Defendants cite no cases that actually support their contention that a surety bond imposes a duty on the surety in favor of the principal, providing the principal with a right to sue the surety for breach of that duty.  Defendants do point to *PSE Consulting*,  *see* [Dkt. 175 at 16-17], in which the Connecticut Supreme Court recognized the "unique nature of the tripartite relationship among surety, principal, and claimant" which the Court noted may expose a surety to liability from either side.  *PSE Consulting, Inc. v. Frank Mercede & Sons, Inc.*, 838 A.2d 135, 159 (Conn. 2004).  But in making this comment, the *PSE Consulting* Court was analyzing whether evidence of a self-interested motive in settling claims on a bond constituted a violation of the implied covenant of good faith and fair dealing.  *Id.* The court was specifically referring to the potential for *bad faith claims* against a surety, not making a generally statement as to the rights of principals to sue sureties for breach of bonds.  As the *PSE Consulting* Court explained, Connecticut recognizes an implied covenant of good faith and fair dealing in every contract. *PSE Consulting*, 838 A.2d at 150-51.  Thus, the *PSE Consulting* Court entertained

the possibility of claims by a principal against a surety for breach of the implied covenant of good faith and fair dealing arising from indemnity agreements. *Id.* Defendants previously pursued a claim against Arch for breach of the implied covenant of good faith and fair dealing but failed to allege facts supporting that claim. *See* [Dkt. 77 at ¶¶ 78-82; Dkt. 156 at 28-36]. The Court dismissed it as a result.[3]

Defendants also point to cases where sureties have been held liable to bond obligees for breach of bonds. *See* [Dkt. 175 at 25 (citing *Associated Constr. / AP Constr., LLC v. Hanover Ins. Co.*, No. 3:15-cv-1600 (MPS), 2018 WL 3998968, at *14 (D. Conn. Aug. 8, 2018); *Marshall Contractors, Inc. v. Peerless Ins. Co.*, 827 F. Supp. 91, 95 (D.R.I. 1993)). These cases are inapposite here because Defendants seek to hold Arch liable not to the Obligees, but to the Principal and Indemnitors. Surety performance bonds are executed for the benefit of the obligee and obligate the surety and principal to complete the bonded project up to the penal sum. They establish a duty on the part of the surety and in favor of the obligees. Thus, an obligee has a claim against a surety for breach of the bond when the principal defaults and the surety fails to satisfy its duty to the obligee under the bond. These cases say nothing about the surety having a duty to the principal, who, like the surety, is bound under the bond to the obligee.

---

[3] Defendants' Opposition Memorandum seems to suggest that this implied covenant creates a contractual duty supporting their breach of contract claim. *See* [Dkt. 175 at 19]. A breach of the implied covenant of good faith and fair dealing is separate from a breach of contract, however. Even if it didn't, the Court has already considered and dismissed Defendants' bad faith arguments.

Defendant cites no cases in which a court allowed a principal to sue its surety for money damages for breach of a bond. Nor can the Court find any such cases. Rather, as Plaintiff points out, cases considering whether a principal has an affirmative claim against its surety have concluded it does not. *See e.g.*, *Darr v. Long*, 313 N.W.2d 215, 219 (Neb. 1981), *overruled in part on other grounds*, *Strong v. Omaha Constr. Indus. Pension Plan*, 701 N.W.3d 320 (Neb. 2005) (holding principal, and thus principal's creditor, do not have a claim against principal's surety). For instance, the Nebraska high court concluded that a principal's creditors could not bring an action in garnishment against the surety of a motor vehicle dealer's bond because the surety's bond, "which runs in favor of the state or a third person," "creates no liability of the surety to the principal and creates no right of action in the principal against the surety." *Durr*, 313 N.W.2d at 218-19. The Nebraska Court cited to several decisions by state appellate courts holding the same. *See Seaboard Surety Co. v. Acme Wellpoint Corp.*, 156 So.2d 688, 689 (Fla. App.1963) ("Under no consideration was Seaboard, the surety on Smith's bond, indebted to Smith, the principal, for an obligation which Smith itself was obligated to pay. The breach of a bond by a principal could create no liability against the surety by which the principal may profit."); *Goodyear Tire & Rubber Co. v. New Amsterdam Cas. Co.*, 114 S.E.2d 546, 578 (Ga. App. 1960) ("The instrument which forms the basis for the proceeding of garnishment in this case is a joint and several obligation of the contractor and the surety. The contractor, being an obligor thereon, acquired no rights thereunder.").

Defendants Third Amended Counterclaim fails to allege a duty under the Bonds imposed on Arch and in favor of Defendants.[4]  As such, they fail to state a viable claim and the Counterclaim is DISMISSED.

Even if Defendants had alleged that the Bonds establish such an obligation, Defendants' claim would still fail because they have not sufficiently alleged that the City owed a duty under the relevant contract which it breached, relieving Arch of its obligation to perform and rendering Arch's performance that of a volunteer.  The Court's discussion below explains this additional holding.

### 2. Defendants Fail To Allege A Breach

Defendants allege that Arch breached its duties under the Bonds by performing when it had no obligation to because (a) Centerplan *was not* in default and (b) the City *was* in default.  [Dkt. 175 at 21-22].

The Court did not grant Defendants leave to reallege the first breach contention, based on Centerplan's lack of default.  Even if it had, as with the Second Amended Counterclaim, Defendants' Third Amended Counterclaim acknowledges Centerplan's arguable default, defeating its own allegation.  First, the Third Amended Counterclaim acknowledges that the Bond guaranteed completion of the Project.  *See* [Dkt. 159 at ¶¶ 13-14].  Second, it acknowledges that Centerplan did not complete the Project by the Substantial Completion Deadline. *Id.* at ¶ 68 ("As a result of the changes to the Project, the Substantial Completion

---

[4] Defendants contend that the Bonds imposed an obligation on Arch to pay only what it agreed to under the Bonds, and not to overpay.  [Dkt. 175 at 18-19; *see also* Dkt. 82-12].  These allegations are beyond those the Court allowed Defendants to replead and the Court therefore does not address them.

Deadline of May 17, 2016 could not be met[.]").  Finally, it acknowledges that the City notified Arch of Centerplan's defaults on the DBA between May 9, 2016 and June 9, 2016, and formally served notice of Centerplan's default on May 27, 2016. *Id.* at ¶ 69.  The Third Amended Counterclaim therefore fails to plausibly allege that Centerplan was not in default such that Arch's obligations under the Bonds were not triggered. [5]

As to the second breach contention, Defendants allege that the Bonds' exculpatory clause, the Multiple Obligee Rider, was triggered by the City's failure to perform its obligations and Arch therefore materially breached its duties to Defendants by "[c]ompleting the work on the Project when it knew or should have known that the City was in material default of the DSA, DBC, BDA, and January Agreement, by, among other things, directing Centerplan to perform change order work without putting up the funds to cover the cost of such work" and by "[t]aking any action on the Project when it knew or should have known that the City did not have funds to pay for the costs of work necessary to complete the Project."  [Dkt. 159 at ¶ 91b, d].  Assuming arguendo that this would implicate an existing duty on Arch's part, this claim still fails because Defendants do not to point to a duty in the DBA (the bonded contract) which the City, or any other Obligee, breached, triggering the Multiple Obligee Rider's exculpatory clause.

---

[5] These alleged facts also show that Defendants have not credibly alleged that they performed under the Bonds, as the second breach of contract element requires. Centerplan's allegation that "the City owed Centerplan and DoNo an extension of contract time," [Dkt. 159 at ¶ 68], does not negate Centerplan's acknowledgement of its own failure to fulfill its obligations.

The Multiple Obligee Rider establishes that "there shall be no liability on the part of the Principal or Surety under this Bond to the Obligees . . . unless the Obligees . . . shall make payments to the Principal, or to the Surety in case it arranges for completion of the Contract upon default of the Principal, strictly in accordance with the terms of said Contract as to payments, and shall perform all the other obligations required to be performed under said Contract at the time and in the manner therein set forth." [Dkt. 82-12]. The Bonds guarantee performance only of the DBA and incorporate only the DBA by reference and, as such, references in the Rider to the "Contract" refer to the DBA. *See id.* Thus, the Rider's requirement that the Obligee perform strictly in accordance with "said Contract" requires performance in strict accordance with the DBA. *See id.* This presents a problem for Defendants because they argue that the City breached specific provisions of, not the DBA, but the DSA and BDA.

Defendants invoke ¶ 6.9 of the BDA, which requires the party (the City or the Ball Club) requesting a change to the Project plan which results in an increase in the previously budgeted cost to "deposit the funds necessary to pay such costs into the construction fund established pursuant to the Financing prior to the change order becoming effective." [Dkt. 159 at ¶ 58]. Defendants also point to ¶ 6(c) of the DSA, which allows the City or DoNo to request a change order, and specifies that the requesting party and the City will be responsible for any additional cost, funds for which must be deposited "into the Project Fund prior to the change order becoming effective." [Dkt. 159 at ¶ 59]. Defendants allege that the City issued Change Orders and CCDs but made no attempt to set aside money

to pay for the additional work as required by the BDA and DSA. *Id.* at ¶ 60. These provisions, however, are not part of the DBA, but of separate contracts which were not made part of the DBA. To address this issue, Defendants allege that "[t]he bond incorporated all of the various contracts then that were each incorporated into the other." [Dkt. 159 at ¶ 34; Dkt. 175 at 14].

"Where . . . the signatories execute a contract which refers to another instrument in such a manner as to establish that they intended to make the terms and conditions of that other instrument a part of their understanding, the two may be interpreted together as the agreement of the parties." *Randolph Constr. Co. v. Kings East Corp.*, 334 A.2d 464, 467 (Conn. 1973) (quoting *Batter Bldg. Materials Co. v. Kirschner*, 110 A.2d 464, 468 (Conn. 1954)). "In the absence of an express provision, incorporated documents may neither expand nor restrict the obligations of the parties under the basic contract." *Id.* (citing *Cruthers v. Donahoe*, 84 A. 322, 323 (Conn. 1912)). The Bonds only expressly incorporate the DBA. The DBA does not expressly incorporate either the DSA or the BDA.

Defendants allege that the DBA incorporates the DSA via the following provision: "To the extent that said Development Services Agreement ["DSA"] contains terms, conditions, obligation [sic] and requirements pertaining to the design and construction of the Project, Design Builder shall comply with such terms, conditions, obligations, and requirements. To the extent that there is a conflict between the provisions contained in the Development Services Agreement [DSA] and the provisions of this Design Build Agreement [DBC], the Development Services Agreement [DSA] shall control." [Dkt. 159 at ¶ 34 (quoting DBC § 8.1.10].

This provision imposes obligations included in the DSA only on the Design-Builder, and only to the extent they are inconsistent with the provisions of the DBA. It does not incorporate the entirety of the DSA into the DBA. Nor do provisions in the DSA requiring DoNo to bring Centerplan on as the Design-Builder and requiring Centerplan to provide bonds effectively incorporate the DSA into the DBA. As for the BDA, Defendants do not explain how it is incorporated into the DBA, nor does the Court see an incorporation of the BDA by reference or otherwise in the DBA. Without explicit incorporation, the terms of the other agreements do not impact the rights and obligations in the DBA or the Bonds.

Despite this, Defendants argue that "these agreements are intrinsically inter-related" and "[i]t is impossible to interpret one without considering the others." [Dkt. 175 at 16]. Defendants suggest that this is a case where multiple writings evidence the intent of a single contract such that they all must be considered to ascertain the express intent of the contract as a whole. [Dkt. 175 at 15 (citing *Schubert v. Ivey*, 264 A.2d 562, 564 (Conn. 1969))]. As such, they contend that the series of contracts entered into by the City, Ball Club, DoNo, and Centerplan to govern the design and construction of the Hartford Stadium Project—the BDA, DSA, DBA, Direct Agreement, and Term Sheet—must all be read together to determine the obligations imposed on the parties. *Id.*

Defendants cite to a Connecticut Supreme Court case, *Schubert v. Ivey*, to support this "multiple writings" argument. 264 A.2d 562 (Conn. 1969). In *Schubert*, the plaintiff entered into a contract with the three defendants to sell them his interest in a jointly owned company for $60,000. *Id.* at 563. Each of the three buyers

/ defendants executed a promissory note in the amount of $20,000. *Id.* When the defendants did not pay the plaintiff, plaintiff sued. *Id.* The principal dispute between the parties was whether the defendants were jointly liable to the plaintiff in the principal sum of $60,000 or severally liable in the principal sum of $20,000 each, as represented by the three notes. *Id.* The *Schubert* Court explained that "[i]n considering the express intent of a contract evidenced, as was this, by multiple writings, all of the writings should be considered and an endeavor made to ascertain the expressed intent of the contract as a whole." *Id.* at 564.

This concept applies "[w]hen there are multiple writings regarding the same transaction." *Mongillo v. Comm'r of Transp.*, 571 A.2d 112, 115 (1990) (citing *Schubert*, 264 A.2d at 564). For instance, where a sale contract is accompanied by promissory notes, *see Schubert*, 264 A.2d at 562-64, where a stipulated judgment providing for the acquisition of property by a defendant is clarified by the deed executed by the plaintiff pursuant to that stipulated judgment, *see Mongillo*, 571 A.2d at 114-15, or where both an "Opt-In Contract" and "Account Agreement" govern the terms under which a bank may assess overdraft fees on customers' accounts, *see Walker v. Peoples United Bank*, 305 F. Supp. 3d 365, 375 (D. Conn. 2018).

This concept, however, does not apply in the present case as Defendants contend. First, in the case cited the contracts are inextricably linked and Defendants do not analogize them to the present case. Moreover, the facts of this case are distinguishable from those on which Defendants rely. The Bonds, executed by Arch and Centerplan in favor of DoNo, the City, and HSA, guarantee

21

the completion of the Hartford Stadium Project and expressly incorporate the DBA. The DBA is an agreement between Centerplan and DoNo for Centerplan to design and build the Hartford Stadium Project. By contrast, the DSA is an agreement between the City and DoNo for DoNo to develop the Hartford Stadium Project and the BDA is an agreement between the Ball Club and the City setting out the schedule and process for the Hartford Stadium Project. While each of these contracts concerns, in some manner or another, the Hartford Stadium Project, they are each between different parties and govern different contractual relationships, rights, and obligations. Unlike in the above cited cases—concerning sale of property or bank overdraft charges—these contracts do not concern a single transaction, but multiple separate transactions—a joint venture to develop a baseball stadium, hiring a developer, hiring a design-builder, and ensuring completion of the project.

The purpose of a surety bond as illustrated by the terms of the Indemnity Agreements demonstrate the fallacy of Defendants' argument. The Indemnity Agreements are illustrative of the object of a surety bond, which is to assure the timely completion of the project where there is a dispute between the owner and the builder. The role of the surety is to complete the project while the owner and builder resolve the dispute; not to become mired in or adjudicate the dispute. This principle is supported by the fact that the Indemnity Agreement was amended to strengthen the unilateral authority of the surety to exercise its discretion to complete the project as it deemed fit after the problems between the city and the Defendants mounted. It bears noting here that, in its ruling on summary judgment,

the court found the Surety did not act in bad faith in exercising its discretion to complete the project.

Defendants also suggest that the City breached its obligations under the January Agreement, or the Term Sheet. *See* [Dkt. 175 at 29-30]. The City and DoNo entered into the January 2016 Term Sheet to resolve disputes regarding changes requested by the City and the Ball Club in a December 24, 2015 Change Order. *See* [Dkt. 89-4]. The Term Sheet extended the Substantial Completion Deadline for the Project from March 11, 2016 to May 17, 2016 and increased the GMP to account for the costs of the additional work. *Id.* at ¶¶ 1, 7. It specifies that the City is responsible for funding the cost of the work in the December 24, 2015 change order in excess of the $2,800,000 which DoNo and Centerplan agreed to pay. *Id.* at ¶¶ 6, 11. It also states, "All of the agreements between the City and DoNo Hartford LLC (and Centerplan Construction Company, to the extent applicable) shall be amended to reflect the terms and conditions stated herein." *Id.* at ¶ 14. This provision clearly establishes that the Term Sheet amends the DBA to the extent the terms of the two contracts conflict. Thus, a breach by the City of its obligations under the Term Sheet would be construed as a breach under the DBA, as it relates to the exculpatory clause of the Bonds. However, Defendants do not successfully allege a violation of any provision of the Term Sheet.

As noted above, under the Term Sheet, the City agreed to pay for the additional cost of the construction work in the December 24, 2015 Change Order, less the $2,800,000 to be provided by DoNo and Centerplan. *Id.* at ¶¶ 6, 11. The Term Sheet further makes clear that "the City shall continue to be required to make

payment on all properly submitted payment applications and requisitions[,]" explaining that "the City cannot refuse payment of a payment application or requisition if Centerplan Construction Company LLC misses a milestone, but provides a proper recovery plan and updated Schedule that evidences that the Substantial Completion Date of May 17, 2016 is not in jeopardy." *Id.* at ¶9. These provisions affirm the City's obligation to pay for the cost of the additional work ordered in the December 24, 2015 Change Order upon submission of a payment application and/or requisition.

Defendants allege that "[t]he City never appropriated enough money to meet its obligations" under the Term Sheet. [Dkt. 159 at ¶ 53]. But the Term Sheet does not obligate the City to appropriate money for changes it orders, it obligates the City to pay for additional work ordered and included in a submitted requisition. Defendants do not allege that the City failed to pay for work completed and included on a formal requisition submitted for payment. *See* [Dkt. 89-4 at ¶¶ 9, 11]. Additionally, the facts in evidence, which the Court examined extensively on summary judgment, show that the City fully paid all requisitions submitted for payment, as it was required to do. *See* [Dkt. 171 at 46-48].

Nor does the DBA itself require the Owner (DoNo or the City if it were to step into DoNo's shoes via the Direct Agreement) to deposit funds into an account for additional work it is requesting or otherwise affirm its ability to pay future amount due. The closest the DBA comes to such a requirement is the provision establishing that Centerplan, as Design-Builder, is not obligated to perform any change requested by the City unless a fully executed change order is processed

by the parties. [Dkt. 82-10 at § 7.7]. But this provision does not establish a duty on the part of the Owner to deposit funds. On the contrary, to the extent the parties agreed change orders had to be pre-funded, these provisions give Defendants the authority to decline to process a change order which was not prefunded. Thus the only way the City could have failed to pay a change order would be if Defendant's waived their right to prefunding, in which case the City could not be in default.

Defendants suggest that the City repudiated the Obligees' duty under the Bonds by refusing to pay for work covered by the contracts and Term Sheet and failing to provide funds required to complete the CCDs and Change Orders. *See* [Dkt. 175 at 31-32]. For instance, Defendants allege that the City's Director of Development Services told DoNo in a March 30, 2016 email, "there is no money in City coffers" to fund the changes the City requested. *Id.*; [Dkt. 159 at ¶ 67]. But, because it is the DSA and BDC which obligate the City to deposit funds for the later changes, not the bonded contract, this claim still fails. Even the Term Sheet, which did, to a certain extent, amend the bonded contract, required that the City "procure funding" for the December 24, 2015 Change Order changes, but not that the City set aside funds or affirm that it would be able to cover additional later change requests for which requisitions / payment requests had not been ordered. *See* [Dkt. 89-4]. The comments by City representatives that the City did not have the funds to cover additional changes may constitute repudiation of the DSA and BDA terms. But they do not repudiate any obligation set out in the bonded contract.

Defendants only sufficiently allege that the City breached terms of the DSA and the BDA. But Arch bonded only the DBA and thus the Multiple Obligee Rider's

exculpatory clause is only triggered by a breach of the DBA.  Defendants do not sufficiently allege such a breach and therefore fail to sufficiently allege that Arch breached by acting without obligation under the Bond.

Accordingly, the Court holds that, in addition to its failure to allege a duty imposed on Arch in favor of Defendants under the Bonds, the Third Amended Counterclaim fails to sufficiently allege breach and therefore must be dismissed.

<u>Conclusion</u>

For the above reasons, the Court GRANTS Arch's Motion to Dismiss, [Dkt. 160], and Defendants' Third Amended Counterclaim, [Dkt. 159], is DISMISSED.

IT IS SO ORDERED

_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: July 15, 2019